SCOTT N. SCHOOLS, SC SBN 9990
United States Attorney
JOANN M. SWANSON, CSBN 88143
Assistant United States Attorney
Chief, Civil Division
ILA C. DEISS, NY SBN 3052909
Assistant United States Attorney

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102
   Telephone: (415) 436-7124
   FAX: (415) 436-7169

LYLE D. JENTZER
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice, Civil Division

   P.O. Box 878, Ben Franklin Station
   Washington, D.C. 20044
   (202) 305-0192
   FAX: (202) 305-7249

J. MAX WEINTRAUB, VSBN 36188
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division

   P.O. Box 878, Ben Franklin Station
   Washington, DC 20044
   (202) 305-7551
   FAX: (202) 305-7249

Attorneys for Respondents

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JOSE BAUTISTA-PEREZ, *et al.*,<br>        Plaintiffs,<br>     v.<br>PETER D. KEISLER[1],<br>ACTING ATTORNEY GENERAL,<br>  *et al.*,<br>     Defendants. | No. C 07-4192 TEH<br><br>DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Judge Thelton E. Henderson |

---

[1] In accordance with Fed. R. Civ. P. 25(d), Acting Attorney General Peter D. Keisler is hereby substituted for Alberto R. Gonzales as Respondent in this Case.
Defendants' Memorandum In Opposition To Plaintiffs' Motion For Preliminary Injunction
C 07-4192 TEH

Defendants, by J. Max Weintraub, Trial Attorney, United States Department of Justice, Office of Immigration Litigation, respectfully submit the Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction.

**ISSUES PRESENTED**

1.  Whether this Court may issue a preliminary injunction that drastically changes, rather than preserves, the status quo.

2.  Whether Plaintiffs have shown that they will be irreparably harmed if a preliminary injunction does not issue in this case.

3.  Whether Plaintiffs have demonstrated that they will likely succeed on the merits of their claim so as to justify a preliminary injunction.

4.  Whether Plaintiffs have shown that the balance of harms weighs in favor of the granting of a preliminary injunction.

5.  Whether Plaintiffs have shown that the public interest favors the granting of a preliminary injunction.

**I.  FACTS**

On January 5, 1999, the Attorney General designated Honduras for Temporary Protected Status ("TPS") under the provisions of 8 U.S.C. § 1254a, and, subsequent to that date, the Attorney General and Secretary of Homeland Security ("the Secretary") have extended TPS for Honduras seven times.  On January 5, 1999, the Attorney General designated Nicaragua for TPS, and, subsequent to that date, the Attorney General and the Secretary have extended TPS for Nicaragua seven times.  For both country designations, the most recent extension will not expire until January 5, 2009.  See 72 F.R. 29529-02 (May 29, 2007); 72 F.R. 29534-01 (May 29, 2007).

On March 9, 2001, the Attorney General Designated El Salvador for TPS, and, subsequent to that date, the Attorney General and the Secretary have extended TPS for El Salvador five times. The most recent extension will not expire until March 9, 2009.  72 F.R. 46649-01 (August 21, 2007).

Individuals who wish to obtain TPS must file Form I-821 ("Application for Temporary Protected Status") with the Department of Homeland Security ("DHS"), and must also submit

Defendants' Memorandum In Opposition To Plaintiffs' Motion For Preliminary Injunction
C 07-4192 TEH                                    2

required supporting documentation, the registration fee, a biometrics services fee if the applicant is age 14 or older, a Form I-765 ("Application for Employment Authorization" (EAD)), and the fee for that Form I-765 if the person desires to receive an EAD and is not more than 65 years old.  See 8 C.F.R. §§ 103.2, 103.7(b)(1), 244.6; Declaration of Barbara Velarde ("Velarde Decl.") ¶¶ 4, 5. All applicants must comply with the accompanying application form instructions and any additional published instructions, which are published in the Federal Register and typically posted on the USCIS website, that pertain to the applicant's TPS-designated country.  Velarde Decl. ¶ 4.

Plaintiffs state they are nationals of El Salvador, Honduras, and Nicaragua, who applied for and received TPS between September 5, 2002, and May 14, 2006, after completing the requisite applications and remitting the requisite fees.  Each of the Plaintiffs, with the exception of Denis Caballero-Espinoza, claims to have paid a biometrics fee in connection with his or her re-registration for TPS.  For plaintiffs who filed before July 30, 2007, that fee was $70.00, and for those who filed on or after July 30, 2007, the biometrics fee was $80.00.  See 72 FR 29851 at pp. 29865-66 (May 30, 2007).  Plaintiffs have mischaracterized this biometrics fee as a "registration fee."  None of the Plaintiffs has been charged the $50.00 registration fee for TPS more than once, when each filed his or her initial TPS application.  That $50.00 registration fee is not charged for the re-registrations required of every TPS beneficiary by regulation.  Velarde Decl. ¶ 8.  Each of the named Plaintiffs has apparently paid the biometrics fee upon re-registering for TPS, without choosing to take advantage of the provision for requesting a waiver of such fee.  See 8 C.F.R. §§ 103.7(c), 244.20; see also 72 FR 29851 at pp. 29865-66 (May 30, 2007) (extending fee waiver availability to biometric fee).

## II.  STATUTORY AND REGULATORY FRAMEWORK

Pursuant to 8 U.S.C. § 1254a(a)(1), the Secretary[2] may grant TPS to aliens in the United States

---

[2]  As of March 1, 2003, in accordance with §§ 1517 of Title XV of the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135, any reference to the Attorney General in a provision of the Immigration and Nationality Act describing functions which were transferred from the Attorney General or other Department of Justice official to the Department of Homeland Security by the HSA "shall be deemed to refer to the Secretary" of Homeland Security. See 6 U.S.C. §§ 557 (2003) (codifying HSA, Title XV, §§ 1517).

1   who are nationals of certain designated states, or to aliens having no nationality who last resided in

2   the designated country.  Pursuant to 8 U.S.C. § 1254a(a)(1)(A), the Secretary shall not remove the

3   alien from the United States during the period in which such status is in effect.  Pursuant to 8

4   U.S.C. § 1254a(a)(1)(B), the Secretary shall authorize the alien to engage in employment in the

5   United States.  In addition, pursuant to 8 U.S.C. § 1254a(a)(1)(B), the Secretary shall provide the

6   alien with an "employment authorized" endorsement or other appropriate work permit.  Section

7   1254a(c)(1)(A)(iv) states that an alien meets the requirements for TPS only if the alien registers for

8   such status during a registration period of not less than 180 days.  Section 1254a(c)(1)(B) permits

9   the Secretary to require payment of a reasonable fee as a condition of registering an alien under

10   section 1254a(c)(1)(A)(iv), and states that the <u>registration</u> fee may not exceed $50.00.  It further

11   establishes that, in the case of aliens registered pursuant to a designation under this section made

12   after July 17, 1991, the Secretary may impose a separate, additional fee for providing an alien with

13   documentation of work authorization.

14      The Secretary has promulgated regulatory guidance to implement the statute.  <u>See generally</u>, 8

15   C.F.R. § 244.  Pursuant to 8 C.F.R. § 244.6, each application for TPS registration must be filed with

16   the fees provided in 8 C.F.R. § 103.7, except that the filing fee for the application for employment

17   authorization will be charged only for those applicants between the ages of fourteen and sixty-five

18   (inclusive) who request employment authorization.  TPS applicants who seek an Employment

19   Authorization Document ("EAD") under 8 C.F.R. § 244.12 must file a separate form (Form I-765)

20   with its current $340.00 filing fee.[3]  While the TPS application (or "registration" fee) is a one-time

21   fee of $50.00, and TPS applicants are not re-charged the $50.00 fee for the annual registration

22   mandated by 8 C.F.R. § 244.17, they are, like applicants for most other immigration services,

23   required to pay an $80.00 service fee for DHS to capture and use certain biometric information in

24   connection with their applications.  <u>See</u> 8 C.F.R. §§ 103.2, 103.7(b)(1), 244.6.  DHS uses this

25   biometric information for several purposes, including identity verification, Federal Bureau of

26   Investigation (FBI) background and security checks (including criminal history record checks), as

27

28   ─────────────────
       [3] The I-765 filing fee for those who want EADs was $180.00 until a fee increase on July
    30, 2007.

1  well as for the production of secure documentation for the individual containing his or her

2  biometric identifiers.  See Velarde Decl. ¶ 7.  The FBI reports are further used to determine whether

3  a TPS applicant has been convicted of a felony or two misdemeanors in the United States, is

4  disqualified for any of the unwaivable criminal grounds of inadmissibility, or is barred from TPS as

5  a persecutor, a person involved in terrorism, a danger to the community, or on one of the other

6  statutory grounds of ineligibility.  See 8 U.S.C. § 1254a(c)(2); 8 C.F.R. §§ 244.3, 244.4; Velarde

7  Decl. ¶¶ 16-17.  DHS also uses this biometric information for identity verification and comparison

8  when an individual enters the United States at ports of entry or is encountered during immigration

9  enforcement activities.  Velarde Decl. ¶ 7.   USCIS, in conjunction with other DHS components, is

10  also in the process of expanding the use of an individual's biometrics for purposes of preventing

11  immigration fraud, verifying the identity of a person when he or she submits additional immigration

12  applications and petitions, and increasing the use of biometric identifiers in immigration

13  documentation.  Id.  See 8 U.S.C § 1379 (directing the Secretary and the Secretary of State, in

14  consultation with other federal entities, to "develop and certify a technology standard, including

15  appropriate biometric identifier standards, that can be used to verify the identity of persons

16  applying for a United States visa or such persons seeking to enter the United States pursuant to a

17  visa for the purposes of conducting background checks, confirming identity, and ensuring that a

18  person has not received a visa under a different name or such person seeking to enter the United

19  States pursuant to a visa."); see also Chapter 15 of the Immigration and Nationality Act, Enhanced

20  Border Security and Visa Entry Reform, 8 U.S.C. §§1701-1775.  The biometrics fee covers not

21  only the collection of fingerprints and photographs, but also funds many other operational activities

22  related to the applicants' background checks, including, but not limited to, the electronic re-

23  submissions to the FBI for record checks, the FBI's charges for resubmissions, and the processing

24  of the results of FBI responses on applicants.  Velarde Decl. ¶¶ 7, 18, 19.  It is, as noted above,

25  distinct from the registration and application fees, and is expressly provided for in 8 C.F.R.

26  § 103.7(b)(1).

27      The most recent Federal Register notices announcing the 18-month extension of the TPS

28  designations for Honduras, El Salvador, and Nicaragua expressly segregate the biometrics fee in

the instruction table, making it clear that the $80.00 is not meant to be a registration or application fee. See 72 F.R. 29529-02 (May 29, 2007); 72 F.R. 29534-01 (May 29, 2007); 72 F.R. 46649-01 (August 21, 2007). The notices for Nicaragua and Honduras explain that extensions of the TPS designation of those countries became effective July 6, 2007, and will remain in effect until 11:59 p.m. on January 5, 2009, and that the sixty-day re-registration period began May 29, 2007, and remained in effect until July 30, 2007. See 72 F.R. 29529-02 (May 29, 2007); 72 F.R. 29534-01 (May 29, 2007). Individuals applying to re-register for Honduran and Nicaraguan TPS, or who fell in the category of aliens who qualified to file as "Late Initial Registrants" under 8 C.F.R § 244.2(f)(2), were required to pay $70.00 if they filed before July 30, 2007. However, if they filed on that last day of the registration period they were required to either pay the $80.00 biometrics fee or take advantage of the new provision for a fee waiver request if they did not have the ability to pay. 8 C.F.R. §§ 103.7, 244.20. The Federal Register notice for El Salvador explains that the extension of the TPS designation of El Salvador is effective September 10, 2007, and will remain in effect until 11:59 p.m. on March 9, 2009, and that the sixty-day re-registration period began August 21, 2007, and will remain in effect until October 22, 2007. 72 F.R. 46649-01 (August 21, 2007).

All individuals applying for any kind of immigration benefit that requires biometrics – not just TPS applicants –  must pay the fee required by 8 C.F.R § 103.7(b), unless they file a fee waiver request for adjudication. 8 C.F.R § 103.7(c); see also 8 C.F.R. § 103.2(a)(1) (service fee for fingerprinting in § 103.7(b)(1) must be paid). TPS applicants, whether initial applicants or re-registrants, may file for a fee waiver request, along with information that would support a claim that they are unable to pay the fee. See 8 C.F.R. §§ 103.7(c), 244.20. Under the new fee regulations, effective July 30, 2007, the fee waiver can be extended to cover the biometrics fee. 8 C.F.R. §§ 103.7(c), 224.20.

### III.  PRELIMINARY STATEMENT

Plaintiffs are not entitled to their requested relief – a preliminary injunction – not only because they have fallen far short of meeting their burden of persuasion as to the requisite elements involved, see infra, but also, importantly, because the preliminary injunction they request does not seek to preserve the status quo, but seeks instead to change it. They ask the court to order DHS to

stop the collection of biometrics fees it has collected for years in connection with performing the important government task that Congress has assigned to it.  This is a far cry from preserving the status quo and would have an especially detrimental effect in light of the national security interests at stake.

## IV. ARGUMENT

### A.  Legal Standards

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  The Ninth Circuit has cautioned that granting a preliminary injunction involves "the exercise of a very far reaching power never to be indulged except in a case clearly warranting it." Dymo Indus., Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964).

In determining whether to grant a preliminary injunction, the Court considers: (1) the likelihood of success on the merits; (2) the possibility of irreparable injury to plaintiff if an injunction is not granted; (3) the extent to which the balance of hardships favor plaintiff; and (4) whether the public interest will be advanced by the injunction.  See Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1200 (9th Cir. 1980).  The analysis is often compressed into a single continuum where the required showing of merit varies inversely with the showing of irreparable harm.  See Prudential Real Estate Affiliates, Inc. v. PRP Realty, Inc., 204 F.3d 867, 874 (9th Cir. 2000).  The moving party may meet its burden by demonstrating either: (1) a probability of success on the merits and the possibility of irreparable injury; or (2) that serious legal questions are raised and the balance of hardship tips sharply in petitioner's favor.  Los Angeles Memorial Coliseum Comm'n, 634 F.2d at 1201.

To obtain preliminary injunctive relief, Plaintiffs "must fulfill one of two standards, described in this circuit as 'traditional' and 'alternative.'" Cassim v. Bowen, 824 F.2d 791, 795 (9th Cir. 1987) (quoting Am. Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir. 1983)).  Under the traditional standard, a court may issue such relief if it finds that "(1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors

granting relief." Burlington N. R.R. Co. v. Dep't of Revenue, 934 F.2d 1064, 1074 n.6 (9th Cir. 1991) (quoting Cassim, 824 F.2d at 795)).  Under the alternative standard, the moving party may meet its burden by demonstrating either "(1) a combination of probable success and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." Id. (quoting Cassim, 824 F.2d at 795).

Despite the "either/or" phrasing of the standard for a preliminary injunction, "cases have made it clear . . . that there are not really two entirely separate tests, but that they are merely extremes of a single continuum." Benda v. Grand Lodge of Int'l. Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978).  In other words, [t]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc., 762 F.2d 1374, 1376 (9th Cir. 1985); see also Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987). A party seeking a preliminary injunction must show, as an "irreducible minimum," that there is at least a fair chance of success on the merits.  Stanley v. Univ. of S. California, 13 F.3d 1313, 1319 (9th Cir. 1994) (quoting Martin v Int'l Olympic Comm., 740 F.2d 670, 674-75 (9th Cir. 1984)). Additionally, "[u]nder any formulation of the test, plaintiff must demonstrate that there exists a significant threat of irreparable injury."  Oakland Tribune, 762 F.2d at 1376; City of Tenakee Springs v. Block, 778 F.2d 1402, 1407 (9th Cir. 1985).

Plaintiffs' burden here is further intensified, however, because they seek an order which seeks to change the status quo ante lite before the Court has made any determination on the merits of their claims. The function of a preliminary injunction, however, is to preserve the status quo ante lite. Regents of University of California v. American Broadcasting Companies, 747 F.2d 511,514 (9th Cir. 1984); Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963).  In Tanner Motor Livery, Ltd., the Court put it thusly:

> It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante lite pending a determination of the action on the merits.  The hearing is not to be transformed into a trial of the merits of the action upon affidavits, and it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial. This is particularly true where the relief afforded, rather than preserving the status quo, completely changes it.

Id. At 808-09.  Moreover, courts must be particularly cautious in disrupting the status quo where injunctive relief would interfere in administrative procedure.  See Heckler v. Lopez, 463 U.S. 1328,1333 (1983) (stating general principle that a district court's injunctive power should not be a basis for "propel[ling] the court into the domain which Congress has set aside exclusively for the administrative agency" (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

**B. Plaintiffs Fail to Show They Are Entitled to a Preliminary Injunction**

**1.    A Preliminary Injunction Is Not Appropriate Because it Would Upset, Rather than Preserve, the Status Quo**

It is readily apparent that Plaintiffs seek the preliminary injunction for the improper purpose of changing, rather than preserving the existing status quo.  Under established law in this Circuit, "It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante lite pending a determination of the action on the merits."  Tanner Motor Livery, 316 F.2d at 808.  That is precisely the situation before this Court in the instant case.

According to their own complaint, Plaintiffs have in the past paid the biometrics fee when renewing their Temporary Protected Status.  Although they seek to obfuscate this fact by conflating the biometrics fee with the registration fee, the status quo is that Plaintiffs have in the past been required to pay a separate biometrics fee when they renewed their Temporary Protected Status.  Thus, they have registered and renewed their Temporary Protected Status, have paid their one-time registration fees, and have paid their requisite biometrics fees.  Conversely, they seek to invalidate the regulation permitting DHS to charge the biometrics fee.  If their request is granted it would improperly upset the status quo and deprive the government of its ability to fund critical aspects of its mission, including obtaining FBI criminal histories and other record reports.  An injunction would also deprive the government of funding necessary to maintain both mainframe computer systems and on-line information retrieval systems that allow immigration adjudicators to electronically access and view background check data  – including fingerprints, photographs, and other biometrics – in connection with the background and identification checks that are vital to the TPS program and to national security.

Such a ruling would completely change the status quo and would afford Plaintiffs at this early stage the result they ultimately seek at the conclusion of litigation, in precisely the manner proscribed by the Ninth Circuit in Tanner. 316 F.2d at 808 ("The hearing is not to be transformed into a trial of the merits of the action upon affidavits, and it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial. This is particularly true where the relief afforded, rather than preserving the status quo, completely changes it.").

**2.      Plaintiffs Have Not Demonstrated The Possibility Of Irreparable Harm**

Pursuant to the Secretary's most recent decisions, the TPS designation of Nicaragua and Honduras remain in effect until 11:59 p.m. on January 5, 2009, and the TPS designation of El Salvador will remain in effect until 11:59 p.m. on March 9, 2009.  According to the Plaintiffs' own claims, they have already re-registered for TPS, and they paid their biometrics fees without seeking a waiver of such fees.  Until such time, therefore, as they are required to submit further fees, they will not be harmed if DHS continues to collect the fees that comprise the subject of the preliminary injunction.  In addition, should Plaintiffs ultimately succeed on their claims, they will likely be reimbursed the minimal fees they have remitted, rendering them financially unharmed.  It is well-established that "monetary injuries are generally not considered irreparable."  Poeng v. United States, 167 F.Supp. 2d 1136, 1142 (S.D. Cal. 2001), citing Los Angeles Memorial Coliseum Commission, 634 F.2d at 1202 (stating that the temporary loss of income, ultimately to be recovered, does not generally constitute irreparable injury).

Furthermore, the imposition of an otherwise lawful and reasonable fee cannot be shown to cause irreparable harm because of the availability of a waiver of the biometrics fee to applicants who can demonstrate an inability to pay.

**3.      Plaintiffs Have Not Demonstrated A Likelihood Of Success On The Merits**

Plaintiffs' bald assertion that they have shown a "substantial" probability of success on the merits of their complaint is unsupported.  Their argument relies solely on their interpretation of the language of 8 U.S.C. § 1254a(c)(1)(B), limiting the amount of the fee the Secretary may require of TPS applicants, which specifically refers to "a reasonable fee as a condition of registering."  The

biometrics fee, however, is separate and distinct from the registration and application fees, and is expressly provided for in 8 C.F.R. § 103.7(b).  See Velarde Decl. ¶ 5.  As noted, supra, the biometrics fees of which Plaintiffs complain are used for including identity verification, FBI background and security checks,  criminal history record checks, the production of secure documentation for the individual, and other identity verification and comparison purposes.  Velarde Decl. ¶ 18.  It is not a registration fee, and it serves an entirely different purpose.

Contrary to Plaintiffs' argument, 8 U.S.C. § 1254a(c)(1)(B) does not expressly prohibit DHS from requiring that TPS applicants pay a biometrics fee.  The statute is silent on the issue, and therefore this Court must defer to the Agency's interpretation of the statute if it is reasonable. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984) (holding that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute").  See INS v. Abudu, 485 U.S. 94, 110 (1988) (finding that judicial deference to the Executive Branch is especially appropriate in the immigration context); Gonzales v. Oregon, 546 U.S. 243, 126 S. Ct. 904, 914 (2006) (holding that an agency's interpretation of a statute is entitled to deference, if the interpretation is promulgated in the exercise of the authority delegated to the agency).  See also U.S. v. Dang, 488 F.3d 1135, 1140 (9th Cir. 2007), in which the Court stated:

> In deciding whether an administrative agency's regulation is a permissible construction of the governing statute, we employ the analysis set forth by the Supreme Court in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., as further explained in Food & Drug Admin. v. Brown & Williamson Tobacco Corp. Under Chevron, we must consider first whether Congress has directly spoken to the precise question at issue.  If Congress has done so, the inquiry is at an end; [we] must give effect to the unambiguously expressed intent of Congress.  In making that assessment, we not only look at the precise statutory section in question, but we also analyze the provision in the context of the governing statute as a whole, presuming congressional intent to create a symmetrical and coherent regulatory scheme.  Finally, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate [such an important] policy decision.  If, after conducting such an analysis, we conclude that Congress has not addressed the issue, we must respect the agency's construction of the statute so long as it is permissible.

(internal citations and quotations omitted).  Congress has not prohibited DHS from collecting the

biometrics fees at issue here. The statute at issue refers specifically to a "registration" fee; it is not unreasonable for DHS to collect a separate and distinct biometrics fee in connection with the performance of tasks related to its mandated authority and in the context of national security. In that context, it is illustrative to note that Congress has mandated that DHS use electronic, or digital, documents that use biometric identifiers in numerous instances. See, e.g., 8 U.S.C. § 1732(b)(1) (requiring DHS to "issue to aliens only machine-readable, tamper resistant visas and other travel and entry documents that use biometric identifiers.").

In this regard, it must be noted that section 1254a(c)(1)(B) was written before important developments in the need and capability of the Agency to capture and use biometrics in administering the Agency's programs, including that for TPS. The Agency needs this information to properly perform its functions, and it has determined that it has the need to use a separate fee schedule to offset the costs of doing so. See 8 C.F.R. § 103.2(a) (providing for filing fees); 8 C.F.R. §103.7(b) (setting fee schedules); 8 C.F.R. § 244.6 (requiring fingerprints and photographs); see also Instructions accompanying Form I-821 (requiring biometrics in conjunction with TPS application); 8 C.F.R. § 103.2(a)(1) (incorporating immigration form instructions into the regulations). The Agency does not interpret the statute as prohibiting a separate fee schedule. Rather, the Agency reasonably concluded that it may impose this additional fee, which is separate and distinct from the statutory registration fee, and the separate additional fee for providing documentation of work authorization. The Agency's determination constitutes a permissive construction of the governing statute, and should not be disturbed. It is consistent with "the context of the governing statute as a whole, presuming congressional intent to create a symmetrical and coherent regulatory scheme," and is "guided to a degree by common sense as to the manner in which Congress is likely to delegate [such an important] policy decision." Dang, 488 F.3d at 1140.

### 4. Plaintiffs Have Not Demonstrated That The Balance Of Hardships Weigh In Their Favor

For the same reasons noted above regarding Plaintiffs' failure to demonstrate irreparable harm, Plaintiffs have not demonstrated that the balance of hardships weighs in their favor. Each named Plaintiff already possesses Temporary Protected Status and, according to the Complaint the Plaintiffs themselves filed, each has re-registered for that status under the recent Federal Register

1    extension notices for their particular countries of nationality.  These Plaintiffs therefore, are not in

2    any imminent danger of losing their status.  Their re-registration applications are in the queue for

3    DHS adjudication, if their allegations are accurate.  Until and unless the Plaintiffs need to submit

4    applications for the next re-registration period, they will not be required to remit any fees and they,

5    therefore, will not be irreparably harmed if DHS continues to collect the fees that comprise the

6    subject of the preliminary injunction.  In addition, as noted above, those TPS applicants who have

7    not filed are entitled to seek a waiver of the biometrics fee under 8 U.S.C. § 244.20.  Moreover,

8    Plaintiffs have provided no supporting affidavits or other evidence to support their allegations that

9    any of the putative class members who may not yet have filed their TPS applications would be

10   irreparably harmed if the requested preliminary injunction is not granted and they are required to

11   pay the $80.00 biometrics fee or submit a fee waiver request.  Those individuals, and not the named

12   Plaintiffs, would be the only individuals affected by a grant or denial of the preliminary injunction.

13   Conversely, should this Court grant the requested preliminary injunction, DHS would suffer an

14   immediate and detrimental effect on its ability to conduct biometric-related operations and

15   consequently, to complete the adjudications of TPS applications filed by Plaintiffs and the putative

16   class members they seek to represent.  See Velarde Decl. ¶ 21.  Indeed, DHS estimates that for FY

17   2007 alone, and including the remainder of the applications expected before the October 22, 2007,

18   close of the El Salvadoran TPS re-registration period, it will receive approximately $25 million in

19   biometric service fees from Honduran, Nicaraguan, and Salvadoran TPS beneficiaries and late

20   initial filers.  See Velarde Decl. ¶ 20.  In addition, a preliminary injunction would have an ancillary,

21   negative effect on applicants and petitioners for numerous types of immigration benefits, in

22   addition to TPS, for whom DHS obtains biometric services in support of those individuals' requests

23   for benefits.  See Velarde Decl. ¶ 21.  DHS would likely have to divert substantial amounts of funds

24   from other immigration programs and services in order to cover a loss of the TPS biometrics fees

25   and to keep Application Support Center ("ASC") biometric operations functioning effectively, and

26   such an action would have continuing detrimental effects on DHS operations and customer

27   services.  Id.  As a result, DHS would inevitably be forced to delay benefit adjudications not only

28   for TPS applicants, but also for many other members of the public, including citizen petitioners as

well as foreign national applicants, who are waiting for DHS decisions.  Id.

### 5.   Plaintiffs Have Not Demonstrated That the Public Interest Will Be Advanced by the Granting of a Preliminary Injunction

Since the terrorism attacks of September 11, 2001, Congress has emphasized the need to do better background and security check screenings on all aliens seeking immigration benefits[4], and DHS has been increasing its capabilities and practices to meet Congress's mandate.  Since the biometrics fees that Plaintiffs are disputing are intrinsically tied to DHS's ability to fund the technology, staffing, and other resources necessary to do the enhanced screening that it now performs – including FBI and other law enforcement agency checks – any judicial interference with DHS's ability to collect the funds necessary for those activities will have a direct, detrimental effect on the Government's ability to screen aliens and protect the public.

Even setting aside the question of national security, however, a preliminary injunction barring the government from collecting fees to cover the costs related to the collection of identification materials is not in the best interests of the public.  Should DHS be forced to face such a financial loss, as noted above, it would likely result in a negative impact, including delays in adjudications, not only on the TPS program, but also on other DHS benefit adjudications for which many other individuals are already waiting.  See Velarde Decl. ¶ 21.  The result would be to the detriment of those very individuals that Plaintiffs claim they seek to aid, as well as to other aliens.  Id.

---

[4] See, e.g. 8 U.S.C § 1379 (directing the Secretary and the Secretary of State, in consultation with other federal entities, to "develop and certify a technology standard, including appropriate biometric identifier standards, that can be used to verify the identity of persons applying for a United States visa or such persons seeking to enter the United States pursuant to a visa for the purposes of conducting background checks, confirming identity, and ensuring that a person has not received a visa under a different name or such person seeking to enter the United States pursuant to a visa."); H.R. Conf. Rep. No. 109-72, at 159 (2005) (stating that the purpose of the Emergency Supplemental Appropriations Act is "to establish and rapidly implement regulations for State driver's license and identification document security standards, to prevent terrorists from abusing the asylum laws of the United States . . . .").  Similarly, in discussing the REAL ID Act of 2005, H.R. Conf. Rep. No. 109-72, at 160, notes, "As the staff of the 9/11 Commission determined, terrorist aliens have exploited our asylum laws to enter and remain in the United States."  Although this language relates directly to asylum law, similar concerns abound regarding TPS fraud.

## IV.  CONCLUSION

For the foregoing reasons, the Government respectfully asks the Court to deny Plaintiff's Motion for a Preliminary Injunction.

Dated this 24th day of September, 2007.

Respectfully submitted,


SCOTT N. SCHOOLS,
United States Attorney

ILA C. DEISS
Assistant United States Attorney


/s/J. Max Weintraub
_____
J. MAX WEINTRAUB
Trial Attorney