1
2
3
4
IN THE UNITED STATES DISTRICT COURT

5
FOR THE NORTHERN DISTRICT OF CALIFORNIA

6
7
JOSE BAUTISTA-PEREZ, et al.,

8
Plaintiffs,

9
v.                                          NO. C 07-4192 TEH

10
PETER KEISLER, Acting Attorney            ORDER DENYING MOTION
General and MICHAEL CHERTOFF,             FOR PRELIMINARY
11
Secretary of Homeland Security,           INJUNCTION

12
Defendants.

13
14
15
        This matter came before the Court on October 15, 2007 on Plaintiffs' Motion for

16
Preliminary Injunction.  This class action for declaratory and injunctive relief challenges

17
the Department of Homeland Security's policy of allegedly charging fees totaling more

18
than the $50.00 fee permitted by statute as a condition of registering for "Temporary

19
Protective Status."  Plaintiffs' motion seeks to enjoin Defendants from charging more

20
than a $50.00 fee, and specifically, to enjoin the Defendants from charging an additional

21
fee for collection of biometric information.  For the reasons set out below, the Court finds

22
that although Plaintiffs have made a strong showing of probability of success on the

23
merits, they have not shown that they or other members of the putative class will suffer

24
irreparable injury absent a preliminary injunction.  Accordingly, the motion for

25
preliminary injunction is DENIED.

26
//

27
//

28

1

1  STATUTORY AND FACTUAL BACKGROUND

2      The Immigration Act of 1990 established a procedure whereby the government

3  could provide temporary protection to aliens in the U.S. who were forced to flee their

4  homelands because of natural disaster, civil strife and armed conflict, or other

5  extraordinary and temporary conditions.  The Secretary of Homeland Security may grant

6  "Temporary Protective Status" ("TPS") to nationals of certain countries temporarily

7  designated under the statute, which allows those nationals to stay in the United States and

8  obtain work authorization for the period their home country is so designated. 8 U.S.C. §

9  1254a(a)(1), (a)(1)(B);  6 U.S.C. § 557 (Secretary).

10      Once a country is designated for TPS, nationals of that country can register for

11  benefits under TPS.  To establish eligibility for TPS, an applicant must establish, among

12  other things, that he or she is a national of the country designated for TPS, has been

13  continuously physically present and resided in the United States since the effective date

14  of designation, and is otherwise admissible as an immigrant (although certain grounds of

15  inadmissibility can be waived).  8 C.F.R. §§ 244.2, 244.3(a), 1244.3(a);  8 U.S.C. §

16  1254a(c)(2)(A).  The government can deny an applicant TPS on the basis of the

17  applicant's criminal history.  8 U.S.C. § 1254a(c)(2)(A); (c)(2)(B); 8 C.F.R. §§ 244.3(c),

18  244.4, 1244.3(c), 1244.4.

19      El Salvador was designated for Temporary Protective Status after the January,

20  2001 earthquake.  Since then, the Attorney General and, later, the Secretary of Homeland

21  Security have extended the designation multiple times;  the most recent extension will

22  expire on March 9, 2009.  72 Fed.Reg. 46649-01 (August 21, 2007).  Honduras and

23  Nicaragua were designated for TPS in 1999.  The most recent extension of their

24  designations will expire on January 5, 2009.  72 Fed.Reg. 29529-02 and 29534-01 (May

25  29, 2007).

26      The statute at the core of this case limits the registration fee for TPS to $50.00.

27  Title 8 U.S.C. § 1254a(c)(1)(B) provides:

28

2

1

Registration fee

2

The Attorney General may require **payment of a reasonable fee as a condition of registering an alien** under subparagraph (A)(iv) (including providing an alien with an "employment authorized" endorsement or other appropriate work permit under this section). **The amount of any such fee shall not exceed $50**. In the case of aliens registered pursuant to a designation under this section made after July 17, 1991, **the Attorney General may impose a separate, additional fee for providing an alien with documentation of work authorization**. Notwithstanding section 3302 of Title 31, all fees collected under this subparagraph shall be credited to the appropriation to be used in carrying out this section.

3

4

5

6

7

(emphasis added).

8

However, regulations governing TPS require applicants to pay more than just a

9

$50.00 registration fee and a work authorization fee.    *See* 8 C.F.R. § 244.  The

10

Department of Homeland Security ("DHS" or "Homeland Security") requires individuals

11

who wish to obtain TPS to file:

12

13

1)    an application form I-821 and extensive supporting documentation.  8 C.F.R. §§ 244.6, 244.9;

14

15

2)    a registration fee for TPS of $50.00.  8 C.F.R. § 107.3(b)(fee for form I-821 not to exceed $50.00); 72 Fed. Reg. 29529, 29531 (May 29, 2007); 72 Fed. Reg. 29534, 29536 (May 29, 2007);  72 Fed. Reg. 46649-01 (August 21, 2007)(extensions of designation for Honduras, Nicaragua, and El Salvador, respectively, setting fee at $50.00);

16

17

3)    an application for employment authorization, if desired, and a $340.00 fee for documentation of work authorization.  8 C.F.R. §§ 103.7(b), 244.6;  and

18

19

20

4)    a "biometrics services fee" for applicants over 14.  8 C.F.R. §§ 103.7(b)(1), 244.6.   (The biometrics fee, previously set at $70.00, was raised to $80.00 on July 30, 2007.  72 Fed. Reg. 29851, 29873 (May 30, 2007)).

21

Homeland Security charges the "biometrics services fee" for processing of fingerprints,

22

photographs, and electronic signatures used for background and security checks and

23

identity verification, and for storage and maintenance of the information so collected.

24

Declaration of Barbara Velarde,  Chief of Service Center Operations for the United States

25

Citizenship and Immigration Services, Department of Homeland Security ("Velarde

26

Decl.") ¶¶ 7, 18; *see also* 72 Fed. Reg. 29851, 29857 (May 30, 2007)(discussing uses of

27

biometrics fee).

28

Although aliens are required to re-register for TPS whenever a country is re-

designated, Homeland Security collects the $50.00 TPS registration fee only once.  8
C.F.R. § 244.17(a); 72 Fed.Reg. 46649, 46650 (August 21, 2007)(explaining fee structure
for El Salvador re-registration);  Velarde Decl. ¶ 13.  However, aliens are required to pay
a new biometrics fee (and work authorization document fee) for each re-registration.  72
Fed.Reg. 46649, 46650 (August 21, 2007);  Velarde Decl. ¶ 13.   Plaintiffs allege, and
DHS admits, that it requires applicants to pay the biometrics fee even if Homeland
Security does not need updated biometric information.

*          *          *

Plaintiffs are foreign nationals from Honduras, El Salvador, and Nicaragua who
currently have TPS.   They allege they have been required to remit fees totaling over
$50.00 on multiple occasions as they re-register for TPS, even though their biometric data
was being reused.  They claim that because 8 U.S.C. § 1254a(c)(1)(B) provides that the
fee charged by DHS "as a condition of registering" for TPS is "not to exceed" $50.00, the
$70.00 or $80.00 biometric services fee DHS charges them is unlawful.  The Plaintiffs'
class action Complaint, brought on behalf of all nationals of El Salvador, Honduras, and
Nicaragua who submitted applications to register for TPS and were required to pay fees
of more than $50.00, seeks an order declaring the additional fee unlawful, enjoining DHS
from imposing fees over $50.00, and requiring Defendants to refund all fees over $50.00
paid by class members.  This Motion for Preliminary Injunction, brought by nationals of
El Salvador who have not yet re-registered for TPS or paid a biometric services fee under
the most recent re-designation of El Salvador, seeks solely an order enjoining DHS from
charging Plaintiffs and other class members more than $50.00 for TPS registration,
including collection of biometric information.


PRELIMINARY INJUNCTION STANDARD

Ordinarily, a party seeking preliminary injunction must meet "one of two
standards, described in this circuit as 'traditional' and 'alternative.'" *Burlington Northern
R. Co. v. Department of Revenue of State of Wash.*, 934 F.2d 1064, 1074 n.6 (9th Cir.

1991), *quoting Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir. 1987).  Under the traditional test, a preliminary injunction should issue when a plaintiff shows "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)."  *Natural Resources Defense Council, Inc. v. Winter*, __F.3d__,  2007 WL 2481465, *2 (9th Cir. August 31, 2007);  *Los Angeles Memorial Coliseum Comm'n. v. National Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).  Under an alternative test, plaintiff must demonstrate "either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor."  *Lands Council v. Martin (Lands Council II)*, 479 F.3d 636, 639 (9th Cir. 2007);  *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003).  These two formulations "represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  *Paramount Land Co. LP v. California Pistachio Com'n,*  491 F.3d 1003, 1008 (9th Cir. 2007).

## ANALYSIS

Although Plaintiffs have shown a high likelihood of success on the merits, they have not shown a likelihood of irreparable injury or that other factors weigh in their favor.  In short, they have not met their burden of demonstrating entitlement to "the extraordinary remedy of a preliminary injunction at an early stage of the litigation, before the defendant has had the opportunity to undertake extensive discovery or develop its defenses."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 714 (9th Cir. 2007).

I.     Likelihood of Success On The Merits

DHS argues that its policies and procedures comply with § 1254a(c)(1)(B) because applicants for TPS <u>are</u>, in fact, charged only a one-time $50.00 registration fee.  DHS views the $80.00 biometric service fee as falling outside the ambit of § 1254a(c)(1)(B) because it "serves an entirely different purpose" than a registration fee: it is used for

running the biometric data program, identity checks, FBI background checks, and related functions.  DHS argues this ostensibly reasonable interpretation is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984).  *See United States v. Dang*, 488 F.3d 1135, 1140 (9th Cir. 2007), *citing Chevron* (if Congress has not spoken on the question at issue, court should defer to agency's permissible construction of statute).

Deference is not warranted here.  First, the statute is scarcely silent on the issue of fees: the plain language of 8 U.S.C. § 1254a(c)(1)(B) unambiguously prohibits fees "as a condition of registering" for TPS of over $50.00.  The requirements of the TPS statute show that collecting fingerprints, photographs, and signatures to identify applicants and do background checks is an integral part of the registration process.  The registration fee is the fee charged "as a condition of registering an alien under subparagraph (A)(iv)."  Subsection (A)(iv), in turn, requires the applicant to register to the "extent and in the manner which the Attorney General establishes."  8 U.S.C. § 1254a(c)(1)(A)(iv).  Regulations require applicants to submit fingerprints on Form FD-258, collected by the United States Citizenship and Immigration Services.  8 C.F.R. §§ 103.2(e), 244.6.  The $80.00 biometrics fee is charged for the fingerprinting process.  8 C.F.R. § 103.7(b)(1)("A service fee of $80 will be charged for any individual who is required to have biometric information captured in connection with an application or petition for certain immigration and naturalization benefits (other than asylum), and whose residence is in the United States");  *see also* 8 C.F.R. § 103.2(a)(1)(every form that requires fingerprints on FD-258 must be submitted with the service fee).  Another regulation incorporates immigration form instructions into the regulations, 8 C.F.R. § 103.2(a)(1), and the TPS application, Form I-821, requires biometric data.  In short, DHS charges the biometrics fee for forms that are required "as a condition of registering" an alien for TPS.

Moreover, the TPS statute itself requires the applicant to establish he or she is from a designated country and that he or she has not been convicted of a disqualifying criminal offense. 8 U.S.C. § 1254a(c)(1)(A), (c)(2).  Since the biometric information is

used for background checks that go directly to the applicant's criminal history, collecting biometric information should be considered part of the registration process.   In fact, in a recent final rule increasing the biometrics services fee, Homeland Security noted that

> Background checks are an integral part of determining the applicant's eligibility for a benefit, and thus, their costs are appropriate for full recovery through a fee. Were it not for the underlying application or petition for immigration benefits, these specific security checks would not have been conducted.

"Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule,  72 Fed.Reg. 29851, 29866 (July 30, 2007).

Second, although Homeland Security argues that the statute does not expressly bar a biometrics fee, the fact that it limits the registration fee to $50.00, but gives explicit permission to charge an extra fee *solely* for employment authorization documents strongly suggests that other fees are not permitted.   As originally passed in the Immigration Act of 1990, section 1254a(c)(1)(B) allowed only a $50.00 registration fee (including any fee for work authorization). Pub L. No. 101-649, § 302(a), 104 Stat. 4978, 5030 (1990).[1]   In 1991, Congress added the language allowing an additional fee for a work authorization document.  Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 304(b)(2), Pub. L. No. 102-232, 105 Stat 1773 (1991).[2]   However, although the government has always required applicants to submit fingerprints, *see*, *e.g.*, 8 C.F.R. 240.6 (1992), the statute has never been amended to allow a separate fee for collecting biometric information.  By the principle of statutory construction "*expressio unius est exclusio alterius,*" Congress's listing of one permissible additional fee indicates it intended to exclude other fees. *See Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307,

---

[1]  It provided that  "The Attorney General may require payment of a reasonable fee as a condition of registering an alien under subparagraph (A)(iv) (including providing an alien with an 'employment authorized' endorsement or other appropriate work permit under this section). The amount of any such fee shall not exceed $50."  *Id.*

[2]  The amendment provided that "In the case of aliens registered pursuant to a designation under this section made after July 17, 1991, the Attorney General may impose a separate, additional fee for providing an alien with documentation of work authorization."  *Id.*

1312-1313 (9th Cir. 1992); *see also I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432

(1987)(when Congress includes certain language in one part of a statute but omits it from

another, Congress is presumed to act intentionally and purposely in doing so).

The history of the biometrics service fee itself is also instructive.  The government

first began collecting a fee for fingerprinting services in 1998, after Congress passed a

statute limiting what entities could collect fingerprints for immigration purposes.

Department of Commerce, Justice, and State, The Judiciary, and Related Agencies

Appropriations Act, 1998, Pub L. 105-119, 111 Stat 2440 (November 26, 1997).

Implementing regulations set the initial fee at $25.00, with a fee analysis "to determine

the full cost to the service of fingerprinting individuals for immigration benefits" to

follow.  63 Fed. Reg. 12979, 12981 (March 17, 1998).[3]  Since that time, fees have

increased, and the regulation requiring a fee "for fingerprinting by the service" was

changed to a fee "for capturing biometric information" in 2004.  69 Fed.Reg. 20528,

20534 (April 15, 2004).  In other words, the increased cost of fingerprinting, and now, of

capturing even more elaborate electronic biometric information, has come to pass long

after the $50.00 fee limit was imposed by Congress in 1991.

Homeland Security claims that this fact  – that § 1254a(c)(1)(B) was written before

"important developments in the need and capability of the Agency to capture and use

biometrics in administering the Agency's programs" –  weighs in its favor.  It argues that

it used its expertise to determine it needed a separate fee schedule to offset the costs of

performing its newly onerous and complex functions, and that therefore its interpretation

of the statute as *not* prohibiting separate fees is all the more reasonable.   But Homeland

---

[3]  It appears that before then, the cost of fingerprinting services and background checks was
incorporated into the INS's various immigration fees (which, under 8 U.S.C. § 1356(m), fund
immigration services).  For example, one of the rationales for raising those  fees in 1991 was that
"[t]he significant cost of Federal Bureau of Investigation (FBI) fingerprint and record checks
required for many types of applications and petitions have, since 1990, been paid for by the
Examinations Fee Account. These costs were previously absorbed by the FBI."  INS/EOIR Fee
Review, 56 Fed. Reg. 12647 (April 11, 1991).

Security's need to collect expensive biometric information does not make its strained interpretation of the statute any more reasonable, or give it license to ignore the statute's plain meaning.   Congress could have allowed the government to charge a "reasonable" fee  that could be adjusted for rising costs or other changed circumstances (as it did in the original and slightly different TPS program for nationals of El Salvador in 1990, Immigration Act of 1990 § 303(b)(2), Pub. L. No. 101-649, 104 Stat. 4978).  It did not. The statute is clear, and changed circumstances (or costs) do not alter the plain language limiting fees to $50.00.

Finally, DHS argues that the biometrics services fee is separate because nearly all applicants for any immigration benefit are required to pay it.  8 C.F.R. § 103.7(b).  But the regulation must comply with the authorizing statute, and cannot, in itself, provide a rationale for contradicting the clear prohibition on fees over $50.00 embodied in the statute.  Moreover, since 1990 (with only a brief interruption) the government has been authorized to set its fees at a level "that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants."  8 U.S.C. § 1356(m).[4]   Asylum applicants pay no fee for biometric services, 8 C.F.R. 103.2(e)(4)(ii)(B), in part because of the "humanitarian nature of the asylum process," 72 Fed. Reg. 29851, 29867 (July 30, 2007); there are other categories of individuals for whom the fee is waived as well.  *See*, *e.g.*, 72 FR 53035, 53031 (Sept. 17, 2007)(fees waived for applicants for "U" non-immigrant status (cooperating victims of crime)).  Congress presumably wanted to reduce the financial burden of applying for TPS on aliens who could not return to their home country because of civil strife or natural disaster; otherwise it would not have expressly limited registration fees to $50.00.  If USCIS can waive fees for asylum applicants and other aliens for "humanitarian" reasons, and assess a surcharge on others to make up the

---

[4]  This "surcharge" on other applicants for services rendered to asylum applicants and others was repealed briefly in 2002, Pub. L. 107-296, § 457, and reinstated in 2003, Pub L. 108-7, § 107.

1    difference, it could certainly do so for another category of aliens that Congress evinced an

2    intent to protect – particularly when it is required to limit fees by statute.

3        At this juncture, Plaintiffs have argued convincingly that the biometric services fee

4    is charged as a condition of registration for TPS, and therefore have shown a high

5    likelihood of success on the merits.

6    II.    <u>Irreparable Injury To the Plaintiff</u>

7        The Court can grant a preliminary injunction only "when the moving party has

8    demonstrated a significant threat of irreparable injury, irrespective of the magnitude of

9    the injury." *Simula, Inc. v. Autoliv, Inc*., 175 F.3d 716, 725 (9th Cir. 1999).  Plaintiffs

10   claim that they will suffer irreparable injury if the government is not enjoined to limit fees

11   to $50.00.

12       It is well-settled that monetary injury alone is not irreparable injury for the

13   purposes of preliminary injunctive relief.  *Phany Poeng v. United States*, 167 F.Supp.2d

14   1136, 1142 -1143 (S.D.Cal. 2001), *citing Los Angeles Memorial Coliseum Commission v.*

15   *National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)(monetary injuries not

16   generally considered irreparable);  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115

17   (2nd Cir. 2005)("[a]t the preliminary injunction stage, the only cognizable harms are

18   those that cannot be remedied at the end of trial if the movant were to prevail"; no

19   injunction where plaintiffs can recoup money placed into escrow if they prevail);

20   *Bedrossian v. Northwestern Memorial Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005)(loss of

21   income not irreparable injury);  *National Ass'n of Internal Revenue Emp. v. Nixon*, 349

22   F.Supp. 18, 21 (D.C.D.C., 1972)(issue is "well settled"); *see also* 11A Wright and Miller,

23   *Federal Practice and Procedure* § 2948.1 p. 149-150 (""A preliminary injunction usually

24   will be denied if it appears that the applicant has an adequate alternate remedy in the form

25   of money damages or other relief").

26       Here, it appears that any harm to Plaintiffs will be fully remedied if they prevail on

27   their claim for a refund of unlawfully collected fees.  Plaintiffs argue that they will suffer

28   irreparably injury because they "will be confronted with the Hobson's choice of paying

an exorbitant service fee they are not required by statute to pay, or refuse to pay and risk the exploitation inherent in illegal employment, as well as apprehension, detention, and removal from the United States because they will have lost their TPS." However, this Court finds that being forced to make a choice between paying $80 and facing deportation is not, in itself, irreparable injury. The First Circuit's opinion in *DeNovellis v. Shalala,* 135 F.3d 58 (1st Cir. 1998) is instructive. There, after a workplace reorganization, the Plaintiff federal employee was given the choice of a lateral transfer to another city, or of staying in same city with a demotion. She brought suit alleging age discrimination, and sought a preliminary injunction preventing her reassignment. The Court found no irreparable injury:

> We start with the obvious. It is Janey-Burrell's choice whether she accepts the transfer to San Francisco or whether she remains in Boston at a reduced salary. If she accepts the transfer, there is no diminution in pay or loss of status. If she stays in Boston, she will suffer a diminution in pay, but will recover all of that pay and perhaps other damages if she prevails on the merits. Even under traditional Rule 65 standards, a temporary loss of income which may be recovered later does not usually constitute irreparable injury.

*Id.* at 63-64. In this case, Plaintiffs similarly have to choose whether to pay the fee or lose their TPS benefits and become subject to removal. Plaintiffs have not argued that the $80.00 fee is so onerous that it causes an irreparable hardship. *Cf. Olson v. Wing,* 281 F.Supp.2d 476, 486 (E.D.N.Y. 2003)(loss of medical benefits might create irreparable harm because plaintiffs will be unable to obtain medical services), *citing Goldberg v. Kelly*, 397 U.S. 254, 264 (1970)(loss of subsistence benefits can be irreparable injury).[5] If they pay the fee, they will recover it if they prevail on the merits.

Plaintiffs offered no persuasive responses to the Court's question asking what harm Plaintiffs will suffer that cannot be remedied if Plaintiffs were to prevail. First, they

---

[5] At oral argument, counsel for Plaintiffs suggested that if members of the putative class were not required to pay the $80.00 biometrics fee, they would send that money to their families in El Salvador, where that amount would be far more significant. However, even if this assertion were supported by declarations or other evidence, the Plaintiffs must show that they, not some third party, will suffer irreparable injury.

1   suggested that a refund might not be available because the government may not have

2   funds available to pay restitution.  While some courts have found irreparable injury if a

3   plaintiff shows that a money judgment might go unsatisfied absent equitable relief, *see,*

4   *e.g., Alvenus Shipping Co., Ltd. v. Delta Petroleum (U.S.A.) Ltd.,*  876 F.Supp. 482, 487

5   (S.D.N.Y. 1994), Plaintiffs have made no such showing here, offering only their own

6   unsupported conjecture.   Second, Plaintiffs argued that if this Court does not resolve the

7   merits of the action until after El Salvador's TPS expires, plaintiffs who remain in the

8   United States might be reluctant to claim a refund.  The most recent designation for El

9   Salvador expires on March 9, 2009.  72 Fed.Reg. 46649-01 (August 21, 2007).  Pure

10  speculation that members of the class might be dissuaded from claiming a refund for fear

11  of exposing their immigration status – seventeen months from now -- is insufficient to

12  constitute irreparable injury.

13          Plaintiffs have not shown what harm they might suffer that cannot be remedied if

14  they prevail in this action.  They therefore have not carried their burden of showing a

15  possibility of irreparable injury.

16  III.   The Balance of Hardships

17          The government has presented at least some evidence that it will suffer serious

18  hardship were a preliminary injunction granted.  It adduced evidence that the biometric

19  fee pays for Homeland Security's funding of background checks that "enhance national

20  security and ensure the integrity of the immigration process," and for maintenance of

21  computer and other systems that allow immigration adjudicators to access the biometric

22  data electronically.  *See* Declaration of Barbara Velarde, ¶¶ 7, 16, 18, 19.  The amount of

23  fees at issue is significant.  While the government has not provided a precise estimate of

24  the dollar amount at issue, Velarde estimates that TPS beneficiaries and applicants from

25  Honduras, Nicaragua, and El Salvador will have paid approximately $25,000,000 in

26  biometric service fees in fiscal year 2007 alone.  Velarde Decl. ¶ 20.  Ms. Velarde

27  declared that loss of tens of millions of dollars a year in biometrics fees would

28  significantly affect the agency's ability to perform its screening functions.  *Id.*

1    The immediate hardship to the Plaintiffs is not clear.  Although regulations allow

2 for both a waiver of the TPS fee, 8 C.FR. § 244.20, and, now, of the biometrics services

3 fee because of an inability to pay,  8 U.S.C. § 103.7(c)(1), (5),  Plaintiffs alleged that they

4 have paid the fees in the past, First Amended Complaint ¶ 12, and have not alleged or

5 submitted evidence that the fees create a particular hardship for them (such as serious

6 financial difficulties or imminent homelessness).  The Court notes that Plaintiffs have not

7 alleged that they are seeking or have ever sought waivers of any of the fees at issue.  They

8 argue only that the fees are "exorbitant," and that waiver provisions are so onerous and

9 require disclosure of so much potentially sensitive information that waiver is not a

10 realistic option for most applicants.  Nonetheless, Plaintiffs' failure to apply for a waiver,

11 coupled with their failure to introduce any evidence of genuine hardship, shows that the

12 balance of hardships does not tip in their favor.

13

14 CONCLUSION

15    Because Plaintiffs have shown neither a possibility that they will suffer irreparable

16 injury nor a balance of hardships tipping in their favor.  Accordingly, their motion for

17 preliminary injunction is hereby DENIED.

18

19 **IT IS SO ORDERED.**

20

21 Dated: October 17, 2007

22 THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

23

24

25

26

27

28

13