1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF CALIFORNIA

JUAN BAUTISTA-PEREZ, *et al.*,

    Plaintiffs,

v.

MICHAEL B. MUKASEY, *et al.*,

    Defendants.

NO. C 07-4192 TEH

ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE

This matter came before the Court on January 28, 2008 on Defendants' Motion to Dismiss or, In the Alternative, To Transfer Venue. This class action for declaratory and injunctive relief challenges the Defendant Department of Homeland Security's ("DHS" or "Homeland Security" or "the government") policy of charging fees totaling more than the $50.00 fee allegedly permitted by statute as a condition of registering for "Temporary Protective Status." Defendants move to dismiss the action both on jurisdictional grounds and on the merits. Alternatively, they move to transfer this action to the Federal Court of Claims. For the reasons set out below, the Court DENIES the motion in its entirety.

## FACTUAL AND STATUTORY BACKGROUND[1]

The Immigration Act of 1990 established a procedure whereby the government could provide temporary protection to aliens in the U.S. who were forced to flee their homelands because of natural disaster, civil strife and armed conflict, or other extraordinary and temporary conditions. The Secretary of Homeland Security may grant "Temporary Protective Status" ("TPS") to nationals of certain countries temporarily designated under the statute, 8 U.S.C. § 1254a(a)(1), 6 U.S.C. § 557, which allows those persons to stay in the

---

[1] The Court's October 17, 2007 Order contains a more detailed description of the statutory scheme and of Plaintiffs' claims.

United States and obtain work authorization for the period their home country is so designated. 8 U.S.C. § 1254a(a)(1)(B).

Once a country is designated for TPS, nationals of that country can register for benefits during a certain period of time. To establish eligibility for TPS, an applicant must establish, among other things, that he or she is a national of the country designated for TPS, has been continuously physically present and resided in the United States since the effective date of designation, and is otherwise admissible as an immigrant (although certain grounds of inadmissibility can be waived). 8 U.S.C. § 1254a(c)(2)(A); 8 C.F.R. §§ 244.2, 244.3(a), 1244.3(a). The government can deny an applicant TPS on the basis of the applicant's criminal history. 8 U.S.C. § 1254a(c)(2)(A); (c)(2)(B); 8 C.F.R. §§ 244.3(c), 244.4, 1244.3(c), 1244.4.

The statute at issue here limits the registration fee for TPS to $50.00. Title 8 U.S.C. § 1254a(c)(1)(B) provides:

Registration fee

The Attorney General may require **payment of a reasonable fee as a condition of registering an alien** under subparagraph (A)(iv) (including providing an alien with an "employment authorized" endorsement or other appropriate work permit under this section). **The amount of any such fee shall not exceed $50**. In the case of aliens registered pursuant to a designation under this section made after July 17, 1991, **the Attorney General may impose a separate, additional fee for providing an alien with documentation of work authorization**. Notwithstanding section 3302 of Title 31, all fees collected under this subparagraph shall be credited to the appropriation to be used in carrying out this section.

(emphasis added).[2]

However, regulations governing TPS require applicants to pay more than just a $50.00 registration fee and a work authorization fee. *See* 8 C.F.R. § 244. Homeland Security requires individuals who wish to obtain TPS to file, in addition to an application form, extensive supporting documentation, and additional materials, an $80.00 "biometrics services

---

[2] The Immigration Act of 1990 originally enacted two TPS programs: Section 302 created what is now the TPS program contained in 8 U.S.C. § 1254a, and Section 303 created a separate TPS program for El Salvador. Section 303(b)(2) placed no limit on the fees the Attorney General could charge, and permitted a "reasonable fee" as a condition of registration. Pub. L. 101-649, 104 Stat. 4978, § 303(b)(2). (The separate program for El Salvador expired, and now the same rules apply to all applicants for TPS).

2

fee" for applicants over 14. 8 C.F.R. §§ 103.7(b)(1), 244.6; "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 29851, 29873 (May 30, 2007).

Homeland Security charges the "biometrics services fee" for processing of fingerprints, photographs, and electronic signatures used for background and security checks and identity verification, and for storage and maintenance of the information so collected. Declaration of Barbara Velarde In Opposition to Plaintiff's Motion for Preliminary Injunction, filed September 25, 2007, ¶¶ 7, 18; *see also* 72 Fed. Reg. 29851, *supra*, at 29857 (discussing uses of biometric fee).

Although aliens are required to re-register for TPS whenever a country is re-designated, Homeland Security collects the $50.00 TPS registration fee only once. 8 C.F.R. § 244.17(a); "Extension of the Designation of El Salvador for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Salvadoran TPS Beneficiaries," 72 Fed.Reg. 46649, 46650 (August 21, 2007) (explaining fee structure for El Salvador re-registration); Velarde Decl. ¶ 13. However, aliens are required to pay a new biometric services fee (and work authorization document fee) for each re-registration. 72 Fed.Reg. 46649, *supra*, at 46650; Velarde Decl. ¶ 13. Plaintiffs allege, and DHS admits, that it requires applicants to pay the biometrics fee even if Homeland Security does not need updated biometric information. Velarde Decl. ¶ 19.

Plaintiffs, foreign nationals from Honduras, El Salvador, and Nicaragua who currently have TPS status, claim that they have been required to remit fees totaling over $50.00 on multiple occasions as they re-register for TPS, even though their biometric data was being reused. First Amended Complaint, ¶ 12. They claim that because 8 U.S.C. § 1254a(c)(1)(B) provides that the fee charged by DHS "as a condition of registering" for TPS is "not to exceed" $50.00, the additional biometric services fee is unlawful. Their class action Complaint, brought on behalf of all nationals of El Salvador, Honduras, and Nicaragua who

//

submitted applications to register for TPS and were required to pay fees of more than $50.00, *id.* ¶¶ 26-28, seeks an order

- declaring that additional fee for collecting biometric information or any combined fee over $50.00 is unlawful under 8 U.S.C. § 1254a(c)(1)(b);
- invalidating those parts of 8 C.F.R. § 244.6 that requires Plaintiffs and other class members to pay biometric service fees;
- enjoining DHS from imposing fees over $50.00;
- enjoining DHS from imposing a fee when collection of biometric information is unnecessary; and
- requiring the Defendants to refund all fees over $50.00 paid by class members.

*Id.* Prayer for relief ¶¶ 2-7.

Defendants move to dismiss on the grounds that 1) exclusive jurisdiction lies in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 because this is in essence an action for money damages; and 2) the action fails to state a claim. Alternatively, they argue that even if jurisdiction is proper in this court under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), then venue is proper in this nationwide class action only in the Court of Federal Claims under 28 U.S.C. § 1402(a).

**LEGAL STANDARD**

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating the sufficiency of a complaint's allegations, a court must assume the facts alleged in the complaint to be true unless the allegations are controverted by exhibits attached to the complaint, matters subject to judicial notice, or documents necessarily relied on by the complaint and whose authenticity no party questions. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). In addition, a court need not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on other grounds by* 275 F.3d 1187 (9th Cir. 2001). A court should not grant dismissal

4

unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). Moreover, dismissal should be with leave to amend unless it is clear that amendment could not possibly cure the complaint's deficiencies. *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

Defendant also moves to dismiss this case for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Because Defendant does not seek to rely on any external facts, this is a facial rather than factual challenge to the court's jurisdiction. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (distinguishing between facial and factual jurisdictional attacks). Consequently, this Court applies a similar standard to Defendant's Rule 12(b)(1) motion as to its Rule 12(b)(6) motion: Dismissal is appropriate only if the complaint's allegations, which are assumed to be true, are insufficient to support a finding of jurisdiction. *Id.*

## ANALYSIS

### I. This Court Has Jurisdiction, And The United States Has Waived Sovereign Immunity

The Tucker Act provides that the United States Court of Federal Claims "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491. Thus, claims for damages against the United States of over $10,000 fall within the exclusive jurisdiction of the Court of Federal Claims.[3]

Defendants argue that this case, which seeks the refund of tens of millions of dollars in biometric fees charged by the USCIS, in addition to declaratory and injunctive relief, is really one for damages, such that exclusive jurisdiction lies in the Court of Federal Claims. Plaintiffs, on the other hand, characterize this case as one that primarily seeks declaratory

---

[3] As discussed more fully below, district courts have concurrent jurisdiction over claims for $10,000 or less under the Little Tucker Act, 28 U.S.C. § 1346(a).

5

and equitable relief, with a request for specific equitable relief in the form of a refund of fees. It therefore allegedly falls within the Administrative Procedure Act's grant of jurisdiction and waiver of sovereign immunity for actions seeking relief *other than* "money damages," brought by a person "suffering legal wrong because of a legal action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

The Supreme Court has held that claims for specific equitable relief – albeit monetary – can fall within the ambit of § 702. *Bowen v. Massachusetts,* 487 U.S. 879, 898-900 (1988).

> The term 'money damages,' 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' D. Dobbs, Handbook on the Law of Remedies 135 (1973). Thus, while in many instances an award of money is an award of damages, '[o]ccasionally a money award is also a specie remedy.'"

*Bowen,* 487 U.S. at 895 (*citations omitted*). Thus, in *Bowen*, a state was entitled to seek Medicaid payments it alleged the federal government should have paid it under the statute in the district court rather than the Court of Federal Claims. *Id.* at 900 ("The State's suit ... is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money"); *see also School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass.,* 471 U.S. 359, 370-71 (1985)(suit by parents for reimbursement of money they paid out of pocket for education of disabled child sought not "damages," but equitable relief; "[r]eimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP").

Plaintiff argues that the statute limiting fees for TPS registration is analogous to the statute providing a free and appropriate education to disabled children: it shows that Congress intended DHS to pay for all costs of TPS registration over the $50.00 fee limit. For the Court to order reimbursement of fees would requiring DHS to bear a financial burden it should have borne all along under the statute.

6

But the analogy is far too attenuated. This case is not like *Bowen* and *Burlington*, where a statute created an obligation to pay the plaintiff specific amounts of money. The complaint does not allege, as in other cases following *Bowen*, that § 1254a(c)(1)(B) "entitles a claimant to a specific amount of money, and an administrative agency wrongfully withh[eld] that money from the claimant," so that a claim under the APA would be appropriate. *Marceau v. Blackfeet Housing Authority,* 455 F.3d 974, 986 (9th Cir. 2006).

Instead, this case falls squarely within a category of cases typically brought under the Tucker Act – claims for "recovery of monies that the government has required to be paid contrary to law," called "illegal exaction" claims. *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1572 (Fed. Cir. 1996). As the Court of Federal Claims explained,

> [A]n illegal exaction claim may be maintained when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). The Tucker Act provides jurisdiction to recover an illegal exaction by government officials when the exaction is based on an asserted statutory power. .... In *Eversharp, Inc. v. United States*, 129 Ct.Cl. 772, 776, 125 F.Supp. 244, 247 (1954) the Court of Claims held that on the allegation that the government had illegally exacted money by enforcement of a regulation that was contrary to statute, the court had jurisdiction under the Tucker Act to render judgment against the United States for recovery of that money.

*Aerolineas Argentinas,* 77 F.3d at 1572 -1573; *see also Brazos Elec. Power Co-op., Inc. v. United States,* 144 F.3d 784, 787 (Fed. Cir. 1998) (when plaintiff in essence seeks "a refund of money that it claims was wrongfully paid to the federal government," claim falls within Tucker Act jurisdiction).

Plaintiffs' request for a refund of the biometric fees allegedly collected in violation of 8 U.S.C. § 1254a(c)(1)(B) is indistinguishable from the "illegal exaction" claims described in *Aerolineas Argentinas* – Plaintiffs are claiming that "the Government has the [Plaintiffs'] money in its pocket." *Id.* at 1573 (citation omitted). Accordingly, the request for a refund is a type of claim that ordinarily falls within the ambit of the Tucker Act.

Even so, this Court has jurisdiction over both the monetary and equitable claims in this case. The Little Tucker Act gives district courts concurrent jurisdiction with the Court of

7

Federal Claims for non-tort claims against the United States "not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2); *see also Berman v. United States*, 264 F.3d 16, 20 -21 (1st Cir. 2001)(Little Tucker Act waives sovereign immunity).

Although Defendants argue that the amount at stake far exceeds $10,000, they concede that each individual Plaintiff's claim is for less than $10,000. In a class action, jurisdiction turns "not upon the aggregate amount of the claims of the members of the class, but upon the amounts claimed individually by those members." *March v. United States,* 506 F.2d 1306, 1309 n.1 (D.C. Cir. 1974); *Slugocki v. United States*, 816 F.2d 1572 & n.1 (Fed. Cir. 1987). Therefore, the Little Tucker Act provides a grant of jurisdiction to this Court and a waiver of sovereign immunity for the requests for refunds of the biometric services fees Plaintiffs paid.

This Court also has the power to grant whatever equitable relief might be necessary, whether it is considered "associated with and subordinated to" the Tucker Act monetary claim, *Wilkins v. United States* 279 F.3d 782, 786 (9th Cir. 2002)(citation omitted), or separate equitable relief which the Court can grant under § 702 of the APA.[4]

## II. Defendants Have Waived Their Venue Objection

Defendants argue that even if the Court finds jurisdiction and a waiver of sovereign immunity, this Court is a proper venue only for Plaintiffs residing in this district, not for a nationwide class. The venue provision for claims arising under the Little Tucker Act

//

---

[4] The parties argue at length about whether the Court of Federal Claims has the power to grant the equitable relief the Plaintiffs seek; whether the equitable relief is "associated with and subordinate to a monetary claim," or "incidental to a claim for affirmative non-monetary relief," *see Wilkins v. United States*, 279 F.3d 782, 786 (9th Cir. 2002); whether the Court should follow the reasoning of the Court of Federal Claims in *Suburban Mortgage Associates vs. United States Department of Housing and Urban Development*, 480 F.3d 1116, 1126 (Fed. Cir. 2007); and other questions that would require the Court to make fine distinctions about the nature of the Plaintiffs' claims and the respective power of the Court of Claims and the district court. But because the Court has jurisdiction no matter how the claims are characterized, the Court need not reach these issues.

8

provides that:

> "[a]ny civil action in a district court against the United States under subsection (a) of section 1346 of this title may be prosecuted only: ...(2) in the judicial district where the plaintiff resides..."

28 U.S.C. § 1402(a); *see also Saraco v. United States*, 61 F.3d 863, 864 (Fed. Cir. 1995)(affirming transfer of nationwide class to Court of Federal Claims because venue was improper for all plaintiffs but those living in district where case was filed).

Plaintiffs counter that Defendants waived their venue objection by failing to raise it in opposition to Plaintiffs' motion for preliminary injunction. Fed. R. Civ. Pro. 12(h) provides that a party waives a venue defense by failing "to include it in a responsive pleading." Rule 12(h)(1)(B)(ii); Rule 12(b)(3)(motions to dismiss for improper venue).

A "responsive pleading" for these purposes is not solely a motion to dismiss or an answer. The Court can find waiver of a venue defense "by submission through conduct" -- *Neirbo Co. v Bethlehem Shipbuilding Corp*, 308 U.S. 165, 167-68 (1939), or "by implication from acts acknowledging the court's power to adjudicate." Schwarzer *et al.*, *Federal Civil Procedure Before Trial*, § 9:33 at 9-8 (2007); *see, e.g., Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industries Fund,* 967 F.2d 688, 692 (1st Cir. 1992)(finding waiver where defendant filed a motion requesting a hearing on plaintiff's motion for TRO, a motion to allow its counsel to appear appear *pro hac vice*, and a stipulation agreeing to expedited discovery and a hearing on a preliminary injunction motion). A party must raise objection to venue in its "first significant defensive move." *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 162 F.3d 724, 730 (2nd Cir. 1998), *quoting* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1391.

*Hendricks v. Bank of America, N.A.,* 408 F.3d 1127, 1135 (9th Cir. 2005) is precisely on point, and shows that opposition to a motion for preliminary injunction can be such a "first responsive pleading" or defensive move. There, the district court issued a temporary restraining order against the defendant, together with an order to show cause why a preliminary injunction should not be entered. *Id.* at 1132. The defendant sought several

9

1 extensions of time, and then opposed the request for a preliminary injunction. *Id.* at 1132, 1135. On interlocutory appeal, the Ninth Circuit found that the defendant had not waived its venue and personal jurisdictional defenses because it had raised them "in its first responsive pleading" *id.* at 1135 – that is, in response to plaintiff's preliminary injunction motion.

Here, in contrast, the Defendants chose to argue the merits of the case in opposition to Plaintiffs' motion for preliminary injunction *without* raising a venue objection. *See* Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction, filed September 25, 2007; Defendants' Surreply in Opposition to Plaintiffs' Motion for Preliminary Injunction, filed October 4, 2007. An officer of the USCIS even submitted an eight-page declaration on the merits of the case. Declaration of Barbara Velarde, *supra.*

Defendants argue that *Hendricks* is distinguishable because here, venue has to be viewed "in light of jurisdiction" granted by the Little Tucker Act, and the two are inextricably intertwined. This argument is hollow; there is nothing specific about either the Little Tucker Act or the related grant of venue in 28 U.S.C. § 1402(a)(1) that makes jurisdiction and venue inseparable. On the contrary, 28 U.S.C. § 1406(b) provides that nothing in the chapter of Title 28 on venue – which includes the Little Tucker Act venue provision – "shall impair the jurisdiction of a district court over any matter involving a party who does not interpose a timely and sufficient objection to the venue."

Allowing Defendants to raise a venue objection only after this Court found a likelihood of success on the merits would permit the forum-shopping and waste of judicial resources Rule 12(h) is designed to avoid. Rule 12(h) contemplates an implied waiver of a venue defense "by defendants who appear before a court to deny the allegations of a complaint, but who fail to make [venue] objections at the time of their appearance." *Foster v. Arletty 3 Sarl*, 278 F.3d 409, 414 (4th Cir.2002)(citation omitted). That is what Defendants have done here. Accordingly, they have waived any objection to venue in this Court.

//

//

### III. Plaintiffs State A Claim On The Merits

Defendants also move to dismiss on the merits. They claim that 8 U.S.C. § 1254a(c)(1)(B), which expressly limits the amount the Secretary can charge "as a condition of registering" for TPS to $50.00, does not prohibit DHS from collecting a separate and additional fee for biometric services. They argue that the Court should defer to Homeland Security's interpretation of the statute under the doctrine of *Chevron U.S.A., Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), and uphold its regulations as consistent with the statute.

The Ninth Circuit recently reviewed the standards this Court must use to evaluate an agency's construction of a statute.

> "When reviewing an agency's construction of a statute it is charged with administering, we first look to the statutory text to see whether Congress has spoken directly to the question at hand. 'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Contract Mgmt., Inc. v. Rumsfeld*, 434 F.3d 1145, 1146-47 (9th Cir.2006) (*per curiam*) (*quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)). Thus, "[t]he language of a statute is controlling when the meaning is plain and unambiguous." *United States v. Maria-Gonzalez*, 268 F.3d 664, 668 (9th Cir. 2001).
>
> If, however, the statute is uncertain or ambiguous with respect to the specific issue, a reviewing court "cannot simply impose [its] own construction." *See United States v. Lopez-Perera*, 438 F.3d 932, 935 (9th Cir.2006). Rather, under *Chevron*, we defer to the agency's interpretation if it is based on "a permissible construction of the statute." 467 U.S. at 843, 104 S.Ct. 2778.

*Resident Councils of Washington v. Leavitt,* 500 F.3d 1025, 1030 (9th Cir. 2007). The Court must "read the words of statutes in their context and with a view to their place in the overall statutory scheme." *Id.*; *see also United States v. Dang,* 488 F.3d 1135, 1140 (9th Cir. 2007).

Defendants have raised no arguments which should alter the Court's earlier conclusion that the language of § 1254a(c)(1)(B) is unambiguous.[7] In its October 17, 2007 Order denying Plaintiff's motion for preliminary injunction, this Court concluded that the plain language of 8 U.S.C. § 1254a(c)(1)(B) unambiguously prohibits fees of over $50.00 "as

---

[7] Defendants repeat several arguments that the Court considered fully on the Motion for Preliminary Injunction (that there is no express prohibition on a biometric services fee, and that § 1254a(c)(1)(B) was written before "important developments in the need and capability of DHS to capture and use biometrics"). Those arguments are not reanalyzed here.

11

a condition of registering an alien" for TSP under 8 U.S.C. § 1254a(c)(1)(A)(iv). Subsection 1254a(c)(1)(A)(iv), in turn, requires applicants to register to the "extent and in the manner which the Attorney General establishes." Numerous regulations established by the Attorney General require applicants to submit fingerprints and fees for fingerprints to register. 8 C.F.R. §§ 103.2(a)(1), 103.2(e), 103.7(b)(1), 244.6. Biometric services fees are plainly part of the fees charged "as a condition of registering" "in the manner which the Attorney General" has established. Moreover, because applicants must establish that they are from a designated country and have not been convicted of a disqualifying criminal offense, 8 U.S.C. § 1254a(c)(1)(A), (c)(2), and biometric information is used for background checks that go directly to establishing these factors, collecting biometric information is part of the registration and application process. Finally, the statute explicitly authorizes Homeland Security to charge an extra fee *solely* for employment authorization. 8 U.S.C. § 1254a(c)(1)(B). Even though the government has always required TPS applicants to submit fingerprints, it did not amend § 1254a(c)(1)(B) to allow an extra charge for collecting fingerprints or biometric information when the government began collecting fees for that service. *See* October 17, 2007 Order at 5-8.

With this motion, Defendants first argue that the statute is ambiguous because it did not define the term "registering." They note that the agency has filled that definitional gap by defining "register" as "to properly file, with the director, a completed application, with proper fee, for Temporary Protected Status during the registration period." 8 C.F.R. § 244.1. But the fact that the agency chose to promulgate a definition does not make the statute "silent" or ambiguous. The statute itself makes clear that "registering an alien" for TPS means doing those tasks that the Attorney General requires applicants to do within the 180 day registration period in order to acquire TPS. 8 USC § 1254a(c)(1)(A)(iv). And, as set out above, those tasks include paying a biometric services fee.[8]

---
[8] Even if the statute were ambiguous, the agency's definition of "register" contained in 8 C.F.R. § 244.1 – that "registering for TPS" means filing an application "with proper fee" – is both circular and of no help to the Defendants. Other regulations show that the biometric services fee is part of
(continued...)

12

United States District Court
For the Northern District of California

Second, Defendants argue that the Court should not interpret § 1254a(c)(1)(B) in isolation, but instead should assess whether Congress expressed its intent unambiguously by analyzing "the provision in the context of the governing statute as a whole, presuming congressional intent to create a symmetrical and coherent regulatory scheme." *United States v. Dang*, 488 F.3d 1135, 1140 (9th Cir. 2007). Specifically, Defendants point to three other statutes that allow DHS to charge fees. First, in 1998, Congress allowed agencies to collect and charge for fingerprinting services. Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. 105-119, 111 Stat 2440. Next, the Independent Offices Appropriations Act ("IOAA"), 31 U.S.C. § 9701, provides that each service an agency provides to a person "is to be self-sustaining to the extent possible," § 9701(a), and should be based in part on the cost to the government. 31 U.S.C. § 9701(b)(2)(a). Finally, 8 U.S.C. § 1356(m) authorizes Homeland Security to set fees at a level "that will ensure recovery of the full costs" of providing services. Defendants argue that these statutes show Congress's intent to allow DHS to charge an additional fee for biometric services.

None of these statutes either shows Congressional intent to allow additional fees for TPS applicants or creates ambiguity in § 1254a(c)(1)(B). It is true that the Court should construe the entire statute, and not isolated provisions, *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 568 (1995); *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221 (1991)("meaning of statutory language, plain or not, depends on context"). But it should do so "giving effect to each word and making every effort not to interpret a provision in a manner that renders other

---

(...continued)
the "proper fee," in the sense that an application would be incomplete without it. Application for Temporary Protected Status is governed by 8 C.F.R. § 244.6, which states that each application "must be made in accordance with § 103.2," and applicants over 14 "must be fingerprinted on Form FD-258." Section 103.2, in turn, provides that forms which require an applicant to complete Form FD-258, Applicant Card, must also be filed with the service fee for fingerprinting, as required by § 103.7(b)(1). Moreover, § 244.6 provides that applications for Temporary Protected Status also "must be filed with the fee, as provided in § 103.7." Section 103.7(b)(1) sets the biometrics fee at $80.00 and the TPS registration fee at an amount not to exceed $50.00. Section 244.1's reference to "the proper fee" does nothing to exclude the biometric services fee from the fees imposed "as a condition of registering" for TPS.

provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. U.S. E.P.A.,* 942 F.2d 1427, 1432 (9th Cir. 1991).

The statute which first allowed DHS to charge for biometric services does not undermine the clarity of, or conflict with, § 1254a(c)(1)(B)'s fee cap. Defendants argue that when Congress allowed the agency to charge fees for biometric services, it evinced its recognition that DHS has to offset the increasing costs of collecting biometric information. The Court has already rejected this argument. October 17, 2007 Order at 8-9 (changing circumstances or costs do not alter plain language of statute limiting fees to $50.00). Moreover, the fact that Congress passed a law allowing the agency to collect a biometric services fee without amending § 1254a(c)(1)(B) – when it *did* amend the statute to allow a fee for a work permit, Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, § 304(b)(2), Pub. L. No. 102-232, 105 Stat. 1773 (1991) – shows, if anything, an intent to keep the $50.00 cap in place.

Nor does the IOAA, 31 U.S.C. § 9701, suggest that under the statutory scheme, Defendants can charge fees for biometric services separate and apart from the fee for TPS registration. Section 9701 contains general statements that it is "the sense of Congress" that each service provided to a person by an agency "is to be self-sustaining *to the extent possible*," § 9701(a) (emphasis added), and that the head of each agency "may prescribe regulations establishing the charge for a service or thing of value provided" by the agency. § 9701(b). But those general statements explicitly *do not* change the interpretation of §1254a(c)(1)(B): the third subsection of § 9701 expressly states that it does not affect "a law of the United States" that prohibits or prescribes bases for determining charges. § 9701(c). Moreover, DHS has previously stated its position that § 9701 does not even apply to immigration fees. 72 Fed. Reg. 29851, *supra* at 29866-67.

Finally, 8 U.S.C. § 1356(m) neither evinces an intent to allow additional biometrics fees nor supersedes § 1254a(c)(1)(B). That section provides:

14

> (m) Immigration Examinations Fee Account
>
> **Notwithstanding any other provisions of law**, all adjudication fees as are designated by the Attorney General in regulations shall be deposited as offsetting receipts into a separate account entitled "Immigration Examinations Fee Account" in the Treasury of the United States, whether collected directly by the Attorney General or through clerks of courts: Provided, however, That all fees received by the Attorney General from applicants residing in the Virgin Islands of the United States, and in Guam, under this subsection shall be paid over to the treasury of the Virgin Islands and to the treasury of Guam: ***Provided further*, That fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants.** Such fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected.

(emphasis added).[9] Defendants argue that the phrase "notwithstanding any other provisions of law" applies not only to the two clauses following it, but also to the third later-added clause (emphasized above), and therefore means that notwithstanding the statutory limit on TPS fees contained in § 1254a(c)(1)(B), the agency may set fees for TPS application, including biometric services, "at a level that will ensure recovery of the full costs of providing all such services." Section 1254a(c)(1)(B) and § 1356(m) must be harmonized, Defendants argue, and a reading of § 1254a(c)(1)(B) that prohibits a biometric services fee for TPS applicants would "emasculate" § 1356(m) and render parts of it inoperative.

It is Defendants' interpretation, however, that would render statutory language surplusage. If § 1356(m) means that DHS can circumvent the $50.00 cap on fees by adding additional charges for TPS applicants to recover the costs of its services, § 1356(m) emasculates § 1254a(c)(1)(B). It is a "fundamental tenet of statutory construction that a court should not construe a general statute to eviscerate a statute of specific effect. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ('[I]t is a commonplace of statutory construction that the specific governs the general.')." *In re Gledhill* 76 F.3d 1070, 1078 (10th Cir. 1996). As one authority observed,

---

[9] In 1988, Title 8 U.S.C. was amended to add § 1356(m), which then consisted of only the first two clauses above, with a period after the second use of the word "Guam." Pub. L. 100-459 § 209(a). The third clause (emphasized above) and final sentence, allowing a "surcharge" on applicants for services rendered to asylum applicants and others was added in 1991 amendments to the statute, Pub L. 101-515, § 210(d)(1), repealed briefly in 2002, Pub. L. 107-296, § 457, and reinstated in 2003, Pub L. 108-7, § 107.

15

> When there is in the same statute a specific provision and also a general one, which in its most comprehensive sense would include matters embraced in a specific provision, the general provision must be understood to affect only those cases within its general language that are not within the purview of the specific provision, with the result that the specific provision controls.

Singer and Singer, 2A *Sutherland Statutes and Statutory Construction* § 46.5 (2007), *citing Ziegler v. America Maize-Products Co.*, 658 A.2d 219 (Me. 1995). Here, Defendants would construe a general statute allowing the agency to impose a surcharge on aliens to recover its full costs in a way that eviscerates the far more specific fee cap on applicants for TPS.

Instead, the statutes can easily be reconciled. "[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Intern., Inc.,* 534 U.S. 124, 143-144 (2001)(citation omitted). There is a straightforward reading of § 1356(m)'s statement that "[n]otwithstanding any other provisions of law, ... fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." The statute means solely that DHS may impose a surcharge on other aliens to recover the costs of services provided for free or below cost to "asylum applicants *or other immigrants*" – such as applicants for TPS. DHS has not in the past charged a surcharge for services provided to TPS applicants, *see e.g.*, "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 4888, 4909 (February 1, 2007)(describing surcharges and to what fees they are applied). However, doing so would be consistent with the humanitarian concerns that underlie the surcharge statute, *see* 72 Fed. Reg. 29851, *supra*, at 29867 (DHS imposes surcharge on others to recover the costs of application and fingerprinting services provided for free to asylum applicants for humanitarian reasons), because TPS applicants who cannot return to their home countries because of natural disaster or civil unrest have suffered hardships similar to those suffered by asylum applicants and refugees.

Nor would this reading render any portion of § 1356(m) meaningless. As DHS itself has argued, the "[n]otwithstanding any other provisions of law" portion of § 1356(m) is an exception to the general guidelines in the IOAA, 31 U.S.C. § 9701, about how agencies must set fees for services they provide, and the requirement that fees must reflect the value to the recipient. 72 Fed. Reg. 29851, *supra*, at 29866-67. Thus, that portion, together with the surcharge language, has the real effect of allowing DHS to set its fees free of the dictates of the IOAA.

In a related and final argument, DHS argues that the language of § 1356(m) allowing DHS to recoup the "full costs" of its services "[n]otwithstanding any other provisions of law" completely supersedes § 1254a(c)(1)(B)'s cap. This argument fails for several reasons. First, to say that the general § 1356(m) supersedes the more specific and later-enacted § 1254a(c)(1)(B)[10] would be to argue that the latter was completely meaningless when enacted. It is a "basic axiom that courts should construe all legislative enactments to give them some meaning." *Rosado v. Wyman,* 397 U.S. 397, 415 (1970); *see also Cook Inlet Native Association v. Bowen,* 810 F.2d 1471, 1474 (9th Cir. 1987)(a "statute should not be interpreted to render one part inoperative"). The court should construe statutes by "giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Boise Cascade Corp. v. U.S. E.P.A.,* 942 F.2d 1427, 1432 (9th Cir. 1991); *see also In re Glacier Bay*, 944 F.2d 577 (9th Cir.1991) (holding the phrase "notwithstanding any other provisions of law" did not govern when there was no irreconcilable conflict between the two statutes at issue).

As set out above, § 1254a(c)(1)(B) and § 1356(m) can be easily harmonized. There is no reason to find that the general grant of the power to impose surcharges to recover the full

---

[10] 8 U.S.C. § 1356(m) was first enacted on November 5, 1990. Pub.L. 101-515, Title II, § 210(a), (d), 104 Stat. 2120, 2121. Section 1254a was enacted on November 29, 1990. Pub.L. 101-649, § 302(a),104 Stat. 5030, 5084.

cost of services repeals the $50.00 fee cap of § 1254a(c)(1)(B).[11]

Finally, Defendants have nowhere addressed on the merits Plaintiffs' separate claim that Defendants have unlawfully imposed fees for collection of biometric information when there is no need to collect such information. FAC ¶ 27. Accordingly, Defendants have also failed to meet their burden of showing that Plaintiffs have failed to state a claim on this theory.

**CONCLUSION**

Defendants' Motion to Dismiss Or, In The Alternative, To Transfer Venue, is DENIED.

**IT IS SO ORDERED.**

Dated: February 4, 2008

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

---

[11] It is also telling that DHS itself has never before interpreted § 1356(m) as superceding § 1254a(c)(1)(B). It has never raised the fee for TPS application over $50.00, despite recent significant increases in other fees, including a surcharge. *See* 72 Fed. Reg. 4888, 4909 (assigning surcharges to numerous fees, but not to fee for TPS). Moreover, DHS recently explained in a final rule that "the application fee for Temporary Protected Status (TPS) is limited by statute to $50. INA section 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B)." 72 Fed. Reg. 29851, 29865. This fact alone undermines the agency's claim that its interpretation is reasonable and entitled to deference. *I.N.S. v. Cardoza-Fonseca,* 480 U.S. 421, 446 n.30 (1987)("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view").