OF COUNSEL:
JOSEPH P. RUSSONIELLO
United States Attorney
JOANN M. SWANSON
Assistant United States Attorney
Chief, Civil Division
ILA C. DEISS, NY SBN 3052909
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
(415) 436-7124; FAX: (415) 436-7169

J. MAX WEINTRAUB
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
Washington, DC 20044
(202( 305-7551; FAX: (202) 305-7000

Attorneys for Defendants

TONY WEST
Assistant Attorney General
JEANNE E. DAVIDSON
Director
BRIAN A. MIZOGUCHI
Senior Trial Counsel
ELIZABETH A. SPECK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-3319; FAX: (202) 305-7644

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JOSE BAUTISTA-PEREZ, *et al.*,

                                    Plaintiffs,

        v.

ERIC H. HOLDER, JR., Attorney General of the
  United States, and

JANET NAPOLITANO, Secretary of
  Homeland Security,
                                    Defendants.

No. C 07-4192 TEH

**DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

Date:   November 23, 2009
Time:  9:00 a.m.
Courtroom: 12

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

INTRODUCTION AND BACKGROUND.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -1-

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -1-

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-

    I.    Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -3-

    II.    Plaintiffs Have Not Established That They Are Entitled To Summary Judgment.. .  -4-

        A.    Plaintifffs' Reliance Upon Sections 8 U.S.C. § 1254a Is Misplaced Given Congress's Specific And Unambiguous Requirement In Pub. L. No. 105-119 For Government Fingerprinting Services And Authorization That The Agency Charge A Fee For Such Services, "For Expenses Not Provided For" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -4-

        B.    Section 1254a(c)(1)(B)'s Allowance Of An Additional Fee For An Employment Authorization Documentation Is Irrelevant To The Plaintiff's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -7-

        C.    Legislative History And Statutory Construction Principles Clearly Establish That The Congress Authorized A Separate Fingerprinting Services Fee For TPS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -9-

            1.    Pub. L. No. 105-119 Required Government Fingerprinting For INA Benefits Including TPS And Authorized A Fee  For Such Services That Were Not Previously Included With The TPS Registration Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -10-

            2.    Plaintiffs' Current Reliance Upon The Words "Condition Of Registration" In The 1990 IMMACT Fails Because It Is Contrary To  Statutory Construction Principles That Words Should Be Defined By Their Context And The Company They Keep, Which In 1990 Did Not Include A Requirement Of Government Fingerprinting Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -13-

        D.    Congress, With Notice Of The Agency's Regulations Charging A Separate Fingerprinting Service Fee In Addition To The TPS Filing Fee, Has Not Changed Its Legislation Or Revoked Its Continuing Authorization And Appropriation Of The Agency's Fee Collections . . . . . . . . . . . . . . . . . . . .  -14-

        E.    Congress's 8 U.S.C. § 1356(m) Provisions For Fees Ensuring Full Cost Recovery "Notwithstanding Any Other Provisions Of Law" Provides An Independent Authority That Supersedes Any Limitations Claimed Based Upon The November 1990 IMMACT As Amended, Because The 1990 IMMACT Does Not Reference, Let Alone Expressly Repeal, 8 U.S.C. § 1356(m), Which Congress  Re-Enacted In 2003. . . . . . . . . . . . . . . . . . . . .  -16-

-i-

F.   To The Extent Pub. L. No. 105-119 is Ambiguous, The Agency's Construction Is Entitled To Chevron Deference. . . . . . . . . . . . . . . . . . . . . -17-

G.   Plaintiffs' Claim That It Is Unlawful To Charge Any Fees For Annual Re-Registration Once $50 Is Charged For The Initial Registration, Must Be Denied Because Either There Is No $50 Limit Upon Annual Registrations, Or Alternatively, Annual Registrations Are Subject To A $50 Fee Authority Because They Are Also The Subject Of 1254a(c)(1)(B) Authorizing The Attorney General To Require Payment Of A Fee Up To $50 As A Condition Of Registration . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

H.   Should Plaintiffs' Prevail On Their Summary Judgment Motion, They Would Not Be Entitled to Damages.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

I.   Plaintiffs' Claims Are Barred Pursuant To The Statute of Limitations. . . . -23-

J.   Plaintiffs' Claims Are Barred By The Doctrine Of Laches. . . . . . . . . . . . -23-

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

# TABLE OF AUTHORITIES

## FEDERAL CASES

AT&T v. United States,
    177 F.3d 1368 (Fed. Cir. 1999)........................................................ 17

Aldridge v. Williams,
    44 U.S. 9 (1845).......................................................................... 13

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)....................................................................... 4

Aponte v. Gomez,
    993 F.2d 705 (9th Cir. 1993). ......................................................... 17

Beno v. Shalala,
    30 F.3d 1057 (9th Cir. 1994). ......................................................... 18

In re Bonner Miller Partnership,
    2 F.3d 899 (9th Cir. 1993). ............................................................. 7

Boone v. Mechanical Spec. Co.,
    609 F.2d 956 (9th Cir. 1979). ..................................................... 23, 24

Bray v. United States,
    785 F.2d 989 (Fed. Cir. 1986)......................................................... 23

Briggs v. United States,
    564 F. Supp. 2d 1087 (N.D. Cal. 2008). ............................................ 22

Celotex v. Catrett,
    477 U.S. 317 (1986)..................................................................... 3, 4

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
    511 U.S. 164 (1994)...................................................................... 20

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984).................................................................. 7, 18

Consolidated Edison Co. of New York, Inc. v. Dep't of Energy,
    247 F.3d 1378 (Fed. Cir. 2001)....................................................... 22

Contract Mgmt., Inc. v. Rumsfeld,
    291 F. Supp. 2d 1166 (D. Haw. 2003). .............................................. 15

Cook v. Principi,
    318 F.3d 1334 (Fed. Cir. 2003)......................................................... 8

D. Ginsberg & Sons , Inc. v. Popkin,
    285 U.S. 204 (1932)....................................................................... 6

Doe v. United States,
    372 F.3d 1308 (Fed. Cir.2004)........................................................ 22

FDA v. Brown & Williamson Tobacco Corp.,
　　529 U.S. 120 (2000). ........................................................................ 13

Fed. Crop Ins. Corp. v. Merrill,
　　332 U.S. 380 (1947)...................................................... 5, 10, 14

Freeman v. Arpaio,
　　125 F.3d 732 (9th Cir. 1997). ..................................................... 4

Freeman v. Gonzales,
　　444 F.3d 1031 (9th Cir. 2006). ................................................. 18

Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Department of Homeland Sec'y,
　　490 F.3d 940 (Fed. Cir. 2007). .................................................. 22

Harger v. Department of Labor,
　　569 F.3d 898 (9th Cir. 2009). .................................................... 22

INS v. Abudu,
　　485 U.S. 94 (1988)........................................................................ 18

INS v. Cardoza-Fonseca,
　　480 U.S. 421 (1987). ..................................................................... 8

Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.,
　　425 F.3d 708 (Fed. Cir. 2005). .................................................. 22

J.H. Rutter Rex Manuf. Co., Inc. v. United States,
　　706 F.2d 702 (5th Cir.1983). ...................................................... 15

Jarecki v. G.D. Searle & Co.,
　　367 U.S. 303 (1961)...................................................................... 13

John R. Sand & Gravel, Inc.v. United States,
　　552 U.S. 130 (2008)...................................................................... 23

Kay v. Federal Communications Commission,
　　443 F.2d 638 (D.C.Cir.1970). ................................................... 15

Lee v. Thornton,
　　420 U.S. 139 (1975)...................................................................... 22

Longview Fibre Co. v. Rasmussen,
　　980 F.2d 1307 (9th Cir. 1992). .................................................... 8

Maffei v. Northern Ins. Co. of New York,
　　12 F.3d 892 (9th Cir. 1993). ........................................................ 4

McGee v. Peake,
　　511 F.3d 1352 (Fed. Cir. 2008)..................................................... 7

Mendoza v. United States,
　　464 U.S. 154 (1984)...................................................................... 22

Red Lion Broadcasting Co. v. Federal Communications Commission,
　　395 U.S. 367 (1969)...................................................................... 15

Rodriguez v. Secretary of Health and Human Services,
    856 F.2d 338 (1st Cir. 1988). .................................................................. 10, 14

Sisseton-Wahpeton Sioux Tribe of Lake Traverse Indian Reservation v. United States,
    895 F.2d 588 (9th Cir. 1990). ...................................................................... 23

Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engr's,
    531 U.S. 159. ................................................................................................ 20

Thomas v. Veal,
    2008 WL 110968 (E.D. Cal. Jan. 9, 2008). ............................................... 22

United States v. Kubrick,
444 U.S. 111 (1979)........................................................................................ 23

United States v. Navarro,
    160 F.3d 1254 (9th Cir.1998). ....................................................................... 6

United States v. Rutherford,
    442 U.S. 544 (1979)....................................................................................... 15

United States v. Wilson,
    290 F.3d 347 (D.C. Cir. 2002). .................................................................... 13

## FEDERAL RULES & REGULATIONS

8 C.F.R. § 103.2. ................................................................................................ 21

8 C.F.R. § 103.7. .......................................................................................... 3, 8, 11

8 C.F.R. § 240.17. ..................................................................................... 3, 8, 18, 21

8 C.F.R. § 240.2(f)(2). ........................................................................................ 2

8 C.F.R. § 240.6. ........................................................................................... 2, 10

8 C.F.R. § 244.17. .............................................................................................. 21

8 C.F.R. § 244.17(a)..................................................................................... 18, 21

8 C.F.R. § 244.6. ..................................................................................... 2, 19, 21

8 C.F.R. § 299.1. ............................................................................................... 10

Fed.R.Civ.P. 56(c). .............................................................................................. 3

## FEDERAL STATUTES

8 U.S.C. § 1254a. ..................................................................................... passim

8 U.S.C. § 1356(m). ................................................................................. passim

38 U.S.C. § 7104................................................................................................. 7

# FEDERAL REGISTER

56 Fed. Reg. 619 (Jan. 7, 1991). ................................................................. 2

56 Fed. Reg. 26163 (June 6, 1991). ............................................................ 12

56 Fed. Reg. 26164 (June 6, 1991). ............................................................ 12

56 Fed. Reg. 23491(May 22, 1991). ......................................................... 3, 8

61 Fed. Reg. 280103 (June 4, 1996). ....................................................... 2, 11

62 Fed. Reg. 10312 (Mar. 6, 1997)] ............................................................ 2

62 Fed. Reg. 45685 (Aug. 28, 1997). ........................................................ 11

62 Fed. Reg. 59735 (Nov. 4, 1997). .......................................................... 11

62 Fed. Reg. 59736 (Nov 4, 1997). ...................................................... 11, 12

62 Fed. Reg., 59737 (Nov. 4, 1997). ..................................................... 11, 12

63 Fed. Reg. 1279-01, 12982 (March 17, 1998). .......................................... 2

63 Fed. Reg. 12985-87. ............................................................................ 19

69 Fed. Reg. 64084 (Nov. 3, 2004). ............................................................ 2

69 Fed. Reg. 64088 (Nov. 3, 2004). ............................................................ 2

70 Fed. Reg. 1450 (Jan. 7, 2005). ............................................................... 2

72 Fed. Reg. 4888, 4890 (Feb. 1, 2007). ................................................... 15

# PUBLIC LAW

Pub. L. No. 101-649 § 302(c)(1)(B), 104 Stat. at 5033 (Nov. 29, 1990). ...................................... 3

Pub. L. No. 101-649, 104 Stat. at 5033 ................................................................................ 6, 7

Pub. L. No. 102-232, 105 Stat. 1733, 1749 (Jan. 3, 1991). ....................................................... 3

Pub. L. 108-7, 107 117 Stat. 11, 532 (2003). ........................................................................ 16

Pub. L. No. 101-515, § 210(c)(1) (Nov. 5, 1990). ................................................................. 17

Pub. L. No. 101-649. ...................................................................................................... 5, 13

Pub. L. No. 101-649, 104 Stat. 4978, 5032-38. .......................................................................... 5

Pub. L. No. 105-119, 104 Stat. 2440, 2447-48 (Nov. 26, 1997). ......................................... passim

Pub. L. No. 109-119. ......................................................................................................... 17

**CONGRESSIONAL REPORTS**

H.R. Conf. Rep. 101-955, 101st Cong., 2nd sess. 1990, 1990 U.S.C.C.A.N. 6710, 6784. ........... 5

H.R. Rep. No. 102-383, at 1 (1991). .............................................................................................. 9

143 Cong. Rec. H7770, 7786, (Debates on H.R. 2267, Sep. 24, 1997; statement of Rep. Smith)....................................................................................................................................... 12

1    Defendants, the Attorney General of the United States Department of Justice (when it

2    included the Immigration and Naturalization Service ("INS"), later reconstituted as part of the

3    Department Homeland Security ("DHS")), and the Secretary of DHS (collectively referenced

4    hereinafter as "defendant," "agency,"  or "Government"), respectfully submit this response in

5    opposition to plaintiffs' motion for partial summary judgment (Dkt. 114).

6                        **INTRODUCTION AND BACKGROUND**

7         This case concerns a complaint that aliens seeking the immigration benefit of Temporary

8    Protected Status ("TPS"), 8 U.S.C. § 1254a, cannot be required to pay a fee that, in 1997, Congress

9    authorized "[f]or expenses, not otherwise provided for" fingerprinting services that it mandated

10   could only be supplied by the Government whenever fingerprints were required to conduct criminal

11   history background checks for benefits under the Immigration and Nationality Act ("INA").  Pub. L.

12   No. 105-119, 104 Stat. 2440, 2447-48 (Nov. 26, 1997).  Although Congress specifically authorized

13   the Government to collect a fee for this service, plaintiffs contend that it was illegal to charge them

14   that fee after they paid $50, the limit Congress separately authorized in the INA for a "registration

15   fee" condition for TPS, a benefit under the INA, as codified at 8 U.S.C. § 1254a(c)(1)(B).

16        On July 9, 2009, the Court certified plaintiffs' "injunctive and declaratory relief claims" and

17   bifurcated this case.  (Dkt. 113).[1]  On August 17, 2009, plaintiffs moved for partial summary

18   judgment and declaratory relief ("PMSJ") and defendants cross-moved on October 2, 2009.  The

19   PMSJ should be denied because the Government's fingerprinting services fee is legal and does not

20   violate 8 U.S.C. § 1254a(c)(1)(B).

21                            **STATEMENT OF FACTS**

22        Except as set forth herein, we do not dispute plaintiffs' "statement of undisputed material

23   facts," PMSJ at 8-9, although we dispute that they support partial summary judgment.  Plaintiffs'

24   brief omits material details concerning the statutes, legislative history, and regulations at issue.  To

25

26        [1]    As a threshold matter, we note that plaintiffs' class is structured to seek relief for TPS applicants
     who registered or re-registered for TPS at any time after August 16, 2001; however, plaintiffs have never
27   amended their complaint to reflect the August 16, 2001 date.  See First Amended Complaint (Aug. 21,
     2007) (Dkt. 5).

28                                          -1-

the extent that such factual material should inform the Court's analysis, we have incorporated that information in the body of our brief. In addition, a more complete and detailed statement of proposed undisputed material facts that supports summary judgment in defendants' favor – and thus denial of plaintiffs' motion and complaint in its entirety – is set forth in the defendants' memorandum in support of cross-motion for summary judgment, filed with the Court simultaneously on Oct. 2, 2009 ("DMSJ").

Plaintiffs' statement at page 5, paragraph 2, inaccurately suggests that the defendant only required biometric data, including fingerprints, photographs and signatures <u>after</u> April 2004. TPS applicants have <u>always</u> been required to provide fingerprints, photographs and signatures with their applications[2]; however, before March 1998, the agency was not required to provide fingerprinting services for TPS applicants, and TPS applicants were required to obtain fingerprints and photographs at their own expense.[3] Similarly, TPS applications have always required a signature. <u>Id.</u> Beginning in 2004, the agency began taking applicants' photographs; previously the applicants had photographs taken from an outside vendor and at their own expense, and at that time the agency also began capturing an electronic signature. <u>See</u> 69 Fed. Reg. 64084 (Nov. 3, 2004) (Nicaragua); 69 Fed. Reg. 64088 (Nov. 3, 2004) (Honduras); 70 Fed. Reg. 1450 (Jan. 7, 2005) (El Salvador).[4]

---

[2]    <u>See</u> former 8 C.F.R. § 240.6 (attached hereto as Exh. 1), redesignated 244.6 [<u>see</u> 62 Fed. Reg. 10312, 10367 (Mar. 6, 1997)].

[3]    <u>See, e.g.</u>, 56 Fed. Reg. 619, 620 (Jan. 7, 1991) (requiring that "each application must consist of a completed Form I-104, Form I-765, Form I-821, two completed fingerprint cards (FD-258) for every applicant who is fourteen years of age or older; two identification photographs"); 61 Fed. Reg. 280103 (June 4, 1996) ([D]esignated Fingerprinting Services entities may] charge only reasonable fees for fingerprinting services, and the current fee status is to be made known to the [INS]); 63 Fed. Reg. 1279-01, 12982 (March 17, 1998) (explaining that 8 C.F.R. § 244.6 was being modified so that TPS registrants would now be required to be fingerprinted by USCIS). DMSJ Statement of Facts ("SoF") ¶¶ 1-2.

[4]    Likewise, plaintiffs state on page 5 of their brief that "[n]ationals from a TPS state must register for the TPS program when their country is initially designated for TPS." No alien is required to register for TPS. In addition, there are other instances where an alien might not be required to register for TPS at the time of a country's initial designation. For example, TPS permits eligible aliens who had a different immigration status or a pending asylum application at the time of the country's initial designation to file applications after their country is initially designated. <u>See</u> 8 C.F.R. § 240.2(f)(2).

-2-

1    Further, at page 6, paragraph 1, plaintiffs incorrectly characterize the work authorization fee,

2    described at 8 U.S.C. § 1254a(c)(1)(B) as a condition of registration that was permitted by Congress.

3    Congress explicitly authorized a fee for an employment authorization document ("EAD") when it

4    passed the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991

5    § 304(b)(2), Pub. L. No. 102-232, 105 Stat. 1733, 1749 (Jan. 3, 1991) [hereinafter "Miscellaneous

6    and Technical Amendments"] on December 3, 1991; however, by the time Congress enacted the

7    Miscellaneous and Technical Amendments authorizing the additional EAD fee, regulations had

8    already been promulgated to provide that obtaining a work authorization was optional for TPS

9    applicants.[5]  Thus, the EAD is an _optional_ benefit because -- although TPS applicants are required to

10   file a Form I-765, the form required to obtain an EAD, when applying for registration, they are not

11   required to obtain the EAD or to pay the EAD fee in order to register for TPS.  Accordingly it would

12   be inaccurate to characterize the work authorization document fee as a "condition of registration."[6]

13                                    **ARGUMENT**

14   **I.      Standard of Review**

15       A principal purpose of the summary judgment procedure is to identify and dispose of

16   factually unsupported claims.  Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).  Summary judgment

17   is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file,

18   together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

19   the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  An issue is

20   "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving

_____

21

22       [5]   See 56 Fed. Reg. 23491, 23498 (May 22, 1991) (8 C.F.R. § 240.17 to state "Form I-765 [the
     form required for an EAD] will be filed with fee only if the alien is requesting employment
23   authorization"); see also 8 C.F.R. § 103.7 (1991) (providing for a separate, mandatory $50 fee for
     registering for TPS).

24       [6]   Moreover Congress's action was necessary because the legislation enacting TPS had grouped
     the fee for an EAD with the $50 registration fee provided at Pub. L. No. 101-649 § 302(c)(1)(B), 104
25   Stat. at 5033 (Nov. 29, 1990).  Prior to Congress's enactment of the Miscellaneous and Technical
     Amendments, the INS had already promulgated regulations modifying 8 C.F.R. § 240.17 to state "Form
26   I-765 [the form required for the EAD)] will be filed with fee only if the alien is requesting employment
     authorization."  See 56 Fed. Reg. 23491, 23498 (May 22, 1991); see also id. (modifying section 103.7
27   of the TPS regulations to state that TPS applicants were required to pay only a registration fee).

28                                         -3-

party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-249 (1986).  An issue is "material" if the

fact may affect the outcome of the case.  Id. at 249.  "In considering a motion for summary judgment,

the court may not weigh the evidence or make credibility determinations, and is required to draw all

inferences in a light most favorable to the non-moving party."  Freeman v. Arpaio, 125 F.3d 732, 735

(9th Cir. 1997).  The party moving for summary judgment has no burden to produce any evidence on

elements of a claim on which the non-moving party will bear the burden of trial, but can merely

point out an absence of evidence to support any such element.  Celotex, 477 U.S. at 322-23; Maffei

v. Northern Ins. Co. of New York, 12 F.3d 892, 899 (9th Cir. 1993).  Once the moving party points

out the absence of evidence, then the nonmoving party must come forward with specific evidence to

show there is a genuine issue for trial.   Celotex, 477 U.S. at 322-23; Maffei, 12 F.3d at 899.  The

moving party is entitled to judgment as a matter of law if the non-moving party fails to make this

showing.  Celotex, 477 U.S. at 323.

Summary judgment is not only proper if plaintiff fails to produce any evidence on an element

of her case, but summary judgment is also proper if plaintiff fails to produce sufficient evidence on

an element of her case.  The Supreme Court has specifically held that summary judgment is proper

against a party who "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex,

477 U.S. at 322.   The mere existence of a "scintilla" of evidence in support of the non-moving

party's position is not sufficient. The non-moving party has the burden of establishing sufficient

evidence on each element of his case so that the finder of fact could return a verdict for her.

Anderson, 477 U.S. at 249.

**II.**	**Plaintiffs Have Not Established That They Are Entitled To Summary Judgment.**

      **A.**	**Plaintifffs' Reliance Upon Section 8 U.S.C. § 1254a Is Misplaced Given Congress's Specific And Unambiguous Requirement In Pub. L. No. 105-119 For Government Fingerprinting Services And Authorization That The Agency Charge A Fee For Such Services,"For Expenses Not Provided For"**

Plaintiffs attempt to focus attention upon section 302 of the Immigration Act of 1990 ("1990 IMMACT")[7]; however, plaintiffs are not challenging the $50 "filing" fee that they have been required to pay when they first applied for TPS registration.  Instead, they complain about the separate fee that they are charged for fingerprinting services.  But that fee was specifically authorized by Congress pursuant to Pub. L. No. 105-119, which, for the first time, and in a single sentence, required that applicants obtain fingerprinting services from the Government rather than any private sources and authorized a fee for that service:

> For expenses, not otherwise provided for, necessary for the administration . . . of laws relating to immigration, naturalization, and alien registration . . .  Provided further, That . . . after the enactment of this Act and for each fiscal year thereafter, none of the funds appropriated or otherwise made available to the Immigration and Naturalization Service may be used by the Immigration and Naturalization Service to accept, for the purpose of conducting criminal background checks on applications for any benefit under the Immigration and Nationality Act, any FD-258 fingerprint card which has been prepared by or received from any individual or entity other than an office of the Immigration and Naturalization Service, . . . Provided further, That agencies may collect and retain a fee for fingerprinting services . . . .

111 Stat. at 2447-48.  When Congress enacted Pub. L. No. 105-119, it was on notice[8] that TPS is a benefit "under the [INA]," and that TPS applicants were required to provide fingerprints and pay $50 for the TPS registration fee.  See supra notes 2-3; DMSJ, SoF ¶¶ 1-7.[9]

---

[7]    The TPS "registration fee" statute codified at 8 U.S.C. § 1254a(c)(1)(B), upon which plaintiffs' complaint relies, was enacted on November 29, 1990, as part of the Immigration Act of 1990, ("1990 IMMACT"), amending the Immigration and Nationality Act  to include a new section 244a dealing with TPS.  Pub. L. No. 101-649, 104 Stat. 4978, 5032-38; H.R. Conf. Rep.  101-955, 101st Cong., 2nd sess. 1990, 1990 U.S.C.C.A.N. 6710, 6784;1990 WL 201613 (Leg. Hist.) (Pub. L. No. 101-649 based upon S. 358 amending the INA).  Thus, as of the November 1997 enactment of Pub. L 105-119, the TPS program at 8 U.S.C. § 1254a was a benefit "under the [INA]."

[8]    Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." (citation omitted)).

[9]    Plaintiffs' rely upon language enacted in section 302 of the 1990 IMMACT which in pertinent part amended the Immigration and Nationality Act to include a new section 244a (codified as 8 U.S.C. section 1254a) providing as follows:

> (B) REGISTRATION FEE.--The Attorney General may require

-5-

1    Congress imposed Pub. L. No. 105-119's requirement of Government-performed

2  fingerprinting services in connection with criminal background checks on "any benefit under the

3  [INA]" which includes TPS, DMSJ ¶ 1, n.2, simultaneously authorized a fee for that service, and did

4  not mandate or even suggest that aliens applying for TPS are entitled free Government

5  fingerprinting services.  Even assuming for purposes of argument only that 8 U.S.C. §

6  1254a(c)(1)(B) did not allow for the expense of the Government providing plaintiffs with

7  fingerprinting services, that would only corroborate that the legality of a fee for that service is

8  controlled by Congress's later, and specific provision in Pub. L. No. 105-119 of authority to charge

9  the fingerprinting services fee "[f]or expenses, not otherwise provided for."  See D. Ginsberg & Sons

10  , Inc. v. Popkin, 285 U.S. 204, 208 (1932) ("Specific terms prevail over general in the same or

11  another statute which otherwise might be controlling."); United States v. Navarro, 160 F.3d 1254,

12  1256-57 (9th Cir.1998) (noting "general and specific provisions, in apparent contradiction, whether

13  in the same or different statutes, and without regard to priority of enactment, may subsist together,

14  the specific qualifying and supplying exceptions to the general.") (internal quotation marks omitted).

15

16

17

18

19

---

20       payment of a reasonable fee as a condition of registering an alien under
           subparagraph (A)(iv) (including providing an alien with an 'employment
21         authorized' endorsement or other appropriate work permit under this
           section). The amount of any such fee shall not exceed $50.
22

23  Pub. L. No. 101-649, 104 Stat. at 5033.  The plain language of the 1990 IMMACT, as amended,
    provides for a "Registration fee" that "[t]he Attorney General may require" as a "condition of
24  registration." 8 U.S.C. § 1254a(c)(1)(B).  The statutory text upon which plaintiffs rely plainly contains
    no reference to "fingerprinting services" or any fee for such services.  Nor would Congress have even
25  contemplated that a fee for the mandatory use of Government-provided fingerprinting services was or
    could be a "condition of registration" as specified in the 1990 IMMACT, as amended, because no such
26  condition existed.  Although the 1990 IMMACT as amended limited the registration fee that the
    Attorney General might elect to require, in 1997 Congress – not the Attorney General – in a separate
27  law, Pub. L. No. 105-119, mandated the Government-provided fingerprinting service and authorized the
    corresponding fee for the expense of this service that is at issue in this case.

28                                              -6-

1     Because the separate fee about which plaintiffs complain was plainly and specifically

2 authorized by Congress "for expenses, not otherwise provided for" when it required Government

3 fingerprinting services for TPS, plaintiffs' motion for summary judgment should be denied.[10]

4          **B.      Section 1254a(c)(1)(B)'s Allowance Of An Additional Fee For An Employment**
                 **Authorization Documentation Is Irrelevant To The Plaintiff's Motion**

5          Plaintiffs contend that, because Congress authorized INS to charge a fee for an employment

6 authorization document ("EAD"), but did not in 8 U.S.C. § 1254a specifically authorize a

7 fingerprinting services fee, that the fee that Congress authorized in Pub. L. No. 105-119 for INA

8 benefits including TPS must be illegal.  Although it is true that Congress explicitly authorized the

9 EAD fee when it passed the Miscellaneous and Technical Amendments, Congress had to take this

10 additional step because the legislation enacting what is now 8 U.S.C. § 1254a originally contained

11 language that expressly incorporated the cost of the employment authorization fee within the $50

12 cap.  See Pub. L. No. 101-649 § 302(c)(1)(B), 104 Stat. at 5033 (Nov. 29, 1990).  Conversely, 8

13 U.S.C. § 1254a(c)(1)(B) never contained any mention of a fingerprinting fee – nor could that statute

14 be expected to have mentioned a fingerprinting fee at the time of enactment or as amended in 1991 –

15 because no such Government fingerprinting services requirement existed at the time.  Therefore,

16 Congress did not need to separately address the fingerprinting fee in 8 U.S.C. § 1254a.

17          The original TPS program listed the services encompassed by the registration fee as follows:

18

19

20          [10]  Plaintiffs' cite several cases supporting their theory that when the statutory text is clear, the
inquiry is complete.  PMSJ at 10.  Because the statutory text of Pub. L. No. 105-119 plainly supports
21 the legality of the agency's separate fingerprinting services, the Court's inquiry should be complete.
Nevertheless, the legislative history also supports the agency's construction and we note that in several
22 of the cases cited by plaintiffs, the court did not stop with the statutory text and also examined the
broader statutory context.  E.g., McGee v. Peake, 511 F.3d 1352, 1357 (Fed. Cir. 2008), (analyzing a
23 claim brought by a veteran, pursuant to 38 U.S.C. § 7104 and noting that the language of the statute had
to be examined in the context of the statutory scheme for disability law); In re Bonner Miller Partnership,
24 2 F.3d 899 (9th Cir. 1993) (analyzing bankruptcy code provision to determine whether, based upon
relevant caselaw and statutory history, that provision could incorporate a pre-bankruptcy code "new
25 value" exception to the absolute priority rule).  As we demonstrate here and in greater detail in our cross-
motion for summary judgment filed simultaneously herewith, the statutes at issue, whether based on
26 plain language or, even assuming ambiguity, statutory construction and judicial deference to Executive
Branch regulation, see Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,
27 842 (1984), plaintiffs' motion should be denied.

28                                           -7-

1

2

3

4

        (B) REGISTRATION FEE – The Attorney General may require payment of a reasonable fee as a condition of registering an alien under subparagraph (A)(iv) (including providing an alien with an "employment authorized" endorsement or other appropriate work permit under this section).  The amount of any such fee shall not exceed $50.00.

Pub. L. No. 101-649 § 302(c)(1)(B), 104 Stat. at 5033 (Nov. 29, 1990) (emphasis supplied).

5

6

        Accordingly, because the original legislation expressly incorporated the EAD fee in the

7

provision describing the $50 fee cap, Congress had to expressly carve out the work authorization fee

8

in the Miscellaneous and Technical Amendments in order for INS to be able to charge a separate

9

work authorization fee.  Conversely, the original TPS legislation did not include any discussion

10

about fingerprints and did not state that any TPS applicant had to have his or her fingerprints

11

collected by the Government.  Therefore, in 1997, when Congress passed Pub. L. No. 105-119,

12

which mandated that TPS applicants obtain fingerprints from the Federal Government, Congress did

13

not have to address the fee provision of 8 U.S.C. § 1254a, because that statute did not address

14

fingerprints or require Government fingerprinting.  Instead, Congress in Pub. L. No. 105-119

15

authorized INS to charge a fee for fingerprinting services.[11]

16

        In addition, by the time Congress passed the Miscellaneous and Technical Amendments

17

authorizing the additional EAD fee, regulations had already been enacted stating that a work

18

authorization fee was optional.  The Miscellaneous and Technical Amendments were not passed

19

until December 3, 1991.  Six months prior to the time that Congress passed the formal technical

20

21

22

23

24

25

26

27

    [11]   Plaintiffs cases regarding the principle of expressio unis est exclusio alterius, PMSJ at 13 are, thus, not relevant. See e.g., Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1312-13 (9th Cir. 1992) (addressing a highly detailed statutory scheme where Congress carefully drafted the statutory provision at issue so that it was clear which other sections of statute Congress intended to be affected by the statutory section in question, so that it would not have made sense to have read another unlisted statutory section into Congress' detailed scheme); Cook v. Principi, 318 F.3d 1334, 1339 (Fed. Cir. 2003) (holding that because Congress had specifically created two exceptions to a statutory rule, a court could not create another exception); INS v. Cardoza-Fonseca, 480 U.S. 421, 432 (1987) (addressing a situation where Congress specifically chose to amend one section of a statute and not another).  None of these cases address this statutory scheme.  As we explained above, Congress was required to carve out the work authorization fee through the Miscellaneous and Technical Amendments because it was expressly included with the $50 fee in the original statute.  By contrast, a mandatory Government fingerprinting service for any INA benefit including TPS  was never contemplated at the time, much less intended to be included with the $50 fee.  Congress separately took the affirmative step of allowing the agency to charge for those services through Pub. L. No. 105-119.

28

amendment, INS had already enacted regulations modifying 8 C.F.R. § 240.17 to state "Form I-765 [the form required for an EAD] will be filed with fee <u>only if</u> the alien is requesting employment authorization."  <u>See</u> 56 Fed. Reg. 23491, 23498 (May 22, 1991) (emphasis supplied); <u>see also</u> 8 C.F.R. § 103.7 (1991) (providing for a separate, mandatory $50 fee for registering for TPS). Congress had notice that INS had issued modified regulations governing TPS fees as the Commissioner of INS, Gene McNary testified before the House Subcommittee of International Law, Immigration and Refugees on May 15, 1991, that the regulation which addressed the work authorization fee had been signed the morning that he testified.  <u>Implementation of the Immigration Act of 1990: Hearing Before the Subcomm. of Int'l Law, Immigration, and Refugees</u>, 102nd Cong. 1, 74 (1991) (attached hereto as Exh. 2).  Accordingly, by the time the Miscellaneous and Technical Amendments passed, payment of a fee for an EAD could not be considered a "condition of registration" pursuant to 8 U.S.C. § 1254a because any EAD fee would have been an optional fee pursuant to the May 1991 regulations.  Therefore, because Congress was not authorizing a mandatory charge, the Miscellaneous and Technical Amendments do not establish that additional legislation in 8 U.S.C. § 1254a was required to charge any fee other than the initial $50 fee pursuant to § 1254a.[12]

---

[12]   Moreover, the legislative history surrounding the Miscellaneous and Technical Amendments suggests the main reason for the enactment of the EAD carveout was related to the program involving El Salvador.  At that time, the El Salvador TPS applicants were governed by section 303 of the Immigration Act of 1990, rather than section 302, which governed all other TPS applicants.  Pursuant to section 303, and its implementing regulations, El Salvadoran immigrants were exposed to the possibility of paying higher fees than other TPS applicants – up to $330 with no cap for what a family might have to pay.  <u>See Implementation of the Immigration Act of 1990: Hearing Before the Subcomm. of Int'l Law, Immigration, and Refugees</u>, 102nd Cong. at 2 (Exh. 2).  Throughout the debate on the Miscellaneous and Technical Amendments, both the House and the Senate emphasized the purely technical nature of the amendment authorizing the work authorization and the fact that the amendment was simply clarifying the intent of Congress in enacting the original bill and not adding anything new.  <u>See, e.g.</u>, Cong. Rec. S 11800 (Aug. 1, 1991) (statement of S. Simpson) ("This bill was developed under the following rule: If any of the four Immigration Subcommittee staff's found a provision to be controversial or non-technical, then it was removed.") (attached hereto as Exh. 3).  Specifically, the technical amendment authorizing the work authorization fee originated in H.R. 3670, whose purpose was to "make certain technical <u>corrections</u> relating to the immigration laws."  H.R. Rep. No. 102-383, at 1 (1991) (emphasis supplied) (attached hereto as Exh. 4); <u>see id.</u> at 2 (noting that the bill included "a number of technical amendments to the underlying body of immigration law" which were the result of comments by "constituents and affected groups; . . . the Administration; and . . .House and Senate

**C.      Legislative History And Statutory Construction Principles Clearly Establish That The Congress Authorized A Separate Fingerprinting Services Fee For TPS**

Just as the text of Pub. L. No. 105-119 plainly establishes that Congress authorized the agency to charge a fee for required Government fingerprinting services for the INA benefit of TPS, the legislative history of Pub. L. No. 105-119 and statutory construction principles clearly support the United States' contention that Congress authorized a separate fingerprinting fee for TPS.

**1.      Pub. L. No. 105-119 Required Government Fingerprinting For INA Benefits Including TPS And Authorized A Fee  For Such Services That Were Not Previously Included With The TPS Registration Fee**

Plaintiffs contend that, by failing to simultaneously amend 8 U.S.C. § 1254a at the time it enacted Pub. L. No. 105-119, that Congress signaled an intention to include an entirely new set of services within its authorization of a $50 TPS registration fee.  Pl's Br. at 14-15.  However, the plaintiffs cite no legislative history which would indicate that Congress in any way intended to exempt TPS participants from paying a fee for fingerprinting services.

At the time Congress enacted Pub. L. No. 105-119 in November 1997, Congress was on notice of its own legislation.[13]  Thus, when Congress enacted Pub. L. No. 105-119, it was necessarily aware of its stautory provisions that: (1) TPS, as a "benefit under the [INA],"[14] is subject to Congress's Pub. L. No. 105-119 requirement for Government fingerprinting services and corresponding fee authority; (2) eligibility for TPS depended upon the absence of certain criminality and other factors, 8 U.S.C. § 1254a(c)(2)(B), necessitating fingerprinting for criminal background

---

staffs").  Thus, it is apparent that Congress was not adding additional authority, rather it was explaining further and correcting the authority originally provided in 1990 when it carved out the EAD fee from the fee cap.

[13] Fed. Crop Ins. v. Merrill, 332 U.S. 380-384-85 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents); see also Rodriguez v. Secretary of Health and Human Services, 856 F.2d 338 (1st Cir. 1988) (noting that Congress must be aware of preexisting regulations when it enacts a new law).

[14]    See note 7 supra.

-10-

1   check purposes;[15] (3) the 1990 IMMACT was silent with respect to fingerprinting and did not require

2   that TPS applicants pay the Government for such services; (4) Congress had provided, in 8 U.S.C.

3   § 1356(m), that "notwithstanding any other law," the INS could recover the full costs of its services,

4   while specifically identifying authority to subsidize asylum (but not the then-existing TPS),[16]

5   (5) Congress did not provide, in 8 U.S.C. § 1254a, that 8 U.S.C. § 1356(m)'s "notwithstanding any

6   other law" authority to recover the full costs of services was repealed as to TPS; and (6) Congress's

7   new Pub. L. No. 105-119 fee authority would not necessarily present any new additional cost to

8   aliens seeking to register for TPS because they already were responsible for providing, at their own

9   expense, biometric identification data; Congress had only changed the permissible source of such

10  services necessary for alien registration, while authorizing the fee at issue in this case, "for expenses

11  not otherwise provided for."   Id.

12         Congress was similarly aware of several pertinent agency regulations that: (1) required that

13  TPS applicants provide biometric identifying data, such as fingerprints, photographs, and signatures,

14  but permitted aliens to procure these identifying materials from private sources and were not required

15  to obtain them from the Government or to pay the Government for such services;[17] and (2) required

16  TPS applicants to pay a "filing" fee at the time of the initial registration that would be determined at

17  the time a country was designated for TPS but would not exceed $50, 8 C.F.R. §§ 103.7 and 244.6;

18

19      [15]   Regulations in place at the time Pub. L. No. 105-119 was enacted required that TPS applicants
     provide two photographs with their application.  See 8 C.F.R. § 240.6 (1997) (attached hereto as Exh.
20   5).  Also, the I-821 Form, incorporated into the regulations by way of 103.2(a)(1), required the
     submission of FD-258 cards and two photographs.  In 1997, the May 22, 1991 edition of Form I-821 was
     in effect and required that an applicant sign the application.  See 8 C.F.R. § 299.1 (1997) (attached
21   hereto as Exh. 6); see also notes 2-3, supra.

22      [16]   As is discussed below, Congress in 2003 – after the 1990 IMMACT, as amended, upon which
     plaintiffs rely – reenacted the clause of 8 U.S.C. § 1356(m), Pub. L. No. 108-7, § 107, 117 Stat. 11, 532
23   (2003), authorizing the agency to subsidize asylum, without likewise mentioning TPS.

24      [17]   Before Congress enacted Pub. L. No. 105-119,  the agency required applicants for immigration
     benefits such as TPS to produce fingerprints, photographs and signatures,  but allowed applicants to
25   obtain such services from private as well as public sources and did not require them to utilize the
     services of the agency or, correspondingly, to pay the agency, rather than a private source, for that
26   service.  See note 2, supra; , 61 Fed. Reg. 280103 (June 4, 1996) ([Designated Fingerprinting Services
     entities may] charge only reasonable fees for fingerprinting services, and the current fee status is to be
27   made known to the [INS]).

28                                      -11-

1   and, consistently and repeatedly just prior to the enactment of Pub. L. No. 105-119, published in the

2   Federal Register its determinations that the TPS filing fee was exactly $50.[18]

3          Likewise, at the time Congress contemplated enacting Pub. L. No. 105-119, Congress was

4   concerned about the potential for fraud associated with immigration benefit applications.  In 1997,

5   Congress, while investigating the potential for criminals to pass background checks and obtain INA

6   benefits, examined whether the INS should continue to allow aliens to supply fingerprints that they

7   had taken from private sources.  Congress received reports and testimony noting the potential for

8   problems if aliens are allowed to procure fingerprinting services privately.[19]  Congress with notice of

9   then existing relevant statutory and regulatory provisions, and in direct response to the potential for

10  fraud or of criminals receiving immigration benefits as a result of aliens obtaining fingerprints from

11

12      [18]   The agency consistently has treated the TPS filing fee as a separate fee due in the amount of
        exactly $50.  The $50 TPS filing fees of which Congress would have had notice, immediately before
13      enacting Pub. L. No. 105-119, were contained in the published notices of the following TPS country
        designations:  Montserrat 62 Fed. Reg. 45685 (Aug. 28, 1997); Burundi 62 Fed. Reg. 59735 (Nov. 4,
14      1997); Sudan 62 Fed. Reg, 59737 (Nov. 4, 1997); Sierra Leone 62 Fed. Reg. 59736 (Nov. 4, 1997).
        Montserrat 62 Fed. Reg.  45685 (Aug. 28, 1997) (including a designation period from Aug. 28, 1997,
15      Aug. 27, 1998); Burundi 62 Fed. Reg 59735 (Nov. 4, 1997) (including a designation period from Nov.
        4, 1997 through Nov. 3, 1998); Sudan 62 Fed. Reg. 59737 (Nov. 4, 1997) (including a designation
16      period: from Nov. 4, 1997 through Nov. 3, 1998); and Sierra Leone 62 Fed. Reg. 59736 (Nov. 4, 1997)
        (including the same designation period as Sudan).  The INS had been setting the TPS filing fee at not
17      less than $50 since the earliest country designations for TPS.  E.g., Liberia, 56 Fed. Reg. 26164 (June
        6, 1991); Kuwait, 56 Fed. Reg. 26163 (June 6, 1991).
18

19      [19]   See Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies
        Appropriations for 1998: Hearing on H.R. 2267 Before the H. Subcomm. of the Comm. on
20      Appropriations, Part Six [hereinafter H.R. 2267 Hearings], at 495-97, 105th Cong. 200 (1997) (attached
        hereto as Exh. 7).  The H.R. 2267 Hearings included the statement of Michael R. Bromwich, Inspector
21      General of the Department of Justice, referring to an February 1994 Office of the Inspector General
        report concerning "Alien Fingerprint Requirements in the Immigration and Naturalization Service."
22      H.R. 2267 Hearings at 495-97.  That report, no. I-93-13 ("OIG Report"), which was discussed during
        the hearings though not specifically read into the record, references the fact that Title 8 requires
23      submission of fingerprints for TPS, when discussing the shortcomings of the agency's  fingerprinting
        process.  See  OIG  Report  at  4  (attached  hereto  as  Exh.  8);  also  available  at:
24      http://www.usdoj.gov/oig/reports/INS/e9313.htm. Members of Congress expressed concerns about the
        use of private fingerprinting.  E.g. 143 Cong. Rec. H7770, 7786, (Debates on H.R. 2267, Sep. 24, 1997;
25      statement of Rep. Smith) (attached hereto as Exh. 9); Id. at H7803 (statement of Rep. Watt) ("What we
        need to put in context, however, is that Pookies' Parcel Post and Lulu's and Anita's are all private
26      enterprises in this country. This is one of those times when this notion that we should privatize
        everything that the Federal Government is doing basically went awry. . . .  And now what we have found
27      is that there are certain things that private enterprise cannot do as well as the Federal Government. . . .
        This is too serious a proposition to give out to just anybody.").

28                                              -12-

1   private sources, made Pub. L. No. 105-119 applicable to "any benefit under the [INA]" and

2   authorized a fee "[f]or expenses not otherwise provided for."  Thus, the legislative history of Pub. L.

3   No. 105-119, as well as its plain language, supports the legality of the agency's assessment of a

4   separate fee for Congress's requirement of Government provided fingerprinting services for TPS.[20]

5          **2.       Plaintiffs' Current Reliance Upon The Words "Condition Of**
                     **Registration" In The 1990 IMMACT Fails Because It Is Contrary To**
6                    **Statutory Construction Principles That Words Should Be Defined By**
                     **Their Context And The Company They Keep, Which In 1990 Did Not**
7                    **Include A Requirement Of Government Fingerprinting Services**

8          The "Registration fee" statute upon which plaintiffs rely, did not define the words "condition

9   of registration."  See Pub. L 101-649, section 302, 104 Stat. 4978, 5032-28; 8 U.S.C.

10  § 1254a(c)(1)(B).  The words "fingerprinting services" do not appear within the "Registration fee"

11  statute.  Id.  Nor could these words "condition of registration" reasonably be construed to include a

12  fee for mandatory use of Government fingerprinting services, because no such condition existed at

13  that time.  Congress's 1990 use of the words "condition of registration" must not be expanded to give

14  them breadth beyond what those words would have meant given their context and the company they

15  kept.  See Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961) (stating that the maxim *noscitur a*

16  *sociis* is often wisely applied where a word is capable of many meanings in order to avoid the giving

17  of unintended breadth to the Acts of Congress); United States v. Wilson, 290 F.3d 347, 354 (D.C.

18  Cir. 2002) ("In resolving the ambiguity, we consider the broader context of [the section] and the

19  structure of the [statute] as a whole, as well as the contextual background against which Congress

20  was legislating, including relevant practices of the Executive Branch which presumably informed

21

22

23        [20]    Plaintiffs make much out of Congress's humanitarian aims in enacting TPS; however, the fact
         that TPS was enacted for humanitarian purposes does not establish that Congress could not separately
24       authorize a fingerprinting services fee to address an entirely different concern.  PMSJ at 15-16.  As
         explained in the preceding sections, the plaintiffs' rendition of legislative history essentially ignores
25       Congress's Pub. L. No. 105-119 and, thus, its separate purpose and authority.  In addition, as we
         established above, at the time Congress passed P.L. 105-119, Congress was well-aware that TPS
26       applicants were already paying non-Government vendors for various services that now comprise the
         biometrics fee, such as fingerprints and photographs.  Congress's concern when it passed P.L. 105-119
27       was to address potential <u>fraud</u> and to prevent criminals from receiving immigration benefits.

28                                                  -13-

1   Congress's decision, prior legislative acts, and historical events.").[21]  To now give the words in the

2   1990 IMMACT the breadth plaintiffs' claim requires, would be contrary to the words used, and

3   conditions that existed, at the time of the 1990 IMMACT.

4        Instead, PL 105-119 and 8 U.S.C. § 1254a can be construed in accordance with statutory

5   construction principles that words be construed by the context and company they kept; that statutes

6   be construed harmoniously and according each meaning, if § 1254a is construed to continue to apply

7   only to the $50 registration fee that the Attorney General required for filing a TPS application, while

8   construing the fingerprinting services fee separately charged as what it is: provided for by Congress's

9   later and separate requirement, in Pub. L. No. 105-119, that the agency provide plaintiffs with

10  Government fingerprinting services and authorization that it collect and retain a fee for that service,

11  "for expenses not otherwise provided for."

12       **D.    Congress, With Notice Of The Agency's Regulations Charging A Separate
             Fingerprinting Service Fee In Addition To The TPS Filing Fee, Has Not
13           Changed Its Legislation Or Revoked Its Continuing Authorization And
             Appropriation Of The Agency's Fee Collections**

14

15       Congress is charged with notice of its own acts and published regulations.  Fed. Crop Ins.

16  Corp. v. Merrill, 332 U.S. at 384-85; see also Rodriguez v. Secretary of Health and Human Services,

17  856 F.2d 338 (1st Cir. 1988) (noting that Congress must be aware of preexisting regulations when it

18  enacts a new law).  Following Pub. L. No. 105-119, the INS developed regulations that implemented

19  the new fingerprinting services requirement and specifically amended at the same time the agency's

20  TPS regulations to note that a separate fingerprinting services fee would be required in addition to

21  the TPS filing fee.  DMSJ, SoF ¶ 7-10.  Following standard procedures, the INS transmitted a copy

22  of the regulations it had drafted to Congress, prior to their March 29, 1998 effective date.  Id.

23       Since March 29, 1998, the Government fingerprinting requirement and fee authority enacted

24  in Pub. L. No. 105-119, and the registration fee authority in 8 U.S.C. § 1254a(c)(1)(B), have not

25

26       [21]   See also FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) ("The
         meaning – or ambiguity – of certain words or phrases may only become evident when placed in
27       context."); Aldridge v. Williams, 44 U.S. 9, 24 (1845) (stating that courts interpreting legislation should
         look, "if necessary, to the public history of the times in which it was passed").

28                                                    -14-

1   been amended, and the agency's regulations continue to specify a Government fingerprinting

2   services fee separate from and in addition to the TPS registration fee.  Id. at SoF ¶ 12.

3          For over a decade following the agency's publication of its March 1998 regulations, Congress

4   has had notice of the agency's regulations construing Pub. L. No. 105-119 to permit charging a

5   separate fee for fingerprinting services in addition to the filing fee that the agency continues to

6   charge for TPS.  See DMSJ, SoF ¶¶ 10-11.[22]  More recently, since 2004, the agency has published

7   regulations setting the fingerprinting services fee at $70, a figure that by itself exceeds $50.  See

8   DMSJ, SoF ¶ 11.

9          Clearly, the agency has publicly and explicitly put all concerned, Congress included, on

10  notice of its administrative interpretation through publication of its fee regulations since March 1998.

11  The fact that Congress has not acted to change the agency's interpretation is "almost conclusive

12  evidence that the interpretation has congressional approval":

13          "[A] consistent administrative interpretation of a statute, shown clearly
            to have been brought to the attention of Congress and not changed by
14          it, is almost conclusive evidence that the interpretation has
            congressional approval." J.H. Rutter Rex Manuf. Co., Inc. v. United
15          States, 706 F.2d 702, 711 (5th Cir.1983) (quoting Kay v. Federal
            Communications Commission, 443 F.2d 638, 646-47 (D.C.Cir.1970));
16          see also United States v. Rutherford, 442 U.S. 544, 553-554, 99 S.Ct.
            2470, 61 L.Ed.2d 68 (1979); Red Lion Broadcasting Co. v. Federal
17          Communications Commission, 395 U.S. 367, 381, 89 S.Ct. 1794, 23
            L.Ed.2d 371 (1969).
18
    Contract Mgmt., Inc. v. Rumsfeld, 291 F. Supp. 2d 1166, 1177 (D. Haw. 2003).
19
20          Further, pursuant to INA §§ 286(m), (n) [codified at 8 U.S.C. §§ 1356(m), (n)], Congress has

21  provided a continuing authorization and appropriation of the agency's expenditure of its fee

22  collections.  The Pub. L. No. 105-119 fingerprinting services fee is deposited into this account.

23  See 72 Fed. Reg. 4888, 4890 (Feb. 1, 2007) (general background of Immigration Examination Fee

24  Account, 8 U.S.C. § 1356(m), (n)).  As is evident in, for example, the very same act that authorized

25      [22]   See e.g. Hearing on Past Designation of Temporary Protected Status And Fraud in Prior
        Amnesty Programs Before H. Immigration And Claims Subcomm. H. Judiciary Comm., 106th Cong. 1,
26      3 (testimony of Paul Virtue, General Counsel, INS) ("A complete application requires . . . fees or fee
        waivers and their appearance for fingerprints.") (attached hereto as Exh. 10).

27

28                                           -15-

1   the fingerprinting services fee at issue, Pub. L. No. 105-119, Congress also utilizes its appropriations

2   legislation to provide specific mandates imposing requirements and limitations upon the agency's

3   use of the funds that are appropriated or otherwise made available to it.  Id., 111 Stat 2447-48.

4   Because Congress has not revoked its continuing authorization and appropriation of the agency's fee

5   collections or otherwise acted to invalidate the agency's charging of the 1997 Pub. L. No. 105-119

6   authorized fee in addition to the TPS filing fee, that is further and conclusive evidence that Congress

7   has approved of the agency fees at issue in this case.

8         **E.**    **Congress's 8 U.S.C. § 1356(m) Provisions For Fees Ensuring Full Cost Recovery**

9                   **"Notwithstanding Any Other Provisions Of Law" Provides An Independent Authority That Supersedes Any Limitations Claimed Based Upon The**

10                  **November 1990 IMMACT As Amended, Because The 1990 IMMACT Does Not Reference, Let Alone Expressly Repeal, 8 U.S.C. § 1356(m), Which Congress Re-Enacted In 2003**

11          Plaintiffs contend that 8 U.S.C. § 1356(m) does not permit the agency to recoup the costs of

12  fingerprinting fees because it is not sufficiently "specific" and because it was enacted prior to the

13  1990 IMMACT.  Pl's Memo at 17.  Plaintiffs apparently overlook the fact that subsequently, in 2003

14  – well after 8 U.S.C. § 1254a was passed –  Congress re-enacted provisions of 8 U.S.C.

15  § 1356(m) mentioning asylum subsidies.  Pub. L. 108-7, § 107 117 Stat. 11, 532 (2003).  Congress's

16  last act, after declining to direct or even expressly suggest that TPS applicants be exempted from

17  paying for the cost of services provided to them -- as it did with asylum  -- confirms that the agency's

18  fingerprinting services fee is authorized independently by 8 U.S.C. § 1356(m), "notwithstanding any

19  other provision of law."  Even assuming, for the sake of argument only, that 8 U.S.C. § 1254a could

20  have been construed as more specific than 8 U.S.C. § 1356(m) at the time 8 U.S.C. § 1254a was

21  enacted, Congress's subsequent reenactment of 8 U.S.C. § 1356(m) clearly shows that the statute

22  permits the agency to recoup the costs of providing fingerprinting services.

23          Moreover, the legislative timeline outlined by the plaintiffs does not establish that 8 U.S.C.

24  § 1356(m) does not authorize the agency to recoup its costs associated with TPS because the 1990

25  IMMACT nowhere references, let alone expressly repeals, 8 U.S.C. § 1356(m), authorizing the

26  agency to recover the full costs of providing adjudication services  "notwithstanding any other

27

28                                                   -16-

provisions of law."[23]  At the time Congress was enacting Pub. L. No. 101-515, § 210(c)(1) (Nov. 5,

1990), adding the cost recovery clauses to 8 U.S.C. § 1356(m)'s authorization "[n]otwithstanding

any other provisions of law," Congress would have been aware of its pending TPS legislation,

enacted on November 29, 1990, adding 8 U.S.C. § 1254a.  Congress did not, however, specify in

8 U.S.C. § 1356(m) that TPS applicants were to be subsidized or reimbursed for their expense in

providing fingerprints.

### F.    To The Extent Pub. L. No. 105-119 is Ambiguous, The Agency's Construction Is Entitled To *Chevron* Deference

Plaintiffs' apparently would argue that 8 U.S.C. § 1254a precludes any analysis of whether

Pub. L. No. 105-119 authorizes USCIS to recoup the full costs of immigration services.  As set forth

in the preceding sections, Congress in 1997 Pub. L. No. 105-119 unambiguously required that

Government fingerprinting services be used when fingerprinting for "any benefit under the [INA],"

which includes TPS and authorized a corresponding fee "[f]or expenses not otherwise provided for."

Therefore, because the plain language of Pub. L. No. 105-119 and its legislative history support the

legality of the agency's regulation assessing the fingerprinting services fee, 8 U.S.C. § 1254a is

relevant <u>only</u> if the statutory scheme that Congress created could be construed as ambiguous.  And, if

---

[23]    Plaintiffs cite numerous cases attempting to show that because the general fee provision set forth in 8 U.S.C. § 1254a was enacted 24 days after the general fee provision in 1356(m), it is not possible that section 1356(m) authorized the agency to charge more than $50. PMSJ at 17.  However, given Pub. L. No. 105-119's application to fingerprinting for "any benefit under the [INA]" which includes TPS and its corresponding grant of authority to charge a fee for the specific purpose of providing the Government performed fingerprinting services that Congress mandated -- a separate service that was not contemplated at the time the agency passed § 1254a -- and the 2003 re-enactment of 1356(m) that continued, after § 1254a, to expressly suggest subsidizing asylum but did not, despite notice of the agency's March 1998 regulations charging TPS, likewise suggest subsidies for TPS, the timing upon which plaintiffs rely would not render any portion of § 1254a superfluous.  Moreover, the cases cited by the plaintiff are wholly factually dissimilar from the current case.  <u>E.g.</u> <u>Aponte v. Gomez</u>, 993 F.2d 705, 707 (9th Cir. 1993), (federal court was analyzing a state penal code and was bound by the manner in which the state court had interpreted the same provision).  Likewise, in <u>AT&T v. United States</u>, 177 F.3d 1368, 1375 (Fed. Cir. 1999), the court was analyzing a lawsuit brought pursuant to the Contract Disputes Act where the Navy failed to follow its own internal review procedures that were required before a contract could be entered into and then attempted to use its failure to follow its own procedures as grounds to invalidate a contract – the "absurd" result referenced by the court.  By contrast, here INS and then USCIS followed the notice and comment procedures and received no objection that § 1254a made it illegal to charge TPS applicants for the new Government fingerprinting services requirement.

-17-

1  Congress's statutory scheme could be construed as containing an ambiguity, then agency's express

2  reliance upon Congress's authorization in Pub. L. No. 109-119 when promulgating contemporaneous

3  regulations that imposed the fee challenged by plaintiffs' complaint was and is reasonable.[24]

4  Therefore, the agency's interpretation would be entitled to Chevron deference.[25]

5       In March 1998, when the agency published its regulation requiring Government

6  fingerprinting services and related fee for TPS registration, it had notice of Congress's November

7  1997 enactment of Pub. L. No.105-119, and, correspondingly, all that Congress had notice of when it

8  enacted that legislation, including the fact that the TPS registration fee was $50.  See section II.C.1;

9  DMSJ, SoF ¶ 3.  The agency had promulgated TPS regulations that did not charge any filing fee for

10 annual re-registrations; see 8 C.F.R. § 244.17(a); and the new fee authority that Congress provided in

11 Pub. L. No.105-119 would not necessarily present any new cost to TPS applicants such as the

12 plaintiffs, because they already were responsible for providing at their own expense, biometric

13 identification data; Congress had only changed the permissible source of such services necessary for

14 alien registration.  In sum, in March 1998, when the agency issued its new regulation requiring and

15 _____

16 [24] Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984) (holding that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"); see also INS

17 v. Abudu, 485 U.S. 94, 110 (1988) (finding that judicial deference to the Executive Branch is especially appropriate in the immigration context).  In United States v. Dang, the Ninth Circuit recently held that,

18 under Chevron, a court must "not only look at the precise statutory section in question, but we also analyze the provision in the context of the governing statue as a whole, presuming congressional intent

19 to create a symmetrical and coherent regulatory scheme." 488 F.3d 1135, 1140 (9th Cir. 2007).

20 [25] Plaintiffs' brief cites several cases which they contend support their position that the agency's interpretation is not entitled to deference because the fee at issue is unambiguously illegal.  However,

21 the fact that the regulation implementing the fingerprinting fees went unchallenged at the time it was enacted in March 1998 by AILA, and for almost 10 years thereafter by anyone else, including, for over

22 six years, by plaintiffs and their current immigration counsel and co-class counsel, establishes that plaintiffs' claims are not in fact founded upon an unambiguous illegality in Congress's statutory scheme.

23 See DMSJ, SoF ¶¶ 10-15.  Likewise, the cases that the plaintiffs' rely upon to support their contention that the agency's interpretation is not entitled to deference are factually dissimilar from the current case.

24 For example, Freeman v. Gonzales, 444 F.3d 1031, 1036 (9th Cir. 2006) involved a challenge to an agency program where the agency's interpretation of a statute ran contrary to its own practices.  See also

25 Beno v. Shalala, 30 F.3d 1057, 1071 (9th Cir. 1994) (refusing to defer to agency's interpretation of a statute that was developed for purposes of litigation and which ran contrary to the purpose of the statute).

26 By contrast, here the agency has held a longstanding practice of charging the biometrics fee which is both in line with the language and the purpose of Pub. L. No. 105-119 and does not render 8 U.S.C.

27 § 1254a superfluous.

28                                  -18-

1    charging a fee for Government fingerprinting services, it reasonably construed Pub. L. No. 105-119

2    to authorize it to charge TPS applicants for that service.

3           As noted in section II.D of this brief, on March 17, 1998, the INS published in the Federal

4    Register, regulations that, among other things, provided that, pursuant to the grant of authority

5    established in Pub. L. No. 105-119,  the agency would begin providing fingerprinting services to

6    TPS applicants and that it would charge applicants for those services.  Id.  In the same March 17,

7    1998 Federal Register publication, the agency amended its TPS regulation at 8 C.F.R. § 244.6, which

8    "continues" to cite 8 U.S.C. § 1254a as authority, to refer to the requirement to pay "fingerprinting

9    fees as provided in §103.7 of this chapter" in addition to the separate TPS "filing" fee that the 244.6

10   regulation continued to require.  63 Fed. Reg. 12985-87.

11          The contemporaneous, pre-dispute conduct of all concerned further corroborates the

12   reasonableness of the agency's determination that it could charge the Pub. L. No.105-119 authorized

13   fee for Government fingerprinting services.  Although the March 1998 regulation plainly added not

14   only a new requirement that plaintiffs must obtain and pay for Government fingerprinting services,

15   while it "continu[ed]" to rely upon § 1254a as cited authority for the TPS regulation which also

16   charges a fee specifically for filing applications to register for TPS, i.e., the initial TPS filing fee of

17   $50, neither plaintiffs, nor the immigration bar, nor anyone else, responded to the agency's 1998

18   request for comments with an objection that the fingerprinting services fee was unlawful.[26]

19   Moreover, Congress's continuing to leave unchanged its laws and continuing and annual

20   appropriation authority, and the agency's regulations, further establishes that they agency's

21   interpretation of the relevant statutes is reasonable.  See section II.D of this brief, supra.

22

23

24

25

26   [26] Indeed, the American Immigration Lawyers Association ("AILA") filed comments on the
     regulation, and did not assert that the agency's amendment of its TPS regulation to reflect that the TPS
27   filing fee would continue to be charged, along with the new fingerprinting services fee, violated the §
     1254a authority cited as the "continuing" authority for the TPS regulation.  See DMSJ, SoF ¶¶ 10, 13.

28                                              -19-

1

2

3

4

**G.      Plaintiffs' Claim That It Is Unlawful To Charge Any Fees For Annual Re-Registration Once $50 Is Charged For The Initial Registration, Must Be Denied Because Either There Is No $50 Limit Upon Annual Registrations, Or Alternatively, Annual Registrations Are Subject To A $50 Fee Authority Because They Are Also The Subject Of 1254a(c)(1)(B) Authorizing The Attorney General To Require Payment Of A Fee Up To $50 As A Condition Of Registration**

5       Another claim of plaintiffs at odds with their own pre-dispute conduct is their contention to

6   the effect that, after they pay an initial TPS filing fee of $50, they are entitled to receive for free the

7   Pub. L. No. 105-119 required Government fingerprinting services every time they apply for the

8   annual registration (or "re-registration") required to maintain TPS.  See PMSJ at 18-22.  In support

9   of their current claim, plaintiffs' note that 8 U.S.C. §1254a(c)(3)(C) requires TPS registration

10  annually but does not specify in that section anything about a fee for those registrations.  Id.

11  However, the plain text of 8 U.S.C. §1254a(c)(3)(C) serves to disprove plaintiffs' claim.

12      Congress requires that aliens re-register for TPS periodically as follows:

13          Withdrawal of temporary protected status

14          The Attorney General shall withdraw temporary protected status
            granted to an alien under this section if --

15          * * *

16          (C) the alien fails, without good cause, to register with the Attorney
            General annually, at the end of each 12-month period after the granting

17          of such status, in a form and manner specified by the Attorney General.

18

19  Congress delegated to the agency the authority to provide for registrations after the initial registration

20  in "a form and manner specified by the Attorney General."  Congress did not reference the

21

22

23

24

25

26

27

28

-20-

§ 1254a(c)(3)(C) annual registrations in the §1254a(c)(1)(B) $50 limitation on fees.[27]  The only type

of registration cross-referenced in the §1254a(c)(1)(B) $50 limitation on fees is the subparagraph

(a)(IV) registration.

As is authorized by 8 U.S.C. § 1254a(c)(3)(C), the Attorney General specified that for annual

registrations[28] after the initial registration, TPS applicants could file the TPS application "without

---

[27]    PMSJ at 21 quotes as "legislative history" the statement of a Congressman in 1989, regarding H. 45, anticipating that for a form of temporary status a "one-time" fee of $50 would be required, and annual re-registration would be required.  Plaintiffs are mistaken in several respects.  First, H. 45 was not enacted.  See DMSJ, SoF ¶ 1, n.2.  Failed legislation is not persuasive.  Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engr's, 531 U.S. 159, 160 (2001)(warning that "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute") (quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 187 (1994)) (in turn quoting PBGC v. LTV Corp., 496 U.S. 633, 650 (1990)) (internal citations omitted).  In any event, Congress did not specify that the registration fee authorized in 1254a(c)(1)(B) is a "one-time" fee and that all annual re-registrations are to be free of charge.  It also makes logical and practical economic sense that Congress only capped the TPS registration fee for the initial TPS registration, before a beneficiary would have been able to secure Employment Authorization Documentation ("EAD") associated with such status.  After EAD is issued, a TPS holder is able legally to work and earn money to pay the fees required annually to continue TPS registration.  Further, the 1990 IMMACT nowhere addresses the subject of fingerprinting services, and, thus, has no bearing upon the Pub. L. No. 105-119 fee at issue.

[28]    Plaintiffs also contend that no fee is authorized for annual registrations because such registrations are not taking place as Congress required in 8 U.S.C. § 1254a(c)(3)(C), i.e., at the end of each 12 month period as Congress required be met in order to maintain TPS eligibility.  PMSJ at 18-22.  Regardless of whether the agency allowed plaintiffs more than 12 months to register, plaintiffs' contention does not establish that they are thus entitled to free Government fingerprinting services, or that annual registrations are subject to 8 C.F.R. § 1254a(c)(1)(B).

-21-

1   fee."[29]  The Attorney General did not exempt TPS applicants from the separate fingerprinting

2   services required and fee authorized by Pub. L. No. 105-119.[30]

3          In the alternative, assuming, for the sake of argument, that when Congress required in

4   § 1254a(c)(3)(C) annual registrations "in a form and manner specified by the Attorney General," it

5   silently intended to subject those annual registrations to § 1254a(c)(1)(B)'s provision that the

6   Attorney General may charge a fee as a condition of registration, not to exceed $50 – an assumption

7   that is not supported by the plain language of these statutes – that would only establish that the

8   Attorney General was authorized to charge up to $50 for each annual registration.  Consequently,

9   even assuming that the fingerprinting services fee that Congress authorized is not completely

10  separate from, and unlimited by, § 1254a(c)(1)(B), that would at most establish that any fee for

11  fingerprinting or biometric services charged by the Attorney General was legal to the extent that it

12  did not exceed $50, reducing any liability by the $50 amount so authorized for TPS registration.

13      **H.     Should Plaintiffs' Prevail On Their Summary Judgment Motion, They Would
                 Not Be Entitled to Damages**

14
15          Plaintiffs' have requested only "declaratory" relief, that is, a declaratory judgment in their

16  partial summary judgment motion.  It is clear that plaintiffs' request therefore can only be construed

17  as a request made pursuant to the Administrative Procedure Act ("APA") because equitable relief is

18  not available pursuant to the Little Tucker Act ("LTA").  See Gonzales & Gonzales Bonds & Ins.

19  Agency, Inc. v. Department of Homeland Sec'y, 490 F.3d 940, 942 (Fed. Cir. 2007) (citing Doe v.

20
21      [29]   8 C.F.R. § 244.17. The only fee in existence at the time 8 C.F.R. § 244.17 was issued was the
        $50 TPS filing fee, thus the "without fee" language, which has not changed since 1991, can only refer
22      to the $50 filing fee and not the biometrics fee.  The agency's charge of a $50 filing fee for the initial
        TPS registration is not being challenged by plaintiffs' complaint.  Because the agency has elected to
23      refrain from requiring that the TPS "filing" fee prescribed at 8 C.F.R. § 244.6 of $50 be submitted with
        applications for TPS registration after the first registrations, whether 8 C.F.R. § 1254a(c)(1)(B) permits
24      charging a TPS filing fee of up to $50 for each subsequent registration is a question not before the Court
        and, to the extent that plaintiffs have raised this issue, they lack standing – because the agency has not
25      required them to pay any TPS filing fee after the initial registration – and, accordingly, the Court lacks
        jurisdiction to entertain a question about TPS filing fees after the first registration.

26      [30]   The agency's "form and manner" annual registration procedures are contained in 8 C.F.R.
        § 244.17; I-821A instructions which are incorporated by reference into the agency's regulations (see 8
27      C.F.R. § 103.2(a)(1)), and published Federal Register notices of TPS extensions.

28                                                  -22-

1   <u>United States</u>, 372 F.3d 1308, 1312 (Fed. Cir. 2004)) (holding that a district court is generally not

2   empowered to award equitable relief pursuant to the LTA); <u>Lee v. Thornton</u>, 420 U.S. 139, 140

3   (1975) ("The Tucker Act empowers district courts to award damages but not to grant injunctive or

4   declaratory relief.").[31]   Likewise, the APA does not confer upon the Court jurisdiction to award

5   money damages.  <u>Harger v. Department of Labor</u>, 569 F.3d 898, 902 (9th Cir. 2009) ("Pursuant to 5

6   U.S.C. § 702, a plaintiff must seek 'relief other than money damages'") (citing <u>Marceau v. Blackfeet</u>

7   <u>Hous. Auth.</u>, 540 F.3d 916, 929 (9th Cir.2008)).  Thus, should plaintiffs prevail on their request for

8   declaratory relief, plaintiffs would not also be entitled to an award of monetary damages based upon

9   a free-standing "declaratory" judgment.

10       **I.       Plaintiffs' Claims Are Barred Pursuant To The Statute of Limitations**

11          There should be no dispute, as plaintiffs effectively conceded in defining their class, (Dkt. 5),

12   that any allegedly illegal fee that was paid more than six years before their August 16, 2007

13   complaint, is barred by the six-year statute of limitations on suits against the United States.

14   Accordingly, the Court lacks jurisdiction to consider such untimely claims.  <u>See</u> 28 U.S.C.

15

16

17

18       [31]    The United States further disputes plaintiffs' contention that granting monetary relief pursuant
     to the Little Tucker Act would be insufficient to bind the United States if it continued to charge
19   biometric fees to TPS applicants from Honduras, Nicaragua and El Salvador in future litigation.  None
     of the cases involving the nonmutual collateral estoppel doctrine cited by plaintiffs involve plaintiffs
20   who were previously involved in a class action against the government regarding precisely the same
     issue in the case.  <u>See</u>, <u>e.g.</u>, <u>Thomas v. Veal</u>, 2008 WL 110968 (E.D. Cal. Jan. 9, 2008) (prisoner who
21   was never part of a previous class action or even affected by a previous state "no parole" policy filed suit
     challenging his incarceration based upon that policy); <u>Idaho Potato Comm'n v. G&T Terminal</u>
22   <u>Packaging, Inc.</u>, 425 F.3d 708 (Fed. Cir. 2005) (company who was not a party to a previous non-class
     action lawsuit could assert that plaintiff was barred from brining a lawsuit based upon nonmutual
23   collateral estoppel); <u>Mendoza v. United States</u>, 464 U.S. 154 (1984) (holding that plaintiff who was not
     a party to a previous non-class action lawsuit was not entitled to judgment based upon the previous
24   lawsuit).  The plaintiffs have brought a class action lawsuit upon behalf of <u>every</u> Honduran, El
     Salvadoran or Nicaraguan national who has filed for TPS since 2001.  Clearly, a money judgment
25   against the United States would be expected to have a <u>res judicata</u> effect if the United States continued
     to charge fingerprinting fees upon any TPS applications from those countries in the future.  <u>See</u>
26   <u>Consolidated Edison Co. of New York, Inc. v. Dep't. of Energy</u>, 247 F.3d 1378, 1384-85 (Fed. Cir.
     2001), cited with approval by Judge William H. Alsup of this judicial district in <u>Briggs v. United States</u>,
27   564 F. Supp. 2d 1087, 1094-95 (N.D. Cal. 2008).

28                                                    -23-

1   §§ 2401(a), 2501.[32]

2        As is set forth in the statement of facts supporting our cross-motion for summary judgment,

3   at least two of the class representatives failed to file a timely complaint about the purportedly

4   unambiguous application of the $50 limit on fees set forth in 8 U.S.C. § 1254a(c)(1)(B) to preclude

5   charging of any fee of any kind in addition to their payment of the $50 TPS filing fee.  See DMSJ,

6   SoF  ¶15.  Accordingly, the Court should dismiss plaintiffs' complaint as to any payments made

7   prior to August 16, 2001, by these class representatives or by any other class member.

8        **J.      Plaintiffs' Claims Are Barred By The Doctrine Of Laches**

9        Laches is an equitable time limitation on a party's right to bring suit. The doctrine bars an

10  action where a party's "unexcused or unreasonable delay" has prejudiced his adversary.  Boone v.

11  Mechanical Spec. Co., 609 F.2d 956, 958 (9th Cir. 1979) (upholding summary judgment in favor of

12  the defendant on summary judgment based upon the plaintiff's "unexcused and unreasonable" delay)

13  (quoting International T. & T. Corp. v. General T. & E. Corp., 518 F.2d 913, 926 (9th Cir. 1975);

14  Danjaq, L.L.C. v. Sony Corp., 263 F.3d 942, 955 (9th Cir. 2001) (holding case was barred based

15  upon finding of laches); see also Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir.

16  2007) (recognizing that plaintiff unreasonably delayed bringing a claim regarding flaws in a

17  government solicitation when it could have filed an administrative objection much earlier).

18  By failing to bring suit in a timely manner when they were first charged the allegedly unlawful

19  fingerprinting fee over six years ago, plaintiffs have permitted the amount of their potential claims to

20  grow to what they presumably will assert is several millions of dollars.  If they are successful in

21  obtaining such a remedy of this financial magnitude, many applicants for immigration benefits,

22  citizen and non-citizen alike, including TPS applicants, will suffer from the significant cutbacks in

23

24      [32]   See  John R. Sand & Gravel, Inc.v. United States, 552 U.S. 130 (2008) (citing United States v.
        Kubrick, 444 U.S. 111, 117 (1979) (explaining that six-year statute of limitations applies to claims
25      brought pursuant to the Tucker Act); Bray v. United States, 785 F.2d 989 (Fed. Cir. 1986) (affirming
        district court dismissal of Little Tucker Act case as barred by the statute of limitations); Sisseton-
26      Wahpeton Sioux Tribe of Lake Traverse Indian Reservation v. United States, 895 F. 2d 588, 592 (9th
        Cir. 1990) (noting that the six-year statute of limitations period is applicable to claims for money
27      damages against the United States as well as equitable claims).

28                                        -24-

1   services and other actions that the Government would likely need to take in order to pay the

2   judgment.  See Declaration of Barbra Velarde in Supp. Of Defs.' Opp. To Pls. Mot. For Prelim. Inj.

3   (Dkt. 25) at ¶¶ 21-22 (Sep. 24, 2007).  As USCIS activities are (with minor exception) funded by

4   fee-paying customers, a judgment payable by USCIS would require USCIS to use future fee revenues

5   to pay refunds to past TPS applicants, rather than to provide immigration services to its customers.

6   Id.  Had plaintiffs brought suit sooner and received a judgment in their favor, the negative effect on

7   these other immigration applicants would have been significantly reduced.  Plaintiffs, by delaying

8   their lawsuit, should not be permitted to cause such increased harms to other applicants.

9                                                      **CONCLUSION**

10          For these reasons, and the reasons set forth in defendants' cross-motion for summary

11   judgment filed this same day, we respectfully request that the Court deny plaintiffs' motion for

12   partial summary judgment; grant defendants' motion, and dismiss plaintiffs' complaint in its entirety.

13

14                                                          Respectfully submitted,

15                                                          TONY WEST
     OF COUNSEL:                                            Assistant Attorney General
16   JOSEPH P. RUSSONIELLO                                  JEANNE E. DAVIDSON
     United States Attorney                                 Director
17   JOANN M. SWANSON                                       /s/ Brian A. Mizoguchi
     Assistant United States Attorney                       BRIAN A. MIZOGUCHI
18   Chief, Civil Division                                  Senior Trial Counsel
     ILA C. DEISS                                           ELIZABETH A. SPECK
19   Assistant United States Attorney                       Trial Attorney
     San Francisco, CA
20
     J. MAX WEINTRAUB
21   Senior Litigation Counsel                              Commercial Litigation Branch
     Office of Immigration Litigation                       Civil Division
22   Civil Division                                         Department of Justice
     Department of Justice                                   Attn.: Classification Unit 8th Flr.
23                                                          1100 L Street, N.W.
                                                            Washington, D.C.  20530
24                                                          Tel: (202) 305-3319

25
     Date: October 2, 2009                                 Attorneys for Defendants
26

27

28
                                                    -25-