OF COUNSEL:
JOSEPH P. RUSSONIELLO
United States Attorney
JOANN M. SWANSON
Assistant United States Attorney
Chief, Civil Division
ILA C. DEISS, NY SBN 3052909
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102
(415) 436-7124; FAX: (415) 436-7169

J. MAX WEINTRAUB
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
Washington, DC 20044
(202) 305-7551; FAX: (202) 305-7000

TONY WEST
Assistant Attorney General
JEANNE E. DAVIDSON
Director
BRIAN A. MIZOGUCHI
Senior Trial Counsel
ELIZABETH A. SPECK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-3319; FAX: (202) 305-7644

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| JOSE BAUTISTA-PEREZ, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>ERIC H. HOLDER, JR., Attorney General of the<br>　United States, and<br><br>JANET NAPOLITANO, Secretary of<br>　Homeland Security,<br>　　　　　　　　Defendants. | No. C 07-4192 TEH<br><br>**DEFENDANTS' REPLY TO<br>PLAINTIFFS' SURREPLY<br>REGARDING PUB. L. NO. 111-83**<br><br>Hearing Date: November 23, 2009<br>Time:  9:00 a.m.<br>Courtroom: 12 |

1

2

TABLE OF CONTENTS

Page

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

I.   Plaintiffs' Surreply Arguments Are Contrary To Congress's Plain Language In
     Pub. L. No. 111-83, Providing That Fees For Fingerprinting And Biometric
     Services May Be Collected "In Addition To" The "Registration Fees Described
     In [8 U.S.C. §] 1254a(c)(1)(B)" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

     A.   Congress Authorized The Fingerprinting And Biometrics Services Fees
          Claimed By Plaintiffs To Be Collected "In Addition To" The "Registration
          Fees Described In [8 U.S.C. §] 1254a(c)(1)(B)" That Are At Issue In This
          Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

     B.   Plaintiffs' Complaint Is Not Supported By A Purported Absence Of
          Legislative History Or The Existence Of Unrelated Fees For
          Inadmissibility Waiver, Parole for Travel and Appeal Services . . . . . . . . . . -3-

     C.   Plaintiffs' Err In Contending That The Court Must Find Pub. L. No. 111-83
          Repeals 8 U.S.C. 1254a(c)(1)(B), Because, To The Contrary, Congress
          Has Clarified That Fingerprinting And Biometric Services Fees May Be
          Collected "In Addition To" The Registration Fees Described In 8 U.S.C.
          1254a(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

II.  Congress Has Not Violated The Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-

     A.   Congress Has Not Violated Any Due Process Right. . . . . . . . . . . . . . . . . . -6-

          1.   Plaintiffs Cannot Meet Their Burden of Establishing That Pub. L.
               No. 111-83 is "Wholly Arbitrary And Irrational" . . . . . . . . . . . . . . -7-

          2.   Congress Specified A Rational Basis For Pub. L. No. 111-83. . . . . -8-

     B.   Pub. L. 111-83 Does Not Violate The Ex Post Facto Clause. . . . . . . . . . . -9-

     C.   The Constitution's Contracts Clause Is Inapplicable To This Case Because
          No Contract Is Involved. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-

     D.   Plaintiffs' Arguments That A Heightened Standard Of Review Should
          Apply Because Pub. L. No. 111-83 Purportedly Involves "Self-Dealing"
          Are Flawed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

     E.   Pub. L. No. 111-83 Does Not Violate The Separation Of Powers
          Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

     F.   Pub. L. No. 111-83 Is Not An Attempt To Circumvent The
          Administrative Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

Association of Bituminous Contractors, Inc. v. Apfel,
  156 F.3d 1246 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Block v. North Dakota Bd. of Univ.,
  461 U.S. 273 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bowen v. Georgetown Univ. Hosp.,
  488 U.S. 204 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Calder v. Bull,
  3 U.S. 386 (1798). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Cansius College v. United States,
  799 F.2d 18 (2nd Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Carr Huml Investors, L.L.C. v. Arizona,
  No. CV-05-2233, 2007 WL 440391 (D. Ariz. Dec. 11, 2007). . . . . . . . . . . . . . . . . . 11

Commonwealth Edison Co. v. United States,
  271 F.3d 1327 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Continental Illinois National Bank & Trust Co. of Chicago, et al. v. Washington,
  696 F.2d 692 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Davon v. Shalala,
  75 F.3d 1114 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Dotzel v. Ashbridge,
  306 Fed. Appx. 798 (3d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Eichenlaub v. Township of Indiana,
  385 F.3d 274 (3d Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

FCC v. Beach Communications, Inc.,
  508 U.S. 307 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Green v. Peter,
  No. 71-C-1403, 1997 WL 769458 (N.D. Ill. Dec. 5, 1997). . . . . . . . . . . . . . . . . . . . 10

Greene v. United States,
  376 U.S. 149 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Heller v. Doe,
  509 U.S. 312 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hospital Data Ctr. Of S.C., Inc. v. United States,
  225 Ct. Cl. 158 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ii

Hurtado v. People of the State of California,
     110 U.S. 516 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ileto v. Glock, Inc.,
     565 F.3d 1126 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

In re A, H. Robins Co., Inc.,
     219 B.R. 145 (E.D. Va. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

In re Consolidated United States Atmospheric Testing Litig.,
     820 F.2d 982 (9th Circ. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

Long v. United States Internal Revenue Serv.,
     742 F.2d 1173 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Lynce v. Mathis,
     519 U.S. 433 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Madrid v. Gomez,
     190 F.3d 990 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Masayesva v. Hale,
     118 F.3d 1371 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana,
     472 U.S. 237 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Navajo Tribe of Indians v. Andrus,
     644 F.2d 790 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Northwestern National Life Ins. Co. v. Tahoe Regional Planning Agency,
     632 F.2d 104 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Peick v. Pension Benefit Guaranty Corp.,
     724 F.2d 1247 (7th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,
     467 U.S. 717 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Plaut v. Spendthrift Farm, Inc.,
     514 U.S. 211 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Porter v. Osborn,
     546 F.3d 1131 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Public Utilities Comm'n of Ohio v. United Fuel Gas Co.,
     317 U.S. 456 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Rafferty v. Smith, Bell & Co.,
     257 U.S. 226 (1921). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Robertson v. Seattle Audobon Society,
     503 U.S. 429 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

iii

Seariver Maritime Financial Holdings v. Mineta,
    309 F.3d 663 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Stop H-3 Ass'n v. Dole,
    870 F.2d 1419 (9th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sullivan v. Carrick,
    888 F.2d 1 (1st Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Sullivan v. Stroop,
    496 U.S. 478 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Swayne & Hoyt Ltd. v. United States,
    300 U.S. 297 (1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Taxpayers For the Animas-La Plata Referendum v. Animas-La Plata Water Conservancy
    District,
    739 F.2d 1472 (10th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Temple Univ. v. United States,
    769 F.2d 126 (3d Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States Trust Co. of New York v. New Jersey,
    431 U.S. 1 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Carlton,
    512 U.S. 26 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Conrad Heinszen,
    206 U.S. 370 (1907). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

United States v. Klein,
    80 U.S. 128 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

W.J. Usery, Jr. v. Tucker Elkhorn Mining Co., et al.,
    428 U.S. 1 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 10

Western Union Telegraph Co. v. Louisville & Nashville R.R. Co.,
    258 U.S. 13 (1922). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**FEDERAL STATUTES AND RULES**

8 U.S.C. §1254a(c)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Pub. L. No. 102-232, §304(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Pub. L. No. 105-119, 104 Stat. 2440, 2447-48 (Nov. 26, 1997). . . . . . . . . . . . . . . . . . . . . . . . . 2

Pub. L. No. 105-199. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Pub. L. No. 111-83. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

iv

**LEGISLATIVE MATERIALS**

Cong. Rec. H11226-227, 11231 (Oct. 13, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

H.R. Rep. No. 111-157 (June 16, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

H.R. Rep. No. 111-298 (Oct. 13, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

v

Defendants respectfully submit this reply to the brief plaintiffs filed as a "surreply" ("Pl. Sur.")[1]

concerning Pub. L. No. 111-83, signed into law by the President on October 28, 2009.

## ARGUMENT

**I.      Plaintiffs' Surreply Arguments Are Contrary To Congress's Plain Language In Pub. L. No. 111-83, Providing That Fees For Fingerprinting And Biometric Services May Be Collected "In Addition To" The "Registration Fees Described In [8 U.S.C. §] 1254a(c)(1)(B)"**

Plaintiffs argue at length a variety of claims, see Pl. Sur. 1-7, all of which are futile because

they are contrary to the plain language of Pub. L. No. 111-83:

> SEC. 549.  (a) In addition to collection of registration fees described in
> section 244(c)(1)(B) of the Immigration and Nationality Act (8 U.S.C.
> 1254a(c)(1)(B)), fees for fingerprinting services, biometric services,
> and other necessary services may be collected when administering the
> program described in section 244 of such Act.
>
>           (b) Subsection (a) shall be construed to apply for fiscal year
> 1998 and each fiscal year thereafter.

Pub. L. No. 111-83, § 549, ___Stat. __ (emphasis added).  Congress plainly made it clear that its 1990

act, codified at 8 U.S.C. § 1254a(c)(1)(B), has no application to fingerprinting or biometrics services

fees.  Fees for the fingerprinting and biometrics services provided to plaintiffs were and may

continue to be collected lawfully "in addition to" the registration fee described in 8 U.S.C.

§ 1254a(c)(1)(B).  Accordingly, plaintiffs' complaint seeking a windfall refund of the fees that they

elected to pay, without complaint, for the Government services they received for years, must fail.

**A.      Congress Authorized The Fingerprinting And Biometrics Services Fees Claimed By Plaintiffs To Be Collected "In Addition To" The "Registration Fees Described In [8 U.S.C. §] 1254a(c)(1)(B)" That Are At Issue In This Case**

Plaintiffs' surreply at its core relies upon arguments that 8 U.S.C. § 1254a(c)(1)(B) continues

to place a $50 limit upon registration fees.  Pl. Sur. at 2-8. More specifically, plaintiffs argue that

Pub. L. No. 111-83 only authorizes fingerprinting or biometrics services fees when they are not

charged in relation to an application for TPS registration, on the theory that such services fees are

actually registration fees under 8 U.S.C. § 1254a(c)(1)(B) that continue to be limited to $50.  Id

---

[1]      Filed with the Court as docket ("Dkt.") no. 129-2.

-1-

1  Plaintiffs' arguments all fail because they are contrary to Congress's plain language authorizing "fees

2  for fingerprinting services [and] biometric services" to be collected "in addition to" the "registration

3  fees described in section 244(c)(1)(B) of the Immigration and Nationality Act (8 U.S.C.

4  1254a(c)(1)(B)."

5       By explicitly mandating that subsection (a) of section 549 shall be construed to apply for

6  "fiscal year 1998 and each year thereafter," the plain text of Congress's legislation ties Pub. L. No.

7  111-83 to the year in which Congress first imposed a requirement that the fingerprinting services

8  necessary to criminal background checks be provided by the Government for "any benefit under the

9  Immigration and Nationality Act" which includes TPS.  Defendant's Cross-Motion For Summary

10 Judgment, Dkt. 121 ("DxMSJ") at 2, n.2, and 4, n.7, citing Pub. L. No. 105-119, 104 Stat. 2440,

11 2447-48 (Nov. 26, 1997).  Those service fees, first authorized for fiscal year 1998, are the fees at

12 issue in this case, and have always been charged in accordance with Congress's authorization of

13 them in addition to the separate $50 fee for filing the TPS application.[2]

14      Pub. L. No. 111-83 expressly authorizes "fingerprinting services" and "biometrics services"

15 fees -- without any qualifying limitation upon when or for what such services are provided – "[i]n

16 addition to collection of registration fees described in section 244(c)(1)(B) of the Immigration and

17 Nationality Act (8 U.S.C. 1254a(c)(1)(B)).  Pub. L. No. 111-83, § 549(a) (emphasis added).  Plainly,

18 there are no "fingerprinting services" or "biometrics services" fees "described in section

19 244(c)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1254a(c)(1)(B))."  See 8 U.S.C.

20

21

22

23 _____

24      [2]    In the same sentence imposing this fiscal year 1998 mandate, Congress authorized the
   Government legally to collect the fees at issue in this case, "[f]or expenses, not otherwise provided
25 for."  Id.  In March 1998, after transmitting notice to Congress, defendants published regulations that
   explicitly charged the fingerprinting services fees at issue in this case, in addition to the TPS
26 application "filing" fee.  Thereafter, plaintiffs, represented by their immigration/class co-counsel,
   took advantage of the Government's provision to them of fingerprinting and biometrics services, and
27 paid, without claiming any illegality, the fees prescribed for such service - in addition to the TPS
   application fee.  DxMSJ at 5-8, 14-17.

28                                                     -2-

1  1254a(c)(1)(B).[3]  The absence of any such description is consistent with the fact that section

2  1254a(c)(1)(B) was enacted in 1990, a time when Congress had not imposed any requirement for

3  Government-provided fingerprinting or biometrics services, and thus would not have contemplated,

4  let alone described, such services as being the "Registration fee" that Congress described in 1990.

5  Because "fingerprinting services" and "biometric services" fees are not described in section

6  244(c)(1)(B), they are not a "Registration fee" but rather may be collected" in addition to registration

7  fees.  Because "fingerprinting services" and "biometric services" never have been described in

8  8 U.S.C. §1254a(c)(1)(B), contrary to plaintiffs' contentions, Pl. Sur. 7-8, there is not any statutory

9  conflict or need to amend section 1254a(c)(1)(B) in order to charge fees for "fingerprinting services"

10  and "biometric services" in addition to the $50 "Registration fee" that is described in section

11  1254a(c)(1)(B).

12       In sum, Congress plainly authorized the fingerprinting and biometrics services fees at issue

13  "in addition to" any registration fees "described in" 8 U.S.C. §1254a(c)(1)(B).  Pub. L. No. 111-83,

14  §549.  Congress's plain language must be given its ordinary meaning: that fingerprinting or

15  biometrics fees relating to TPS for fiscal year 1998 and each year thereafter -- i.e., the fees that are

16  the subject of plaintiffs' complaint -- may be collected in addition to any TPS registration fees.

17       **B.    Plaintiffs' Complaint Is Not Supported By A Purported Absence Of Legislative
            History Or The Existence Of Unrelated Fees For Inadmissibility Waiver, Parole**
18       **for Travel and Appeal Services**

19       Plaintiffs seek to avoid the plain language of Section 549, arguing that there "is not one iota

20  of legislative history behind Section 549" that supports our discussion of that legislation, Pl. Sur. 5,

21  7, but then curiously refrain from discussing the legislative history they raise.  As a threshold matter,

22  where, as here, the text of statute is clear, the Court should end its inquiry.  Sullivan v. Stroop, 496

23  U.S. 478, 480-81 (1990).  As noted above, the statute is clear that fingerprinting and biometrics

24

25       [3]    Plaintiffs' surreply uses excerpts from orders upon earlier matters, denying in 2007 plaintiffs'
    motion for preliminary injunction (Dkt. 40) and in 2008 defendants' first motion to dismiss or
26  transfer venue (Dkt. 68), to argue that fingerprinting and biometrics services fees are registration
    fees.  E.g., Pl. Sur. at 3-4.  Respectfully, plaintiffs misplace their reliance because neither of those
27  orders is a final decision on the merits or addresses our October 2, 2009 cross-motion for summary
    judgment or Congress's October 28, 2009 Pub. L. No. 111-83.

28                                          -3-

services fees at issue in this case since fiscal year 1998 are authorized to be collected "in addition to"

any registration fees "described in" 8 U.S.C. 1254a(c)(1)(B). Pub. L. No. 111-83, §549. In any

event, the legislative history that plaintiffs declined to discuss only further reinforces that Congress

meant to authorize fingerprinting and biometrics services fees "in addition to" the existing $50 fee

for filing a TPS application. The House Committee on Appropriations reported with respect to its

bill, H.R. 2892, that:

> CHANGES TO FEES CHARGED TO TEMPORARY PROTECTED
> STATUS APPLICANTS
>
> The budget included a request to raise the statutorily-capped $50
> application fee for those seeking Temporary Protected Status (TPS),
> and to clarify that USCIS is permitted to charge TPS applicants for
> related application services such as fingerprint collection. In the
> general provisions section of the Bill, the Committee has clarified that
> USCIS is allowed to charge fees for services related to TPS
> applications. The Committee has not acted to raise the $50 application
> charge since Congress has determined in the past that this
> humanitarian program should be available for a modest fee.

H.R. Rep. No. 111-157, at 132 (June 16, 2009)(Report to accompany H.R. 2892) (emphasis added).

Plainly, Congress authorized charging TPS "applicants" for "fingerprint collection." Again, that

should end the Court's inquiry. That the House elected not to also lift the $50 "application fee," i.e.,

the separate fee for "filing" a TPS application that the agency has always charged separately in the

amount of $50,[4] emphasized the difference between the two fees. The House Report confirms that

the agency's March 1998 transmittal to Congress and publication in the Federal Register of

regulations charging that fee, and, as the House report indicates, "and" in addition charging TPS

"applicants" for "fingerprint collection," was, and continues to be, in accordance with law.[5]

---

[4]   The historical treatment of the $50 fee for "filing" a TPS application is described at DxMSJ
at 5-7; 12-16, and Defendant's Reply (Dkt. 128) at 5, n.8.

[5]   Similarly, the Conference Report H.R. Rep. No. 111-298 to accompany H.R. 2892 provides,
at 130, that:

> Section 549. The conference agreement includes a new provision
> proposed by the House that clarifies fees for fingerprinting, biometric
> services, and other necessary services may be collected as part of
> section 244 of the Immigration and Nationality Act. The Senate

-4-

1    Plaintiffs also err in their argument to the effect that all Congress did in Pub. L. No. 111-83

2   was to clarify that it was authorizing "non-registration services" relating to things like waiver of

3   inadmissibility, advance parole for travel, or appeals.  Pl. Sur. at 5-7.  Again, plaintiffs' complaint

4   depends upon a construction that is contrary to the plain language of Pub. L. No. 111-83.  Congress

5   authorized "fingerprinting services" and "biometrics services" fees without limiting them to services

6   other than those relating to TPS applications.  Further, the House Report explicitly clarifies that it

7   acted "to clarify that USCIS is permitted to charge TPS <u>applicants</u> for <u>related</u> <u>application</u> <u>services</u>

8   such as <u>fingerprint collection</u>."  Legislative history thus explicitly confirms that Congress meant

9   what it said in the plain text of Pub. L. No. 111-83 – that "in addition to" collection of registration

10   fees described in 8 U.S.C. 1254a(c)(1)(B), the Government may collect, from "TPS applicants," fees

11   for fingerprinting services, biometric services, and other necessary services when administering TPS.

12   **C.   Plaintiffs' Err In Contending That The Court Must Find Pub. L. No. 111-83
         Repeals 8 U.S.C. 1254a(c)(1)(B), Because, To The Contrary, Congress Has
13       Clarified That Fingerprinting And Biometric Services Fees May Be Collected
         "In Addition To" The Registration Fees Described In 8 U.S.C. 1254a(c)(1)(B)**

14
15    Finally, plaintiffs argue that in order to hold that fingerprinting services or biometric services

16   fees may be collected in addition to registration fees in the amount of $50, the Court would have to

17   find that Congress repealed or amended 8 U.S.C. 1254a(c)(1)(B).  Pl Sur. 7-8.  The Court, however,

18   need not make any such finding, because Congress has clarified that fingerprinting and biometrics

19   services fees may be collected "in addition to" any registration fees "described in" 8 U.S.C. §

20   1254a(c)(1)(B).  Pub. L. No. 111-83, §549.  Congress confirmed that fees for fingerprinting and

21   biometrics services are not the "Registration fee" that is described in 8 U.S.C. 1254a(c)(1)(B), and

22

23

24    _____

25    proposed no similar provision.

26   This provision of the Conference Report is reprinted at __ Cong. Rec. H11231 (daily ed. Oct. 13,
     2009).  A copy of the provisions of the House and Conference Reports that we cite is appended to
27   this brief as "Exhibit A."

28
                                                    -5-

1    may be collected "in addition to" that registration fee.[6]  Congress's legislation is altogether in

2    harmony, in contrast with plaintiffs' complaint, which depends upon a construction that is contrary

3    to the plain language of Congress's acts.[7]  It follows that Congress did not need to repeal or amend

4     8 U.S.C. § 1254a(c)(1)(B), to clarify that the Government may collect fees for the fingerprinting and

5    biometrics services that it provides when administering TPS, and that are the subject of plaintiffs'

6    complaint, "in addition to" the registration fee described in 8 U.S.C. § 1254a(c)(1)(B).

7    **II.      Congress Has Not Violated The Constitution**

8          Plaintiffs contend that, "[t]o the extent that Section 549 repeals the $50 fee cap in 8 U.S.C.

9    § 1254a(c)(1)(B), the retroactive application of Section 549 violates the due process rights of

10   Plaintiffs and the certified class."  Because plaintiffs' first premise -- that Section 549 repeals the $50

11   fee cap in 8 U.S.C. § 1254a(c)(1)(B) -- is, as we demonstrated above, incorrect, for this reason alone,

12   the Court need not reach plaintiffs' constitutional argument.  In any event, as we demonstrate, none

13   of plaintiffs' constitutional arguments have any merit.

14         **A.      Congress Has Not Violated Any Due Process Right**

15         Plaintiffs invoke much dramatic language to denounce Pub. L. No. 111-83 as "retroactive"

16   and violative of Due Process but there is no substance to their arguments.  Pub. L. No. 111-83 clearly

17   establishes that – "[i]n addition to" the registration fees described in 8 U.S.C. 1254a, "fees for

18   fingerprinting, biometric and other necessary services may be collected" when administering TPS

19

20   _____

21         [6]      Even assuming, for the sake of argument, that contrary to fact, "fingerprinting services" and
     "biometric services" had been "described" in section 1254a(c)(1)(B), Congress's "in addition to"
22   language plainly removed them from the category of the $50-limited condition of registration fees.
     Pub. L. No. 111-83 clarified the issue in a manner similar to Congress's 1991 amendment providing
23   that an "additional" fee may be imposed for providing work authorization documentation, a service
     which -- in contrast with "fingerprinting services, biometric services, and other necessary services" --
24   actually had been described in section 1254a(c)(1)(B).  See 8 U.S.C.A 1254a(c)(1)(B), Historical and
     Statutory Notes (referencing retroactive technical amendment by Pub. L. No. 102-232, §304(b)).

25         [7]      Indeed, it is plaintiffs' complaint that would require an amendment to the 1990 enactment of
     8 U.S.C. § 1254a(c)(1)(B), which nowhere describes the fingerprinting services or biometrics
26   services that Congress required, starting in fiscal year 1998, for all INA benefits including TPS,
     while simultaneously authorizing "for expenses not otherwise provided for" the collection of fees for
27   the provision of that new and additional Government service.

28                                             -6-

1    "for fiscal year 1998 and each fiscal year thereafter."  Even assuming, for the sake of argument, that

2    retroactivity is an issue, Pub. L. No. 111-83, explicitly applies in 1998 and every year thereafter.

3        In Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 729 (1984), the

4    Supreme Court held that when Congress explicitly enacts retroactive legislation, then the court

5    would uphold the law and its retroactive aspects provided both were justified by a rational legislative

6    purpose.  Id.[8]  Pursuant to the rational basis standard the court must analyze "whether the statute is

7    justified by a rational legislative purpose."  Seariver, 309 F.3d at 687 (citing Turner Elkhorn, 428

8    U.S. at 17).  An act of Congress comes "clothed with a presumption of constitutionality," therefore

9    plaintiffs must show that the act violates due process.  In re Consolidated United States Atmospheric

10   Testing Litig., 820 F.2d 982, 990 (9th Cir. 1987) (citing Tucker Elkhorn, 481 U.S. at 15).

11       **1.    Plaintiffs Cannot Meet Their Burden of Establishing That Pub. L. No.
              111-83 is "Wholly Arbitrary And Irrational"**

12       A retroactive statute will withstand rational basis review unless the plaintiffs can establish

13   that a retroactive law is "wholly arbitrary and irrational in purpose and effect."  In re Consolidated

14   United States Atmospheric Testing Litig., 820 at 990 (citing United States R.R. Retirement Bd. v.

15   Fritz, 449 U.S. 166, 174-77 (1980)); Commonwealth Edison, 271 F.3d at 1345 (challenge to

16   economic legislation will succeed only in the "rarest of cases").  Even when legislation is "severely

17   retroactive," concerns regarding the Due Process Clause could be satisfied provided: (1) Congress

18   could reasonably conclude that the party that was subjected to the retroactive obligations benefitted

19   from the activity for which the legislation imposed an obligation, and the obligation is not

20   disproportionately imposed on the benefitting party; and (2) the imposition of retroactive liability

21

22

23   _____

      [8] See also W.J. Usery, Jr. v. Tucker Elkhorn Mining Co., et al., 428 U.S. 1, 15 (1976) (holding
      that retroactive provisions of the black lung benefit of the Coal Mine Health and Safety Act of 1969
      did not violate the Due Process clause); United States v. Carlton, 512 U.S. 26 (1994) (upholding
24   retroactive amendment to the estate tax); Ileto v. Glock, Inc., 565 F.3d 1126, 1140 (9th Cir. 2009)
      (affirming statute's retroactive application based upon rational basis review); Seariver Maritime
25   Financial Holdings v. Mineta, 309 F.3d 663, 678 (9th Cir. 2002) (same); Commonwealth Edison Co.
      v. United States, 271 F.3d 1327, 1344-45 (Fed. Cir. 2001) (same); Hospital Data Ctr. of S.C., Inc. v.
26   United States, 225 Ct. Cl. 158 (1980) (upholding retroactive Congressional legislation approving
      collection of past Social Security tax overpayments and noting that if Congress had failed to enact
27   the legislation the Government would be strained by a flurry of refund claims).

28                                              -7-

1    would not be contrary to the party's "reasonable expectations."  Commonwealth Edison, 271 F.3d at

2    1346.[9]

3          Plaintiffs benefitted from the Government's provision of a system for collecting fingerprints

4    and other biometric data, and, for that matter, the TPS program.  Likewise, plaintiffs' own conduct

5    and the conduct of their immigration/class co-counsel in this case in electing to take the

6    Government's services and to pay the prescribed fee for years, without any complaint belies their

7    contention that the statute is contrary to "settled expectations."  DXMSJ at 5-8, 14-17, 20.  The

8    "settled expectations" for 1998 forward were and are that Congress authorized the fee for those

9    services necessary to administer TPS, separately and in addition to the TPS filing fee.

10            **2.    Congress Specified A Rational Basis For Pub. L. No. 111-83**

11          Contrary to plaintiffs' argument, Pub. L. No. 111-83 is supported by rational bases.

12   Clarifying or correcting law are rational bases that support Congress's legislation.[10]  Congress

13   expressly specified the rational basis for its legislation: it clarified that notwithstanding the $50 fee

14   cap contained in 8 U.S.C. § 1254a,  for 1998 and each year thereafter, fees for fingerprinting,

15   biometric, and other necessary services may be collected when administering TPS. Congress had

16   rational bases for Pub. L. No. 111-83 because it could reasonably conclude, as it evidently did, that

17

18      [9] Plaintiffs contend that the "oppressive" length of the period affected by Pub. L. No. 111-83
     violates Due Process.  Surreply at 12.  Commonwealth Edison and other cases confirm that Courts
19   have also repeatedly upheld legislation that applied to a retroactive period far longer than the period
     contained in Pub. L. No. 111-83.  E.g., Davon v. Shalala, 75 F.3d 1114, 1126 (7th Cir. 1996)
20   (upholding decades-long retroactivity period and noting "Congress can make a statute retroactive for
     as long a period as is rational.");  Block v. North Dakota Bd. of Univ., 461 U.S. 273, 284 (1983)
21   (noting a statutory 12-year retroactive limitations period is permissible).  Pub. L. No. 111-83's
     retroactivity period is rational because it clearly ties to the fiscal year 1998 inception of Congress's
22   Pub. L 105-199 Government-provided fingerprinting services requirement and corresponding fee
     authorization.

23      [10] See, e.g., In re A, H. Robins Co., Inc., 219 B.R. 145, 147-48 (E.D. Va. 1998) (noting retroactive
     clarifying amendment to a statute had sustained rational basis review in numerous federal courts);
24   see also Mountain States Telephone & Telegraph Co. v. Pueblo of Santa Ana, 472 U.S. 237, 264
     (1985) (clarifying existing law can be a rational basis for enacting legislation).  Courts have
25   repeatedly recognized the legislature's right to cure a court's erroneous interpretation retroactively to
     the date of that interpretation (a fortiori, to pending cases).  E.g. Long v. United States Internal
26   Revenue Serv., 742 F.2d 1173, 1183-84 (9th Cir. 1984), subsequent proceedings vacated on other
     grounds by, 487 U.S. 1201 (1988) (upholding Congress's retroactive cure of Ninth's Circuit's
27   interpretation of statutory exemption to Freedom of Information Act against due process challenge).

28                                          -8-

1    fingerprinting, biometric and other services are necessary to the administration of TPS, and that

2    clarifying that such fees may be collected, in addition to the $50 application fee,[11] would ensure that

3    fees would be collected and retained to provide for the expense of such necessary services.  In

4    making that clarification for 1998 and each year thereafter, Congress rationally tied its act to the

5    beginning of the period for which it has mandated that the Government provide services to plaintiffs

6    and authorized collection of a fee for expenses not otherwise provided for, of providing these

7    services.[12]  The rational bases supporting Congress's legislation is evident from the face of section

8    549 and the legislative history of the fingerprinting and biometric services fees at issue.

9            **B.    Pub. L. No. 111-83 Does Not Violate The Ex Post Facto Clause**

10           Plaintiffs also contend that Pub. L. No. 111-83 violates the Constitution's prohibition against

11   <u>ex</u> <u>post</u> <u>facto</u> laws.  Surreply at 9.  The <u>ex</u> <u>post</u> <u>facto</u> clause prohibits only retroactive criminal laws,

12   which involve punishment and does not extend to civil cases.[13]

13           **C.    The Constitution's Contracts Clause Is Inapplicable To This Case Because No Contract Is Involved**

14

15           The plaintiffs raise several arguments pursuant to the Constitution's Contracts Clause which

         are simply irrelevant to this case, which involves no contracts.  Surreply at 9-10.  As the cases cited

16

17      ───────────────

            [11] <u>See</u> Section I.B, <u>supra</u>.

18

19           [12]    Regardless, even if Congress had not made so plain its rational bases, Congress does not
        have to specify a legitimate purpose in the text of the statute or legislative history, in order for the
        statute to withstand rational basis review. <u>See</u> <u>Madrid v. Gomez</u>, 190 F.3d 990, 996 n.7 (9th Cir.

20      1999) (describing the rational basis standard as "minimal" and explaining that "Congress's failure to
        enunciate its purpose is irrelevant.") (quoting <u>Heller v. Doe</u>, 509 U.S. 312, 320 (1993)); <u>see also</u>

21      <u>Seariver</u>, 309 F.3d at 679 (upholding retroactive legislation based upon a "goal" of Congress); <u>FCC
        v. Beach Communications, Inc.</u>, 508 U.S. 307, 315 (1993) (explaining that "the absence of

22      'legislative facts' ... has no significance in rational-basis analysis"); <u>Commonwealth Edison</u>, 271
        F.3d at 1347 n.18 (the absence of a stated reason in the retroactive legislation itself or its legislative

23      history is not "significant for due process purposes") (quoting <u>Association of Bituminous
        Contractors, Inc. v. Apfel</u>, 156 F.3d 1246, 1256 n.7 (D.C. Cir. 1998)).

24

25           [13] <u>Calder v. Bull</u> 3 U.S. 386, 390-91 (1798) (holding that the constitutional prohibition of ex post
        facto laws applies only to criminal laws); <u>see also</u> <u>United States Trust Co. of New York</u>, 431 U.S. 1,

26      17 n.13 (<u>ex</u> <u>post</u> <u>facto</u> clause applies "only with regard to the imposition of punishment").  All of the
        cases cited by plaintiffs regarding the <u>ex</u> <u>post</u> <u>facto</u> clause are criminal matters.  <u>See, e.g.</u>, <u>Lynce v.</u>

27      <u>Mathis</u>, 519 U.S. 433, 440 (1997); <u>Hurtado v. People of the State of California</u>, 110 U.S. 516, 535
        (1994).

28                                                    -9-

1    by plaintiffs explain, the due process clause and the contracts clause "are by no means coextensive

2    and rightly must be considered distinct" and courts "may not simply take the rash step of erasing

3    lines of demarcation between these two fundamental, far-reaching and *distinct* constitutional

4    provisions" without a directive from the Supreme Court.  Peick v. Pension Benefit Guaranty Corp.,

5    724 F.2d 1247, 1264 (7th Cir. 1983).[14]

6         No contracts were ever executed between the United States and plaintiffs, and there is no

7    language in the INA that would suggest that the United States intended to enter into a contract with

8    prospective immigrants.[15]  See Masayesva v. Hale, 118 F.3d 1371, 1377 (9th Cir. 1997) (refusing to

9    apply the contracts clause when there was no evidence of a contract).  Consequently, the contracts

10   clause of the Constitution has no application.

11        **D.     Plaintiffs' Arguments That A Heightened Standard Of Review Should Apply
             Because Pub. L. No. 111-83 Purportedly Involves "Self-Dealing" Are Flawed**

12

13        Plaintiffs' argument that Pub. L. No. 111-83 "shocks the conscience" further highlights

14   plaintiffs' desperation to circumvent the plain language of Pub. L. No. 111-83.  Surreply at 10.  It is

15   unclear how the "shocks the conscience" standard could possibly apply in this case.  Assuming for

16   purposes of argument that the "shocks the conscience" standard is relevant, plaintiffs would have to

17   establish that a governmental actor acted with a "purpose to harm" a specific individual that is

18        [14] See also Peick, 724 F.2d at 1265 (noting that when a matter involves "national economic and

19   social policy where Congress has traditionally been accorded wide discretion" the legislation merits
     rational basis review) (citing Turner Elkhorn, 428 U.S. at 1). Plaintiffs also erroneously rely upon
     United States Trust Co. of New York v. New Jersey, 431 U.S. 1 (1977), to imply that a contract can

20   be created by statute.  New Jersey, is distinguishable because the parties agreed that the statute
     constituted a contract and the statutory language showed an intent to contract.  Id.. at 18; see also id.

21   ("[T]he Contract Clause does not prohibit the States from repealing or amending statutes generally,
     or from enacting legislation with retroactive effects.").

22

23        [15] Plaintiffs' reliance upon Northwestern National Life Ins. Co. v. Tahoe Regional Planning
     Agency, 632 F.2d 104 (9th Cir. 1980) is misplaced.  Tahoe Regional, relied upon three cases where

24   the United States actually was a contracting party.  Id. at 106.  Likewise, in Continental Illinois
     National Bank & Trust Co. of Chicago, et al. v. Washington, 696 F.2d 692, 701 (9th Cir. 1983) the

25   law affected existing contracts.  Applying a heightened standard of review to this piece of clearly
     economic legislation would directly contradict both Ninth Circuit and Supreme Court precedent.

26   See, e.g., Turner Elkhorn, 428 U.S. at 15; See, e.g., Ileto, 565 F.3d at 1140; Seariver, 309 F.3d at
     678.  Green v. Peter, No. 71 C 4503, 1997 WL 769458 (N.D. Ill. Dec. 5, 1997), does not support

27   plaintiffs' case because the court did not find that an act of either the legislature or Congress
     interfered with a contract and reviewed the legislation at issue on a rational basis standard.

28                                                     -10-

1  unrelated to any governmental objective.  Porter v. Osborn, 546 F.3d 1131, 1136 (9th Cir. 2008).

2  Plaintiffs have not and cannot establish that Congress (or the President) acted with an intent to harm

3  TPS applicants.[16]   Plaintiffs cite no instance where a court has found that Congress's enactment of a

4  piece of economic legislation amounts to an act that "shocks the conscience."[17]   Congress clarified

5  USCIS's authority to collect biometric fees and it did not act to enrich the Government at plaintiffs'

6  expense.[18]

7          **E.      Pub. L. No. 111-83 Does Not Violate The Separation Of Powers Doctrine**

8          Plaintiffs also erroneously contend that Pub. L. No. 111-83 violates the constitutional

9  requirement of separation of powers citing United States v. Klein, 80 U.S. (13 Wall.) 128, 146-47

10

11      [16] See also Carr Huml Investors, L.L.C. v. Arizona, No. CV-05-2233, 2007 WL 4403981 (D.
Ariz. Dec. 11, 2007) ("[F]ederal courts have consistently concluded that a landowner's substantive
12  due process and equal protection rights are not violated even when a municipality acts in violation of
state or local law, in bad faith, or beyond its jurisdiction.").

13

14      [17] Relying upon an unpublished case, Dotzel v. Ashbridge, 306 Fed. Appx. 798 (3d Cir. 2009),
plaintiffs attempt tp analogize Pub. L. No. 111-83 to egregious "self-dealing."  Id. (citing Eichenlaub
15  v. Township of Indiana, 385 F.3d 274 (3d Cir. 2004).  In Eichenlaub, the court discussed several
examples of the type of self-dealing that could "shock the conscience" such as the fraudulent
16  conversion of a tax levy to an unauthorized seizure and forced sale of an $800,000 ongoing business
that was conducted through an auction that benefitted friends of the defendant.  Id. at 285.  Such
17  conduct is wholly inapposite to the Pub. L. No. 111-83, which essentially conforms with plaintiffs'
years of conduct taking Government services and paying without complaint the prescribed $25, $50,
18  $70 or $80 fees for the services they took.

19      [18] Even assuming for the purposes of argument, that collecting the biometric fees previously had
been patently unlawful, Congress could still ratify the collection of the fee.  United States v. Conrad
20  Heinszen, 206 U.S. 370, 390-91 (1907) (Congress could ratify admittedly unlawful collections of
duties even after plaintiff had brought action to recover the duties paid); Western Union Telegraph
21  Co. v. Louisville & Nashville R.R. Co., 258 U.S. 13, 20 (1922) (where telegraph company had
brought lawsuit alleging right to easement under eminent domain statute, company did not have right
22  so far vested under state law to preclude change in statute that destroyed any such right of easement);
Swayne & Hoyt Ltd. v. United States, 300 U.S. 297 (1937) (noting that Congress may ratify acts it
23  could originally have authorized and that statute was constitutional where consequences of
retroactive application were free of elements of novelty and surprise); Rafferty v. Smith, Bell & Co.,
24  257 U.S. 226, 231-32 (1921) (retroactive validation by Congress of duties collected some four years
earlier held constitutional); Taxpayers For the Animas-La Plata Referendum v. Animas-La Plata
25  Water Conservancy District, 739 F.2d 1472, 1477 (10th Cir. 1984) (noting that the Supreme Court
has not hesitated to uphold legislation which has mooted pending lawsuits and nullified accrued
26  causes of action).  Although many of these cases are old, they have been repeatedly recognized as
valid law.  E.g., Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989) (citing Swayne); Cansius College
27  v. United States, 799 F.2d 18, 25-27 (2nd Cir. 1986) (citing above-referenced Supreme Court cases
with approval to find a curative tax statute constitutional despite lengthy retroactivity period).

28                                              -11-

1   (1871), which held that Congress cannot dictate findings or demand results <u>in a particular case</u>.

2   Surreply at 12.  Plaintiffs again overreach.

3       <u>Klein</u> has been significantly narrowed by subsequent decisions.  <u>See</u>, <u>e.g.</u>, <u>Plaut v. Spendthrift</u>

4   <u>Farm, Inc.</u>, 514 U.S. 211, 218 (1995).  As <u>Plaut</u> makes clear <u>Klein</u>'s prohibition "does not take hold

5   when Congress amends applicable law." <u>Id</u>.  Likewise, in <u>Robertson v. Seattle Audobon Society</u>, 503

6   U.S. 429, 441 (1992) the Court upheld a provision in an appropriations bill that was passed in direct

7   response to ongoing litigation and stressed the act was lawful because Congress left it to the Courts

8   to adjudicate the impact of the newly articulated standards in that particular case.  <u>Id</u>..[19]  Nothing in

9   Pub. L. No. 111-83 takes away the court's ability to exercise its adjudicative function of interpreting

10  and applying the meaning and effect of the newly governing law.

11      Although plaintiffs attempt to distinguish <u>Robertson</u>, plaintiffs acknowledge Pub. L. No. 111-

12  83 "creates new law."  Surreply at 13.  Assuming for the purposes of argument only that plaintiffs

13  are correct that the United States previously lacked authority to charge fees in excess of the $50.00

14  cap prescribed in 8 U.S.C. § 1254a, Pub. L. No. 111-83 did so by clarifying that the fee cap

15  contained in 8 U.S.C. § 1254a does not apply to biometric fees.  In any event, as the Supreme Court

16  made clear in <u>Robertson</u>, Congress was free to enact Pub. L. No. 111-83 without running afoul of the

17  separation of powers doctrine.[20]

18

19

20

21      [19] In <u>Robertson</u>, the legislative history was clearly directed to ongoing litigation.  In fact, as the
    court noted, the legislative history referred to pending cases by name.  503 U.S. at 440.

22

23      [20] In addition, the Ninth Circuit has stated that Congress can legitimately affect pending litigation
    by enacting legislation.  In <u>Stop H-3 Ass'n v. Dole</u>, 870 F.2d 1419, 1432 (9th Cir. 1989) ("Through

24  the passage of legislation which governs the lawsuit, Congress can effectively moot a controversy
    notwithstanding its pendency before the court.") (quoting <u>Friends of the Earth v. Weinberger</u>, 562 F.
    Supp. 265, 270 (D.C.D.C. 1983)); <u>Ileto</u>, 565 F.3d at 1139 (holding that retroactive statute does not

25  violate the separation of powers doctrine); <u>In re Consolidated United States Atmospheric Testing</u>
    <u>Litig.</u>, 820 F.2d at 992 (same).  Likewise in <u>Navajo Tribe of Indians v. Andrus</u>, 644 F.2d 790 (9th

26  Cir. 1981), the district court interpreted two statutes together to deny the plaintiffs' claim.  Pending
    appeal, Congress amended one of the statutes to make clear that the district court was correct.  The

27  court of appeals ruled that the amendment mooted the appeal.

28                                          -12-

1    In the alternative, plaintiffs contend that by enacting Pub. L. No. 111-83, Congress acted to

2 compel a result in a particular case.  Pub. L. No. 111-83 is a generally applicable statute that applies

3 to all TPS applicants, not just the plaintiffs in this case.[21]

4    **F.    Pub. L. No. 111-83 Is Not An Attempt To Circumvent The Administrative Process**

5    Plaintiffs' argument that USCIS must engage in rulemaking in order for Pub. L. No. 111-83

6 to apply to the plaintiffs is also without merit.  Requiring rulemaking in this instance would be

7 redundant and pointless because the necessary rules are already in place.  Plaintiffs' argument

8 regarding the APA is essentially a restatement of its argument that Pub. L. No. 111-83 is

9 unconstitutional because it is retroactive.  As we have established, Congress can enact retroactive

10 statutes.  Moreover, when Congress explicitly makes a statute retroactive – as Congress did with

11 Pub. L. No. 111-83 – agencies can also engage in retroactive rulemaking.[22]  Nevertheless, assuming

12 for purposes of argument only that plaintiffs were correct, plaintiffs' only remedy would be to have

13 their case stayed indefinitely while the agency could promulgate new rules.

14    **CONCLUSION**

15    For these reasons, and for the additional reasons set forth in our cross-motion and opposition

16 papers, all of which we respectfully maintain, the Court should grant summary judgment in

17 defendants' favor.

18

---

19    [21] See Temple Univ. v. United States, 769 F.2d 126, 134 n.4 (3d Cir. 1985) (striking down separation of powers challenge to a generally applicable statute).  Pub. L. No. 111-83 applies to

20 every TPS applicant who paid biometric services fees since 1998.  Aliens from countries have been designated for TPS since 1998, namely Angola, Burundi, Montserrat, Sierra Leone, Somalia, Sudan

21 and Liberia, are also affected though they are not a part of plaintiffs' class.  Moreover, the statute extends back to 1998, rather than 2001 which would cover the limitations period for plaintiffs'

22 lawsuit.  Plaintiffs' class purports to represent every El Salvadoran, Honduran, and Nicaraguan national who could conceivably present an action  Plaintiffs cite no authority supporting the

23 contention that Congress is foreclosed from changing substantive law because the Executive Branch is the subject of a class action complaint.

24    [22] Public Utilities Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 463-64 (1943);  Greene

25 v. United States, 376 U.S. 149, 160 (1964) (noting that retroactive rules may be given effect when Congress has explicitly intended for a statute to operate retroactively). As the cases cited by plaintiffs

26 explain, when a statute is specifically written so as to apply retroactively, the presumption against retroactive rulemaking does not apply.  Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208-09

27 (1988).

28    -13-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

OF COUNSEL:
JOSEPH P. RUSSONIELLO
United States Attorney
JOANN M. SWANSON
Assistant United States Attorney
Chief, Civil Division
ILA C. DEISS
Assistant United States Attorney
San Francisco, CA

J. MAX WEINTRAUB
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division
Department of Justice

Date: November 19, 2009

TONY WEST
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Brian A. Mizoguchi
BRIAN A. MIZOGUCHI
Senior Trial Counsel

ELIZABETH A. SPECK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
  Attn.: Classification Unit 8th Flr.
1100 L Street, N.W.
Washington, D.C.  20530
Tel: (202) 305-3319

Attorneys for Defendants

-14-

# Exhibit A



H. R. 2892

# One Hundred Eleventh Congress
## of the
## United States of America

### AT THE FIRST SESSION

*Begun and held at the City of Washington on Tuesday,
the sixth day of January, two thousand and nine*

## An Act

Making appropriations for the Department of Homeland Security for the fiscal
year ending September 30, 2010, and for other purposes.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,* That the
following sums are appropriated, out of any money in the Treasury
not otherwise appropriated, for the Department of Homeland Secu-
rity for the fiscal year ending September 30, 2010, and for other
purposes, namely:

### TITLE I

### DEPARTMENTAL MANAGEMENT AND OPERATIONS

#### OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

For necessary expenses of the Office of the Secretary of Home-
land Security, as authorized by section 102 of the Homeland Secu-
rity Act of 2002 (6 U.S.C. 112), and executive management of
the Department of Homeland Security, as authorized by law,
$147,818,000: *Provided,* That not to exceed $80,000 shall be for
official reception and representation expenses, of which $20,000
shall be made available to the Office of Policy solely to host Visa
Waiver Program negotiations in Washington, DC: *Provided further,*
That $18,000,000 shall not be available for obligation for the Office
of Policy until the Secretary submits an expenditure plan for the
Office of Policy for fiscal year 2010: *Provided further,* That all
official costs associated with the use of government aircraft by
Department of Homeland Security personnel to support official
travel of the Secretary and the Deputy Secretary shall be paid
from amounts made available for the Immediate Office of the Sec-
retary and the Immediate Office of the Deputy Secretary.

#### OFFICE OF THE UNDER SECRETARY FOR MANAGEMENT

For necessary expenses of the Office of the Under Secretary
for Management, as authorized by sections 701 through 705 of
the Homeland Security Act of 2002 (6 U.S.C. 341 through 345),
$264,190,000, of which not less than $1,000,000 shall be for logistics
training; and of which not to exceed $3,000 shall be for official
reception and representation expenses: *Provided,* That of the total
amount made available under this heading, $5,500,000 shall remain
available until expended solely for the alteration and improvement
of facilities, tenant improvements, and relocation costs to consoli-
date Department headquarters operations at the Nebraska Avenue

Buffalo to enhance public access to the Buffalo Lighthouse and the waterfront.

SEC. 546. For fiscal year 2010 and thereafter, the Secretary may provide to personnel appointed or assigned to serve abroad, allowances and benefits similar to those provided under chapter 9 of title 1 of the Foreign Service Act of 1980 (22 U.S.C. 4081 et seq.).

SEC. 547. Section 401(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note) is amended by striking "at the end of the 11-year period beginning on the first day the pilot program is in effect." and inserting "on September 30, 2012.".

SEC. 548. Section 610(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993 (8 U.S.C. 1153 note) is amended by striking "for 15 years" and inserting "until September 30, 2012".

SEC. 549. (a) In addition to collection of registration fees described in section 244(c)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1254a(c)(1)(B)), fees for fingerprinting services, biometric services, and other necessary services may be collected when administering the program described in section 244 of such Act.

(b) Subsection (a) shall be construed to apply for fiscal year 1998 and each fiscal year thereafter.

SEC. 550. Section 550(b) of the Department of Homeland Security Appropriations Act, 2007 (Public Law 109–295; 6 U.S.C. 121 note) is amended by striking "three years after the date of enactment of this Act" and inserting "on October 4, 2010".

SEC. 551. (a)(1) Sections 401(c)(1), 403(a), 403(b)(1), 403(c)(1), and 405(b)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 8 U.S.C. 1324a note) are amended by striking "basic pilot program" each place that term appears and inserting "E-Verify Program".

(2) The heading of section 403(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is amended by striking "Basic Pilot" and inserting "E-Verify".

(b) Section 404(h)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104–208; 8 U.S.C. 1324a note) is amended by striking "under a pilot program" and inserting "under this subtitle".

SEC. 552. (a) None of the funds made available in this or any other Act may be used to release an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS), the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI).

(b) None of the funds made available in this or any other Act may be used to transfer an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS), the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI), for the purpose of detention, except as provided in subsection (c).

Urban Development (HUD) have recognized that there must be some interplay between the agencies after a disaster. The two agencies are working in tandem to operate the Disaster Housing Assistance Program (DHAP) in Louisiana, Mississippi, and Texas following Hurricanes Katrina, Rita, and Ike. The conferees expect FEMA to use DHAP as a model as it develops its agreements with HUD. The conferees expect that FEMA will continue to support disaster costs under an agreement between HUD and FEMA, as it does for DHAP in the Gulf Coast.

The conferees direct FEMA to formalize an agreement with HUD outlining the roles and responsibilities of both agencies following a disaster and clearly delineating when and how HUD should take the lead role in the federal housing response. Upon completion of the agreement, FEMA is directed to report to the appropriate Congressional committees on the resources and any legislative authority needed to implement the agreement.

The conferees remain concerned by continued reports that FEMA trailers purchased to house disaster victims have high levels of formaldehyde emissions, possibly leading to adverse health effects. The conferees understand FEMA is pursuing alternative housing solutions and demonstration projects and encourage FEMA to consider multiple technologies and building solutions during this phase.

### Children and Disasters

FEMA is directed to expedite its discussions with Ottawa School in Illinois and to come to resolution on its elementary school project. FEMA and the affected community should address the continued flooding of this school and area. FEMA and the community should consider taking the mitigation action of moving the school from the floodplain. FEMA shall act with due haste and report to the Committees when the final project is approved.

Further, the conferees direct FEMA to establish planning guidance to ensure child safety and protection in the event of a disaster.

### Disaster Assistance Direct Loan Program Account

The conference agreement provides $295,000 for the cost of loans as proposed by both the House and the Senate. Administrative costs are provided for in the FEMA "Management and Administration" account.

### Flood Map Modernization Fund

The conference agreement provides $220,000,000 for the Flood Map Modernization program as proposed by both the House and Senate. In fiscal year 2010, FEMA will continue to focus these funds on reviewing, updating, and maintaining maps to accurately reflect flood hazards. The goal shall be to review all, where necessary, to update and maintain data, methodologies, models, and maps that have been modernized, and to issue map updates no later than five years past the modernized dates of the maps. To support this goal, FEMA is directed to provide no less than 20 percent of the funds provided under this heading for map updates and maintenance conducted by Cooperating Technical Partners that provide a 25 percent cash match and have a strong record of working effectively with FEMA on flood plain mapping activities. With the fiscal year 2011 budget request, FEMA shall submit to the Committees a status report on the progress made towards the five-year Risk Mapping, Assessment, and Planning strategy.

When allocating map modernization funds, FEMA is encouraged to prioritize as criteria the number of stream and coastal miles within the State, the Mississippi River Delta region, and the participation of the State in leveraging non-federal contributions.

FEMA is directed to develop a National Digital Elevation Acquisition and Utilization plan for the purposes of supporting flood plain map updates. FEMA shall collaborate with the United States Geological Survey, the National Oceanic and Atmospheric Administration, the National Aeronautics and Space Administration, and States that have experience in acquiring disaster coordinates and incorporating high resolution elevation data in the flood plain map updates. FEMA shall submit this plan to the Committees within six months after the date of enactment of this Act.

### National Flood Insurance Fund

The conference agreement provides the agency re-estimated request of $38,680,000 for salaries and expenses as opposed to $52,149,000 as proposed by both the House and Senate. The conference agreement further provides $107,320,000 for flood plain mapping and management as proposed by both the House and Senate.

The conferees do not include authority allowing the FEMA Administrator to transfer funds from flood mapping and flood plain management for salaries and expenses. Instead, FEMA is required to provide the Committees with a reprogramming proposal, in accordance with section 503 of this Act, if a problem arises in meeting mission requirements. The conferees encourage FEMA to consider population growth when determining grant awards to the States under the Community Assistance Program.

### National Predisaster Mitigation Fund

The conference agreement provides $100,000,000 for the National Predisaster Mitigation Fund (PDM), as proposed by the House instead of $120,000,000 as proposed by the Senate. As part of the budget, the Administration proposes to drastically change the distribution methodology used for awarding PDM grants. However, the Administration was unable to adequately articulate the ramifications or benefits of their new approach. Considering that pending legislation is vastly different from the Administration's new approach, the conferees do not approve the proposed change. Instead, the conferees direct FEMA to continue this program as it operated during fiscal year 2009. The conference agreement continues a provision contained in the Department of Homeland Security Appropriation Act, 2009, which extends the authorization of the PDM grant program for one year to continue the current program.

The conference agreement includes funding for predisaster mitigation projects in the following amounts, and the remaining funding shall be competitively awarded:

| Predisaster mitigation projects | Amount |
|---|---|
| Alabama Emergency Management Agency, AL | $200,000 |
| Arkansas Department of Emergency Management, AR | 750,000 |
| Arkansas State University-Beebe, AR | 452,000 |
| Brigham City Corporation, UT | 250,000 |
| CHRISTUS St. Elizabeth Hospital, Beaumont, TX | 250,000 |
| City of Brooksville, KY | 18,500 |
| City of Burbank, CA | 225,000 |
| City of Camanche, IA | 187,500 |
| City of Coconut Creek, FL | 500,000 |
| City of Colton, CA | 200,000 |
| City of Davis, CA | 275,000 |
| City of Emeryville, CA | 600,000 |
| City of Flagler Beach, FL | 760,000 |
| City of Hartselle, AL | 245,000 |
| City of Hidalgo, TX | 500,000 |
| City of Hokah, MN | 590,000 |
| City of Kannapolis, NC | 425,000 |
| City of Los Angeles, CA | 1,000,000 |
| City of Los Angeles, CA | 500,000 |
| City of Maryville, MO | 175,000 |
| City of Miami Beach, FL | 750,000 |
| City of Miami, FL | 600,000 |
| City of New Braunfels, TX | 500,000 |
| City of Prattville, AL | 500,000 |
| City of Reno, NV | 500,000 |
| City of Robstown, TX | 500,000 |
| City of Rockville, MD | 650,000 |
| City of Santa Clarita, CA | 500,000 |
| City of Trenton, NJ | 300,000 |
| City of Venice, FL | 200,000 |
| DeKalb County, IL | 500,000 |
| Drew County, AR | 368,664 |
| Harris County Flood Control District, TX | 1,000,000 |
| Henry County, GA | 275,000 |
| Jackson Health System, Miami, FL | 500,000 |
| Kentucky Emergency Management, KY | 600,000 |
| King County, WA | 750,000 |
| Lake County Stormwater Management Agency, OH | 725,000 |
| Lorain County, OH | 200,000 |
| Louisville-Metro Government, KY | 500,000 |
| Lucas County Engineer, OH | 500,000 |
| McDowell Hospital, Marion, NC | 220,000 |
| Mississippi Homeland Security Office, MS | 500,000 |
| North Carolina Office of Emergency Management, NC | 165,000 |
| Ohio University, Athens, OH | 200,000 |
| Orange County Fire Authority, CA | 252,000 |
| Russell County Fiscal Court, KY | 200,000 |
| San Miguel County, NM | 400,000 |
| Shelby County, Memphis, TN | 325,000 |
| State of Maryland, MD | 1,000,000 |
| Town of Hambleton and Town of Davis, WV | 450,000 |
| Town of Occoquan, VA | 25,000 |
| Town of Shelter Island, NY | 200,000 |
| Town of Union and City of Binghamton, NY | 462,000 |
| Town of Winthrop, MA | 500,000 |
| Village of La Grange Park, IL | 150,000 |
| Village of Pelham, NY | 552,500 |
| Westport Fire Department, CT | 265,000 |

### Emergency Food and Shelter

The conference agreement provides $200,000,000 for the Emergency Food and Shelter program as proposed by the House instead of $175,600,000 as proposed by the Senate. The funding will assist those most immediately in need of food and shelter assistance.

## TITLE IV—RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES

### United States Citizenship and Immigration Services

The conference agreement provides $324,000,000 in discretionary appropriations for United States Citizenship and Immigration Services (USCIS) instead of $289,000,000 as proposed by the House and $135,709,000 as proposed by the Senate.

### User Fee Funded Programs

The current estimates for fiscal year 2010 of USCIS fee collections, which constitute a majority of the agency's resources, is $2,503,233,000. These fee revenues support adjudication of applications for immigration benefits and fraud prevention activities and are derived from fees collected from persons applying for immigration benefits. The conferees understand that fee receipts have decreased significantly in fiscal year 2009 largely due to prevailing economic conditions, and are also likely to be below projections for fiscal year 2010. Since it is unclear how the expenditure estimates will change

October 13, 2009     CONGRESSIONAL RECORD—HOUSE     H11227

to align USCIS costs with anticipated revenues, the conferees cannot accurately modify the budget presentation of fee-funded expenditures. Instead, the conferees direct USCIS to submit, within 30 days after the date of enactment of this Act, an operating plan for fiscal year 2010 accompanied by a reprogramming notification, if necessary, that details how and at what levels USCIS will fund its operations in fiscal year 2010 based on revised fee collection estimates.

Within the total fees collected, the conferees direct USCIS to provide no less than $61,755,000 to support National Customer Service Center operations and to dedicate the entirety of premium processing revenue to business system and information technology transformation. USCIS is also directed to provide no less than $29,000,000 to convert immigration records to digital format, as requested for fiscal year 2010. No more than $10,000 of the fees collected shall be used for official reception and representation expenses.

**Basic Pilot Program (E-Verify Program)**

The conference agreement provides $137,000,000 for the basic pilot program (E-Verify Program) instead of $182,000,000 as proposed by the House and $118,500,000 as proposed by the Senate. Of this amount, $30,000,000 is available until September 30, 2011, for continued improvement of the E-Verify system, including an identity assurance tool, additional capacity to investigate fraudulent use of the system, and development of a "self-check" tool to allow authorized workers to validate the accuracy of their records on file with federal government agencies. The conferees make all appropriations for compliance investments available for fiscal year 2010 only to reflect the emphasis the conferees expect USCIS to place on E-Verify improvements that strengthen compliance with system operating requirements.

**GAO Analysis of Basic Pilot Program/E-Verify Program**

The conferees direct GAO to conduct two studies of the basic pilot program (E-Verify Program): one of the tentative non-confirmation rates for the basic pilot program (E-Verify Program) and the other of the effects of the basic pilot program (E-Verify Program) on small entities, as defined by 5 U.S.C. 601. The House had proposed a general provision (section 545) requiring these studies and GAO is directed to follow the direction in the House bill when designing them. The Senate had proposed no similar provision.

**Refugee and Asylum Application Processing**

The fiscal year 2010 budget proposes $201,000,000 in direct appropriations, rather than a surcharge on application fees, to pay for the cost of processing refugee applications and asylum claims. The conference agreement provides $50,000,000 for these costs instead of $100,000,000 as proposed by the House. The Senate proposed no funding. This level reflects an estimated three months of appropriations funded asylum and refugee application processing costs. Since the Administration has not published a Federal Register notice explaining how or when the existing $10 immigration application surcharge for funding refugee and asylum applications will be discontinued, the conference report includes statutory language withholding appropriated funds from obligation until regulatory revisions are implemented.

**Military Naturalizations**

The conference agreement provides $5,000,000 for the processing of military naturalization applications as proposed by the Senate. The House proposed no funding. The conferees strongly encourage the Office of Management and Budget to include appropriated funding for this activity within the fiscal year 2011 budget request for the Department of Defense in accordance with the National Defense Authorization Act of Fiscal Year 2004 (Public Law 108-136).

**REAL ID**

The budget requests $25,000,000 to complete development of a data sharing hub to support implementation of the REAL ID Act. The conferees, however, note that the $50,000,000 appropriated for this purpose for fiscal year 2009 has yet to be awarded to the State consortium leading the project. DHS has proposed significant revisions to the underlying REAL ID authorization, raising the potential for planning delays in the eventual technological solution that is determined necessary to connect States' vital records systems. As a result, the conference agreement includes $10,000,000 for REAL ID data sharing hub development, to be used only for system engineering and acquisition costs and not for "incentive" or other subsidy payments to project participants, instead of $25,000,000 as proposed by the House. The Senate proposed no funding for the REAL ID hub. As noted in the Senate report, the conferees expect DHS to submit its plan for hub development to the Committees in fiscal year 2010.

**Immigration Integration**

The conference agreement includes $11,000,000 for competitively-awarded grants to organizations promoting the rights and responsibilities of citizenship as proposed by the House instead of $1,900,000 as proposed by the Senate. The conference report includes a statutory restriction limiting the award of these funds to programs that serve legal permanent residents of the United States.

**Charges to Fees Charged to Temporary Protected Status Applicants**

As discussed in the House report, the conference report includes a general provision clarifying that USCIS is allowed to charge fees for services related to Temporary Protected Status applications.

**Naturalization Ceremonies**

As directed in the House report, USCIS is directed to identify, in the fiscal year 2011 budget submission, funds allocated to naturalization and oath of allegiance ceremonies and to work with local public and private groups to schedule naturalization and oath of allegiance ceremonies as part of Independence Day celebrations.

**FEDERAL LAW ENFORCEMENT TRAINING CENTER**

**SALARIES AND EXPENSES**

The conference agreement provides $239,356,000 for Federal Law Enforcement Training Center (FLETC) Salaries and Expenses as proposed by the House instead of $244,356,000 as proposed by the Senate. The conferees understand the Department has revised its priorities for the data center migration initiative and provide no funding within this account. The Department is encouraged to use the transfer authority provided for data center migration to fund any emergent requirements within FLETC as the initiative progresses.

**ACQUISITIONS, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES**

The conference agreement provides $43,466,000 for Acquisitions, Construction, Improvements, and Related Expenses as proposed by both the House and the Senate.

**SCIENCE AND TECHNOLOGY**

**MANAGEMENT AND ADMINISTRATION**

The conference agreement provides $143,200,000 for Management and Administration as proposed by the Senate instead of $142,200,000 as proposed by the House. This amount includes $10,000 for official reception and representation and $1,000,000 for additional Test and Evaluations/Standards personnel to support the Acquisition Review Board process. Science and Technology (S&T) shall brief the Committees quarterly on the test and evaluation status of all level 1 acquisitions.

As part of the fiscal year 2011 budget request and in each subsequent fiscal year, S&T shall report on the results of its research and development efforts in the prior year (fiscal year 2009), including all technologies, technology improvements, or capabilities delivered to front line users, and the role the Integrated Product Teams played in the development. In addition, based on the Directorate's ongoing validation and verification reviews, S&T shall also submit with its fiscal year 2011 budget request and each subsequent fiscal year a report on the amounts deobligated from projects in the prior fiscal year (fiscal year 2009) and what projects those funds were subsequently obligated to.

S&T shall notify the Committees pursuant to section 503 of this Act if it assesses any program for administrative costs exceeding five percent of the total program appropriation.

As discussed in the Senate report, S&T shall report within 30 days after the date of enactment of this Act on its plans and timelines for full implementation of the National Academy of Public Administration study recommendations related to strategic planning.

**RESEARCH, DEVELOPMENT, ACQUISITION, AND OPERATIONS**

The conference agreement provides $863,271,000 for Research, Development, Acquisition, and Operations instead of $925,555,000 as proposed by the Senate. Funds are available for three years, except Laboratory Facilities funding, which is available for five years. The following table specifies funding by budget activity:

| Border and Maritime Security | $44,181,000 |
|---|---|
| Chemical and Biological | 206,800,000 |
| Command, Control, and Interoperability | 81,794,000 |
| Explosives | 120,800,000 |
| Human Factors | 16,087,000 |
| Infrastructure and Geophysical | 74,968,000 |
| Innovation | 44,000,000 |
| Laboratory Facilities | 159,188,000 |
| Test and Evaluations/Standards | 29,000,000 |
| Transition | 46,134,000 |
| University Programs | 49,350,000 |
| Total | $863,271,000 |

**Border and Maritime Security**

The conference agreement provides $44,181,000 for Border and Maritime Security instead of $40,181,000 as proposed by the House and Senate. Included in this funding is $3,000,000 for urban tunnel detection basic research, as requested. In addition, the conferees fully fund the current maritime technology test beds and provide $4,000,000 for a pilot to develop a replicable port security system that would improve maritime domain awareness.

The conferees are disappointed in the slow progress DHS has made in developing a viable container security device, as discussed in the House report. S&T shall continue its quarterly updates to the Committees on its efforts in this area.

**Chemical and Biological**

The conference agreement provides $206,800,000 for Chemical and Biological as

to the Committees not later than 60 days after the date of enactment of this Act. The conferees direct DHS to notify the Committees if DNDO determines that it cannot obligate this funding.

SYSTEMS SECURITY

The conference agreement provides $20,000,000 for Systems Acquisition instead of $10,000,000 as proposed by the Senate. The House proposed no funding. Funding is made available until September 30, 2012, for radiological detection systems for the Securing the Cities program, to be awarded through full and open competition.

Advanced Spectroscopic Portal Monitors and Certification

The conference report prohibits full-scale procurement of advanced spectroscopic portal (ASP) systems until the Secretary has certified and reported to the Committees that a significant increase in operational effectiveness merits such a decision, with a requirement for separate certification for primary and secondary deployments. The Secretary is directed to continue consulting with NAS on this matter. Finally, DNDO is prohibited from engaging in high-risk concurrent development and production of mutually dependent software and hardware components of detection systems.

The conferees expect DHS to ensure certification decisions are made with the best possible test information and to follow NAS recommendations related to development and certification as outlined in the Senate report. Further, the conferees believe that NAS recommendations should be implemented prior to decisions on certification or procurement of ASPs. If for any reason the Department does not follow these recommendations, the Department shall provide a briefing to the Committees as to why these recommendations were not followed. As independent reviews of the ASP programs have been of value to the Department, the conferees believe an independent cost-benefit analysis would also be beneficial.

If certification does not occur or is further delayed, the conferees direct DHS to submit a revised deployment plan, to include additional procurement of PVT monitors, if requirements remain. As described in the House and Senate reports, the conferees encourage DNDO to undertake deployment of low rate initial production ASP systems, as appropriate, and use data from such deployments to inform future portal monitor decisions.

TITLE V—GENERAL PROVISIONS
(Including Rescissions of Funds)

Section 501. The conference agreement continues a provision proposed by the House and Senate that no part of any appropriation shall remain available for obligation beyond the current year unless expressly provided.

Section 502. The conference agreement continues a provision proposed by the House and Senate that unexpended balances of prior appropriations may be merged with new appropriations accounts and used for the same purpose, subject to reprogramming guidelines.

Section 503. The conference agreement continues a provision proposed by the Senate that provides authority to reprogram appropriations within an account and to transfer up to 5 percent between appropriations accounts with 15-day advance notification of the Committees. The House proposed a similar provision. A detailed funding table identifying programs, projects, and activities is included at the end of this statement. This table along with funding levels specified in the report shall serve as the control level for all reprogrammings. These reprogramming guidelines shall be complied with by all agencies funded by the Department of Homeland Security Appropriations Act, 2010.

The Department shall submit reprogramming requests on a timely basis and provide complete explanations of the reallocations proposed, including detailed justifications of the increases and offsets, and any specific impact the proposed changes will have on the budget request for the following fiscal year and future-year appropriations requirements. Each request submitted to the Committees should include a detailed table showing the proposed revisions at the account, program, project, and activity level to the funding and staffing FTE levels for the current fiscal year and to the levels requested in the President's budget for the following fiscal year.

The Department shall manage its programs and activities within the levels appropriated. The Committees are concerned with the number of reprogramming proposals submitted for consideration by the Department and remind the Department that reprogramming or transfer requests should be submitted only in the case of an unforeseeable emergency or situation that could not have been predicted when formulating the budget request for the current fiscal year. When the Department submits a reprogramming or transfer request to the Committees and does not receive identical response from the House and Senate, it is the responsibility of the Department to reconcile the House and Senate differences before proceeding, and if reconciliation is not possible, to consider the reprogramming or transfer request unapproved.

The Department is not to submit a reprogramming or transfer of funds after June 30 except in extraordinary circumstances, which imminently threaten the safety of human life or the protection of property. If a reprogramming or transfer is needed after June 30, the notice should contain sufficient documentation as to why it meets this statutory exception.

Section 504. The conference agreement continues a provision proposed by the House and Senate extending the authorization of the Department's Working Capital Fund (WCF) in fiscal year 2010. No funds appropriated or otherwise available to the Department may be used to make payment to the Department's WCF, except for activities and amounts allowed in the President's fiscal year 2010 budget. Funds provided to the WCF are available until expended. The Department shall only charge components for direct usage of the WCF. Fiscal year 2010 and any carryover funds may be used only for the purposes consistent with the contributing component. Any funds paid in advance or reimbursed must reflect the full cost of each service. The WCF shall be subject to the requirements of section 503 of this Act.

Section 505. The conference agreement continues a provision proposed by the House and Senate that not to exceed 50 percent of unobligated balances remaining at the end of fiscal year 2010 from appropriations made for salaries and expenses shall remain available through fiscal year 2011 subject to reprogramming guidelines.

Section 506. The conference agreement continues a provision proposed by the House and Senate deeming that funds for intelligence activities are specifically authorized during fiscal year 2010 until the enactment of an Act authorizing intelligence activities for fiscal year 2010.

Section 507. The conference agreement continues and modifies a provision proposed by the House and Senate requiring notification of the Committees three business days before any grant allocation, grant award, contract award (including Federal Acquisition Regulation-covered contracts), Other Transaction Agreement, a task or delivery order on a DHS multiple award contract, letter of intent, or public announcement of the intention to make such an award totaling in excess of $1,000,000. If the Secretary determines that compliance would pose substantial risk to health, human life, or safety, an award may be made without prior notification but the Committees shall be notified within five full business days after such award or letter is issued. Additionally, FEMA is required to brief the Committees five full business days prior to announcing publicly the intention to make an award under State and Local Programs.

Section 508. The conference agreement continues a provision proposed by the House and Senate that no agency shall purchase, construct, or lease additional facilities for Federal law enforcement training without advance approval of the Committees.

Section 509. The conference agreement continues a provision proposed by the House and Senate that none of the funds may be used for any construction, repair, alteration, or acquisition project for which a prospectus otherwise required under chapter 33 of Title 40, United States Code, has not been approved. The conferees exclude funds that may be required for development of a proposed prospectus.

Section 510. The conference agreement continues a provision proposed by the House that consolidates by reference prior year statutory bill language into one provision. The Senate proposed a similar provision. These provisions relate to reporting requirements of the privacy officer; contracting officer's technical representative training; sensitive security information; federal building performance and requirements outlined in title V of the National Energy Conservation Policy Act or subtitle A of title I of the Energy Policy Act of 2005; use of funds in conformance with section 303 of the Energy Policy Act of 1992; and Executive Order 13149 relating to fleet and transportation efficiency.

Section 511. The conference agreement continues a provision proposed by the House and Senate that none of the funds may be used in contravention of the Buy American Act.

Section 512. The conference agreement continues a provision proposed by the Senate prohibiting funds to be used to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act (8 U.S.C. 1448). The House proposed no similar provision.

Section 513. The conference agreement continues a provision proposed by the House and Senate regarding competitive sourcing.

Section 514. The conference agreement continues and modifies a provision proposed by the House and Senate directing TSA to work with air carriers and airports to ensure the screening of cargo carried on passenger aircraft, as required by the 9/11 Act, increases incrementally each quarter until the requirements are met. TSA is required to report air cargo inspection statistics detailing how incremental progress is being made to the Committees within 45 days after the end of each quarter of the fiscal year. Finally, TSA shall submit a report on how it plans to meet the 100 percent mandate contained in the 9/11 Act.

Section 515. The conference agreement continues a provision proposed by the House and Senate requiring the Chief Financial Officer to submit monthly budget execution and staffing reports within 45 days after the close of each month.

Section 516. The conference agreement continues and modifies a provision proposed by the Senate directing that any funds appropriated or transferred to TSA "Aviation Security", "Administration", and "Transportation Security Support" in fiscal years

unmanned aircraft systems. The House proposed no similar provision.

Section 545. The conference agreement includes a new provision proposed by the House permitting unobligated amounts made available to Coast Guard Sector Buffalo to be used to make improvements to land to enhance public access to the Buffalo Lighthouse and the waterfront. The Senate proposed no similar provision.

Section 546. The conference agreement includes a new provision proposed by the House and Senate permitting personnel appointed or assigned to serve abroad allowances and benefits similar to those provided in the Foreign Service Act of 1980.

Section 547. The conference agreement includes and modifies a new provision proposed by the House that extends the basic pilot program (E-Verify program) by three years. Because DHS and the Social Security Administration have already entered into a memorandum of agreement on employment verification, statutory language is no longer necessary. The two GAO reports contained in the House provision are addressed under USCIS. The Senate proposed a similar extension.

Section 548. The conference agreement includes a new provision proposed by the Senate that extends the EB-5 visa program for three years. The House proposed no similar provision.

Section 549. The conference agreement includes a new provision proposed by the House that clarifies fees for fingerprinting, biometric services, and other necessary services may be collected as part of section 344 of the Immigration and Nationality Act. The Senate proposed no similar provision.

Section 550. The conference agreement includes a new provision proposed by the House and Senate that extends the risk based security standards for chemical facilities cited in Section 550 of P.L. 109-295 by one year.

Section 551. The conference agreement includes a new provision proposed by the Senate that renames "basic pilot program" as "E-Verify Program". The House proposed no similar provision.

Section 552. The conference agreement includes and modifies a new provision proposed by the House on the individuals detained at the Naval Station, Guantanamo Bay, Cuba. The Senate had no similar provision.

Section 553. The conference agreement includes a new provision proposed by the House that requires the names of individuals detained at the Naval Station, Guantanamo Bay, Cuba to be included on the No Fly List. The Senate proposed no similar provision.

Section 554. The conference agreement includes a new provision proposed by the House and Senate permitting the collection of fees for conferences, seminars, exhibits, symposiums, or similar meetings and requires an annual report on the level of collection by the Department.

Section 555. The conference agreement includes a new provision proposed by the Senate defining rural areas for purpose of section 2105 of the Homeland Security Act of 2002. The House proposed no similar provision.

Section 556. The conference agreement includes a new provision proposed by the House prohibiting funds in this Act to be used for first-class travel. The Senate proposed no similar provision.

Section 557. The conference agreement includes and modifies a new provision proposed by the House prohibiting funds in this Act to be used for adverse personnel actions for employees who use protective equipment or measures, including surgical masks, N95 respirators, gloves, or hand-sanitizers in the conduct of their official duties. The Senate proposed no similar provision.

Section 558. The conference agreement includes a new provision proposed by the House prohibiting funds in this Act to be used to employ workers in contravention of section 274A(h)(3) of the Immigration and Nationality Act. The Senate proposed no similar provision.

Section 559. The conference agreement includes and modifies a new provision proposed by the Senate that prohibits the use of funds for LORAN-C after January 4, 2010, if the Commandant certifies termination will not adversely impact maritime safety and the Secretary certifies that LORAN-C is not needed as a backup to the Global Positioning System (GPS). The certifications must be submitted to the Committees on Appropriations. If such certifications are made, the sale of LORAN-C properties can be used as offsetting collections for environmental compliance and restoration activities, including costs of securing and maintaining equipment that may be used as a backup to GPS. The House proposed no similar provision.

Section 560. The conference agreement includes and modifies a new provision proposed by the Senate that prohibits the obligation of funds for construction of the National Bio-and Agro-defense Facility (NBAF) until the Secretary of DHS undertakes a bio-safety and bio-security mitigation risk assessment using plume and epidemiologic impact modeling to determine the requirements for the safe operation of NBAF in Manhattan, Kansas. Once DHS completes the risk assessment, the National Academy of Sciences shall provide an independent, expert evaluation of the DHS study within four months to ensure that risk has been adequately identified and mitigated in planning for NBAF. In addition, the Secretary of DHS, in coordination with the Secretary of Agriculture, shall report to the Committees on the procedures used to issue a permit for foot-and-mouth disease live virus research and an emergency response plan in the event of an accidental release of a hazardous pathogen originating from NBAF. The House proposed a similar provision under S&T Research, Development, Acquisition, and Operations.

Section 561. The conference agreement includes and modifies a new provision proposed by the Senate on maritime transportation security information. The House proposed no similar provision.

Section 562. The conference agreement includes a new provision proposed by the Senate on the definition of switchblade knives. The House proposed no similar provision.

Section 563. The conference agreement includes and modifies a new provision proposed by the Senate related to the Federal Deposit Insurance Act. The House proposed no similar provision.

Section 564. The conference agreement includes and modifies a new provision proposed by the Senate amending the OPEN FOIA Act relating to certain items being withheld from release. The House proposed no similar provision.

Section 565. The conference agreement includes and modifies a new provision proposed by the Senate on the release of protected national security documents. The House proposed no similar provision.

Section 566. The conference agreement includes a new provision proposed by the Senate permitting temporarily to serve on an arbitration panel created under the American Recovery and Reinvestment Act for FEMA's Public Assistance program for Hurricanes Katrina and Rita. The House proposed no similar provision.

Section 567. The conference agreement includes a new provision proposed by the Senate on the proper disposal of personal information collected through the Registered Traveler program. A report on procedures and status is required to be submitted 90 days after the date of enactment of this Act. The House proposed no similar provision.

Section 568. The conference agreement includes and modifies a new provision proposed by the Senate extending the visa program for special immigrant nonminister religious workers and the "Conrad 30" rural area serving doctors program. The conferees modify treatment of surviving spouses and other relatives. The conference agreement includes reporting requirements and humanitarian consideration for pending petitions and applications. The House proposed no similar provision.

Section 569. The conference agreement includes a new provision proposed by the Senate prohibiting funds appropriated or otherwise made available by this Act to pay for award or incentive fees for contractors with below satisfactory performance or performance that fails to meet the basic requirements of the contract. The House proposed no similar provision.

Section 570. The conference agreement includes a new provision proposed by the Senate that prohibits funds appropriated or otherwise made available by this Act for DHS to enter into a federal contract unless the contract meets the Federal Property and Administrative Services Act of 1949 or Chapter 137 of title 10 U.S.C. requirements and the Federal Acquisition Regulation or the contract is authorized by statute without regard to this section. The House proposed no similar provision.

Section 571. The conference agreement includes a new provision allowing the Secretary to transfer data center migration funds made available by this Act between appropriations for the same purpose after notifying the Committees 15 days in advance.

Section 572. The conference agreement includes a new provision that specifies earmarks contained in House Report 111-157 intended to be awarded to a for-profit entity shall be awarded under full and open competition.

Section 573. The conference agreement includes a provision rescinding $5,572,000 in unobligated balances for fiscal year 2009 from FEMA "Trucking Industry Security Grants" as proposed by the House instead of $5,500,000 as proposed by the Senate.

Section 574. The conference agreement includes a provision rescinding $3,358,000 in unobligated balances of prior year appropriations for "Analysis and Operations" instead of $3,293,000 as proposed by the House and $5,000,000 as proposed by the Senate.

Section 575. The conference agreement includes a provision rescinding $8,000,000 in unobligated balances of prior year appropriations for NPPD "Infrastructure Protection and Information Security" as proposed by the Senate instead of $5,963,000 as proposed by the House.

Section 576. The conference agreement includes a provision rescinding $5,941,145 from unobligated balances of prior year appropriations for S&T "Research, Development, Acquisition, and Operations" instead of $7,500,000 as proposed by the Senate. The House proposed no similar provision. S&T shall notify the Committees on the distribution of the rescission prior to its implementation.

Section 577. The conference agreement includes a provision rescinding $8,000,000 from unobligated balances of prior year appropriations for DNDO "Research, Development, and Operations" as proposed by the Senate. The House proposed no similar provision. DNDO shall notify the Committees on the distribution of the rescission prior to its implementation.

| 111TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>111–298 |

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2010

OCTOBER 13, 2009.—Ordered to be printed

Mr. PRICE of North Carolina, from the committee of conference, submitted the following

## CONFERENCE REPORT

[To accompany H.R. 2892]

The committee of conference on the disagreeing votes of the two Houses on the amendment of the Senate to the bill (H.R. 2892), making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2010, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the House recede from its disagreement to the amendment of the Senate and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the Senate amendment, insert the following:

*That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Department of Homeland Security for the fiscal year ending September 30, 2010, and for other purposes, namely:*

## TITLE I

### DEPARTMENTAL MANAGEMENT AND OPERATIONS

#### OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

*For necessary expenses of the Office of the Secretary of Homeland Security, as authorized by section 102 of the Homeland Security Act of 2002 (6 U.S.C. 112), and executive management of the Department of Homeland Security, as authorized by law, $147,818,000: Provided, That not to exceed $60,000 shall be for official reception and representation expenses, of which $20,000 shall*

52–547

37

ances and benefits similar to those provided under chapter 9 of title
I of the Foreign Service Act of 1990 (22 U.S.C. 4081 et seq.).

SEC. 547. Section 401(b) of the Illegal Immigration Reform and
Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note) is
amended by striking "at the end of the 11-year period beginning on
the first day the pilot program is in effect." and inserting "on Sep-
tember 30, 2012.".

SEC. 548. Section 610(b) of the Departments of Commerce, Jus-
tice, and State, the Judiciary, and Related Agencies Appropriations
Act, 1993 (8 U.S.C. 1153 note) is amended by striking "for 15 years"
and inserting "until September 30, 2012".

SEC. 549. (a) In addition to collection of registration fees de-
scribed in section 244(c)(1)(B) of the Immigration and Nationality
Act (8 U.S.C. 1254a(c)(1)(B)), fees for fingerprinting services, bio-
metric services, and other necessary services may be collected when
administering the program described in section 244 of such Act.

(b) Subsection (a) shall be construed to apply for fiscal year
1998 and each fiscal year thereafter.

SEC. 550. Section 550(b) of the Department of Homeland Secu-
rity Appropriations Act, 2007 (Public Law 109–295; 6 U.S.C. 121
note) is amended by striking "three years after the date of enactment
of this Act" and inserting "on October 4, 2010".

SEC. 551. (a)(1) Sections 401(c)(1), 403(a), 403(b)(1), 403(c)(1),
and 405(b)(2) of the Illegal Immigration Reform and Immigrant Re-
sponsibility Act of 1996 (division C of Public Law 104–208; 8 U.S.C.
1324a note) are amended by striking "basic pilot program" each
place that term appears and inserting "E-Verify Program".

(2) The heading of section 403(a) of the Illegal Immigration Re-
form and Immigrant Responsibility Act of 1996 is amended by
striking "Basic Pilot" and inserting "E-Verify".

(b) Section 404(h)(1) of the Illegal Immigration Reform and Im-
migrant Responsibility Act of 1996 (Public Law 104–208; 8 U.S.C.
1324a note) is amended by striking "under a pilot program" and in-
serting "under this subtitle".

SEC. 552. (a) None of the funds made available in this or any
other Act may be used to release an individual who is detained, as
of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into
the continental United States, Alaska, Hawaii, or the District of Co-
lumbia, into any of the United States territories of Guam, American
Samoa (AS), the United States Virgin Islands (USVI), the Common-
wealth of Puerto Rico and the Commonwealth of the Northern Mar-
iana Islands (CNMI).

(b) None of the funds made available in this or any other Act
may be used to transfer an individual who is detained, as of June
24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the conti-
nental United States, Alaska, Hawaii, or the District of Columbia,
into any of the United States territories of Guam, American Samoa
(AS), the United States Virgin Islands (USVI), the Commonwealth
of Puerto Rico and the Commonwealth of the Northern Mariana Is-
lands (CNMI), for the purpose of detention, except as provided in
subsection (c).

(c) None of the funds made available in this or any other Act
may be used to transfer an individual who is detained, as of June
24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the conti-
nental United States, Alaska, Hawaii, or the District of Columbia,

130

Section 548. The conference agreement includes a new provision proposed by the Senate that extends the EB–5 visa program for three years. The House proposed no similar provision.

Section 549. The conference agreement includes a new provision proposed by the House that clarifies fees for fingerprinting, biometric services, and other necessary services may be collected as part of section 244 of the Immigration and Nationality Act. The Senate proposed no similar provision.

Section 550. The conference agreement includes a new provision proposed by the House and Senate that extends the risk based security standards for chemical facilities cited in Section 550 of P.L. 109–295 by one year.

Section 551. The conference agreement includes a new provision proposed by the Senate that renames "basic pilot program" as "E-Verify Program". The House proposed no similar provision.

Section 552. The conference agreement includes and modifies a new provision proposed by the House on the individuals detained at the Naval Station, Guantanamo Bay, Cuba. The Senate had no similar provision.

Section 553. The conference agreement includes a new provision proposed by the House that requires the names of individuals detained at the Naval Station, Guantanamo Bay, Cuba to be included on the No Fly List. The Senate proposed no similar provision.

Section 554. The conference agreement includes a new provision proposed by the House and Senate permitting the collection of fees for conferences, seminars, exhibits, symposiums, or similar meetings and requires an annual report on the level of collection by the Department.

Section 555. The conference agreement includes a new provision proposed by the Senate defining rural areas for purposes of section 210C of the Homeland Security Act of 2002. The House proposed no similar provision.

Section 556. The conference agreement includes a new provision proposed by the House prohibiting funds in this Act to be used for first-class travel. The Senate proposed no similar provision.

Section 557. The conference agreement includes and modifies a new provision proposed by the House prohibiting funds in this Act to be used for adverse personnel actions for employees who use protective equipment or measures, including surgical masks, N95 respirators, gloves, or hand-sanitizers in the conduct of their official duties. The Senate proposed no similar provision.

Section 558. The conference agreement includes a new provision proposed by the House prohibiting funds in this Act to be used to employ workers in contravention of section 274A(h)(3) of the Immigration and Nationality Act. The Senate proposed no similar provision.

Section 559. The conference agreement includes and modifies a new provision proposed by the Senate that prohibits the use of funds for LORAN–C after January 4, 2010, if the Commandant certifies termination will not adversely impact maritime safety and the Secretary certifies that LORAN–C is not needed as a backup to the Global Positioning System (GPS). The certifications must be submitted to the Committees on Appropriations. If such certifi-

June 24, 2009     CONGRESSIONAL RECORD—HOUSE     H7179

The result of the vote was announced as above recorded.

### GENERAL LEAVE

Mr. PRICE of North Carolina. Madam Speaker, I ask unanimous consent that all Members may have 5 legislative days in which to revise and extend their remarks and include extraneous material on H.R. 2892, and that I may include tabular material on the same bill.

The SPEAKER pro tempore (Mrs. DAVIS of California). Is there objection to the request of the gentleman from North Carolina?

There was no objection.

### DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2010

The SPEAKER pro tempore. Pursuant to House Resolution 573 and rule XVIII, the Chair declares the House in the Committee of the Whole House on the State of the Union for the consideration of the bill, H.R. 2892.

□ 1536

IN THE COMMITTEE OF THE WHOLE

Accordingly, the House resolved itself into the Committee of the Whole House on the State of the Union for the consideration of the bill (H.R. 2892) making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2010, and for other purposes, with Ms. DEGETTE in the chair.

The Clerk read the title of the bill.

The CHAIR. Pursuant to the rule, the bill is considered read the first time. The gentleman from North Carolina (Mr. PRICE) and the gentleman from Kentucky (Mr. ROGERS) each will control 30 minutes.

The Chair recognizes the gentleman from North Carolina.

Mr. PRICE of North Carolina. Madam Chair, I am pleased to present the fiscal year 2010 Homeland Security Appropriations bill, as reported by the Homeland Security Appropriations Subcommittee. It is the product of extensive information gathering and analysis, with 15 hearings touching every Department of Homeland Security component. The bill provides the resources and the direction that the Department needs for the coming fiscal year.

This bill also reflects our subcommittee's tradition of bipartisan cooperation initiated by its first chairman and now ranking member, HAL ROGERS. I want to thank the distinguished ranking member for his advice and help on making this a better bill, and to his staff, too, for working so closely and constructively with us. We agree on most of this bill, if not every item, and I believe this is a bill that every Member in this body can get behind.

In total, the bill contains $42.625 billion in discretionary appropriations for the Department of Homeland Security.

This is $2.6 billion, or 6.5 percent, above the comparable fiscal year 2009 amount, and about 1 percent below the administration request, excluding Coast Guard overseas contingency operations. This level reflects our share of the $10 billion cut made in the budget resolution to the administration's overall request.

Homeland security requires identification and response to all threats, whether man-made or natural. This "all-hazards" approach is the hallmark of our subcommittee, an approach we are happy to see President Obama and Secretary Napolitano embrace. The persistent threat of pandemic flu is an unmistakable reminder of why we must prepare for all hazards, as is the annual and predictable onslaught of natural disasters, from hurricanes and floods to wildfires and ice storms. Accordingly, this bill will enable our government to better protect the American people against all major threats.

Appropriately for the start of hurricane season, the bill maintains a robust $844 million for FEMA management and administration, and $2 billion for disaster relief. In addition, the bill and report specifically place FEMA at the forefront of disaster response management, thereby avoiding confusion when working with our State and local partners.

State and local emergency managers and first responders are equal partners in disaster preparedness and response, and I am pleased that the administration's budget request recognizes this important partnership. This bill strengthens our commitment to our State and local partners by providing $3.96 billion for grant and training programs, including: $330 million for Emergency Management Performance Grants, our one true all-hazards grant program; $950 million for State homeland security grants; $887 million for the Urban Area Security Initiative, which targets the highest risks of terrorism; and $800 million for firefighter assistance grants.

Within that $800 million for firefighter assistance grants, $420 million is for SAFER staffing grants, or personnel grants, and $380 million is for basic equipment and training grants. The additional funding for SAFER is part of a targeted and temporary effort to stem the tide of layoffs and ensure our communities are protected by an adequate number of firefighters.

In addition to the increased funding, the supplemental appropriations bill just passed allows the waiver of certain restrictions and broadens the use of SAFER to allow the grants to be used for the hiring, rehiring and retention of firefighters for fiscal years 2009 and 2010.

Madam Chairman, one could make an argument for increasing nearly any account in this bill; but since we can't spend the whole Federal Treasury on homeland security, we must base our priorities on risk. The subcommittee has done this with respect to the iden-

tification and removal of illegal aliens who have committed crimes; in other words, illegal aliens who have proven their capacity to do harm in our communities.

The bill continues the tradition of recent bills by targeting $1.5 billion of Immigration and Customs Enforcement appropriations for this priority, an effort that the President and Secretary Napolitano wholeheartedly support.

Part of this funding furthers development of the Secure Communities program, which offers a productive approach for Federal immigration agents to work closely with State and local law enforcement while distinguishing the traditional Federal role of enforcing immigration law from the local role of prosecuting criminal violations. We have heard from many law enforcement and community groups about the importance of keeping a bright line between immigration enforcement and local community policing, and the Secure Communities program does just that.

Taking on the international drug cartels along our southwest border is another major priority we support in this bill. The bill enhances funding for CBP and ICE to combat illegal narcotics smuggling from Mexico and the cartels' trafficking in weapons and bulk currency. The bill supports a realistic and strategic approach to southwest border infrastructure and maintains a historically robust Border Patrol force.

Other specific priorities we have funded included: $800 million for explosive detection systems at airports and $122.6 million for air cargo security to meet the 100 percent screening requirement for air cargo in the hold of passenger planes by August of 2010; $804 million to continue developing systems to screen inbound land- and sea-based cargo for weapons or nuclear materials, which includes $162 million to strengthen overseas operations to monitor and target cargo; $241.5 million for the Coast Guard to support overseas contingencies in the Persian Gulf and off the coast of Somalia; $382 million for cybersecurity, to help protect vulnerable computer infrastructure from the escalating sophistication and intensity of cyberattacks; and $10 million above the administration's request to expand the Alternatives to Detention program nationwide. Alternatives to Detention is a cost-effective alternative for low-risk individuals such as asylum seekers, families, and the elderly.

The bill includes several policy items requested by the administration. It clarifies fee authorities for temporary protected status petitions and visa fraud investigations; it extends the E-Verify program for 2 years; and it continues a longstanding provision related to imported prescription drugs.

As it did last year, this bill contains Member-requested and Presidential earmarks. Each Member's project has

| 111TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>111–157 |
|---|---|---|

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS BILL, 2010

JUNE 16, 2009.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. PRICE of North Carolina, from the Committee on Appropriations, submitted the following

# R E P O R T

together with

# ADDITIONAL VIEWS

[To accompany H.R. 2892]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2010.

### INDEX TO BILL AND REPORT

| | Page number | |
|---|---|---|
| | Bill | Report |
| TITLE I—DEPARTMENTAL MANAGEMENT AND OPERATIONS | | |
| Office of the Secretary and Executive Management | 2 | 14 |
| Office of the Under Secretary for Management | 2 | 20 |
| Office of the Chief Financial Officer | 3 | 24 |
| Office of the Chief Information Officer | 3 | 26 |
| Analysis and Operations | 4 | 28 |
| Office of the Federal Coordinator for Gulf Coast Rebuilding | 4 | 29 |
| Office of Inspector General | 5 | 30 |
| TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS | | |
| U.S. Customs and Border Protection | 5 | 32 |
| Salaries and Expenses | 5 | 32 |
| Automation Modernization | 7 | 40 |
| Border Security Fencing, Infrastructure, and Technology | 7 | 41 |
| Air and Marine Interdiction, Operations, Maintenance, and Procurement | 14 | 46 |

132

chose to become Americans. The Committee notes the unprecedented demand from approximately 700 non-profit and immigrant-serving organizations that filed notices of intent to apply for the $1,200,000 appropriated for immigration integration grants in fiscal year 2009. As a result, the Committee provides $11,000,000 for this program in 2010, $1,000,000 more than requested. These additional funds shall be used by the USCIS Office of Citizenship to hire up to 10 additional staff to support the review, award, and oversight of the grants and other activities related to immigration integration.

### VISA FRAUD

The budget included a request to expand the use of H and L Visa Fraud collections to include fraud investigations in other programs, pursuant to the priorities identified by the Fraud Detection and National Security Division of USCIS. The Committee has included this revision in the general provisions section of the Bill.

### CHANGES TO FEES CHARGED TO TEMPORARY PROTECTED STATUS APPLICANTS

The budget included a request to raise the statutorily-capped $50 application fee for those seeking Temporary Protected Status (TPS), and to clarify that USCIS is permitted to charge TPS applicants for related application services such as fingerprint collection. In the general provisions section of the Bill, the Committee has clarified that USCIS is allowed to charge fees for services related to TPS applications. The Committee has not acted to raise the $50 application charge since Congress has determined in the past that this humanitarian program should be available for a modest fee.

### NATURALIZATION CEREMONIES

The Committee directs USCIS to identify, in the 2011 budget submission, all funds allocated to naturalization and oath of allegiance ceremonies. In addition, the Committee directs USCIS to work with local public and private groups to ensure that naturalization and oath of allegiance ceremonies are held as part of Independence Day celebrations.

### FEDERAL LAW ENFORCEMENT TRAINING CENTER

#### SALARIES AND EXPENSES

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $246,530,000 |
| Budget estimate, fiscal year 2010 | 245,356,000 |
| Recommended in the bill | 239,356,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | −7,174,000 |
| Budget estimate, fiscal year 2010 | −6,000,000 |

#### MISSION

The Federal Law Enforcement Training Center (FLETC) provides the necessary facilities, equipment, and support services to conduct advanced, specialized, and refresher training for Federal law enforcement personnel. Specifically, FLETC serves as an interagency law enforcement training organization for over 80 Federal agencies with personnel located throughout the United States and